**No. 25-2349**

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

ANNE PRAMAGGIORE,

*Defendant-Appellant*.

_____

On Appeal from the United States District Court
for the Northern District of Illinois,
No. 20-cr-00812-2

_____

## BRIEF AND REQUIRED SHORT APPENDIX FOR
## DEFENDANT-APPELLANT ANNE PRAMAGGIORE

_____

Oral Argument Requested

_____

SCOTT R. LASSAR
DANIEL C. CRAIG
JENNIFER M. WHEELER
EMILY R. WOODRING
JOAN E. JACOBSON
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603

PAUL D. CLEMENT
  *Counsel of Record*
ANDREW C. LAWRENCE
KEVIN WYNOSKY
JULIA GRANT*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Supervised by principals of the firm who are
members of the Virginia bar

*Counsel for Defendant-Appellant Anne Pramaggiore*

November 14, 2025

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Defendant-Appellant furnishes the following statement in compliance with Circuit Rule 26.1:

(1)     The full name of every party that the attorney represents in the case:

Anne Pramaggiore

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Sidley Austin LLP

Clement & Murphy, PLLC

(3)     If the party or amicus is a corporation:

i)     Identify all its parent corporations, if any:

N/A

ii)     List any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

CLEMENT & MURPHY, PLLC

s/Paul D. Clement
Paul D. Clement

*Counsel for Defendant-Appellant*
*Anne Pramaggiore*

November 14, 2025

i

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Defendant-Appellant furnishes the following statement in compliance with Circuit Rule 26.1:

(1)    The full name of every party that the attorney represents in the case:

Anne Pramaggiore

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Sidley Austin LLP

Clement & Murphy, PLLC

(3)    If the party or amicus is a corporation:

i)    Identify all its parent corporations, if any:

N/A

ii)    List any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

CLEMENT & MURPHY, PLLC

s/Andrew C. Lawrence
Andrew C. Lawrence

*Counsel for Defendant-Appellant*
*Anne Pramaggiore*

November 14, 2025

ii

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Defendant-Appellant furnishes the following statement in compliance with Circuit Rule 26.1:

(1)    The full name of every party that the attorney represents in the case:

Anne Pramaggiore

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Sidley Austin LLP

Clement & Murphy, PLLC

(3)    If the party or amicus is a corporation:

i)    Identify all its parent corporations, if any:

N/A

ii)    List any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

CLEMENT & MURPHY, PLLC

s/Kevin Wynosky
Kevin Wynosky

*Counsel for Defendant-Appellant*
*Anne Pramaggiore*

November 14, 2025

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Defendant-Appellant furnishes the following statement in compliance with Circuit Rule 26.1:

(1)     The full name of every party that the attorney represents in the case:

Anne Pramaggiore

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Sidley Austin LLP

Clement & Murphy, PLLC

(3)     If the party or amicus is a corporation:

i)      Identify all its parent corporations, if any:

N/A

ii)     List any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

CLEMENT & MURPHY, PLLC

s/Julia Grant
Julia Grant

*Counsel for Defendant-Appellant*
*Anne Pramaggiore*

November 14, 2025

iv

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Defendant-Appellant furnishes the following statement in compliance with Circuit Rule 26.1:

(1)    The full name of every party that the attorney represents in the case:

Anne Pramaggiore

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Sidley Austin LLP

Clement & Murphy, PLLC

(3)    If the party or amicus is a corporation:

i)    Identify all its parent corporations, if any:

N/A

ii)    List any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

SIDLEY AUSTIN LLP

s/Scott R. Lassar
Scott R. Lassar

*Counsel for Defendant-Appellant*
*Anne Pramaggiore*

November 14, 2025

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Defendant-Appellant furnishes the following statement in compliance with Circuit Rule 26.1:

(1)     The full name of every party that the attorney represents in the case:

Anne Pramaggiore

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Sidley Austin LLP

Clement & Murphy, PLLC

(3)     If the party or amicus is a corporation:

i)      Identify all its parent corporations, if any:

N/A

ii)     List any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

SIDLEY AUSTIN LLP

s/Daniel C. Craig
Daniel C. Craig

*Counsel for Defendant-Appellant*
*Anne Pramaggiore*

November 14, 2025

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Defendant-Appellant furnishes the following statement in compliance with Circuit Rule 26.1:

(1)  The full name of every party that the attorney represents in the case:

Anne Pramaggiore

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Sidley Austin LLP

Clement & Murphy, PLLC

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any:

N/A

ii)  List any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

SIDLEY AUSTIN LLP

s/Jennifer M. Wheeler
Jennifer M. Wheeler

*Counsel for Defendant-Appellant
Anne Pramaggiore*

November 14, 2025

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Defendant-Appellant furnishes the following statement in compliance with Circuit Rule 26.1:

(1)    The full name of every party that the attorney represents in the case:

Anne Pramaggiore

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Sidley Austin LLP

Clement & Murphy, PLLC

(3)    If the party or amicus is a corporation:

i)    Identify all its parent corporations, if any:

N/A

ii)    List any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

SIDLEY AUSTIN LLP

s/Emily R. Woodring
Emily R. Woodring

*Counsel for Defendant-Appellant
Anne Pramaggiore*

November 14, 2025

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Defendant-Appellant furnishes the following statement in compliance with Circuit Rule 26.1:

(1)    The full name of every party that the attorney represents in the case:

Anne Pramaggiore

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Sidley Austin LLP

Clement & Murphy, PLLC

(3)    If the party or amicus is a corporation:

i)    Identify all its parent corporations, if any:

N/A

ii)    List any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

SIDLEY AUSTIN LLP

s/Joan E. Jacobson
Joan E. Jacobson

*Counsel for Defendant-Appellant*
*Anne Pramaggiore*

November 14, 2025

## TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................... xii

REQUEST FOR ORAL ARGUMENT.................................................. xviii

INTRODUCTION ................................................................................. 1

JURISDICTIONAL STATEMENT ....................................................... 5

STATEMENT OF THE ISSUES .......................................................... 5

STATEMENT OF THE CASE............................................................... 5

     A.     Factual Background.................................................... 5

     B.     Procedural History.................................................... 12

          1.     Indictment ................................................... 12

          2.     Trial and conviction .................................... 16

          3.     The Supreme Court's *Snyder* and *Thompson* decisions undermine the convictions ........................................ 20

          4.     Sentencing. .................................................. 21

          5.     Bail pending appeal proceedings ............................. 22

SUMMARY OF ARGUMENT.............................................................. 23

STANDARD OF REVIEW ................................................................... 26

ARGUMENT ....................................................................................... 27

I.     The District Court Should Have Vacated All Of Pramaggiore's Convictions, Not Just Her Bribery Convictions, In Light Of *Snyder* .......... 27

     A.     The Conspiracy Conviction May Have Rested on the Two Legally Flawed Bribery Objects of the Conspiracy........................... 27

     B.     The FCPA Convictions Likely Resulted From an Improper Application of *Pinkerton*, and Those Convictions Fail on Their Own Terms in Any Event ....................................... 35

II.    *Thompson* Independently Forecloses Pramaggiore's Remaining Convictions. ........................................................................ 39

    A.    The District Court Should Have Acquitted Pramaggiore of All Remaining Charges in Light of *Thompson* ........................................ 39

        1.    The FCPA convictions are invalid because none of the books and records are false under *Thompson* .......................... 39

        2.    The conspiracy conviction is independently invalid because the only conspiracy object remaining after *Thompson* is legally flawed ...................................................... 49

    B.    At a Minimum, The District Court Should Have Ordered a New Trial on All Remaining Counts in Light of *Thompson* .............. 53

        1.    After *Thompon* and *Snyder*, the conspiracy conviction may have rested on three flawed objects ................................ 53

        2.    The FCPA convictions likely resulted from an application of *Pinkerton*, and the government's misstatements of law regarding falsity at trial compound the problems. ........................................................... 55

III.    The District Court Committed At Least Two Other Errors That Warrant Retrial Or Resentencing .................................................... 58

    A.    The District Court Improperly Excluded Relevant *Mens Rea* Evidence ................................................................................. 58

    B.    The District Court Improperly Imposed a Prison Sentence in Violation of the FCPA's No Knowledge Clause ............................... 61

CONCLUSION ...................................................................................... 63

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(d)

CERTIFICATE OF SERVICE

SHORT APPENDIX

# TABLE OF AUTHORITIES

**Cases**

*Carella v. California*,
491 U.S. 263 (1989)..................................................................29

*Chapman v. California*,
386 U.S. 18 (1967)....................................................................55

*Emery v. Am. Gen. Fin., Inc.*,
71 F.3d 1343 (7th Cir. 1995)......................................................40

*Erlinger v. United States*,
602 U.S. 821 (2024)..................................................................28

*Evans v. Jones*,
996 F.3d 766 (7th Cir. 2021)......................................................56

*Griffin v. United States*,
502 U.S. 46 (1991)....................................................................38

*Hedgpeth v. Pulido*,
555 U.S. 57 (2008)............................................................ 28, 30

*Hulce v. Zipongo Inc.*,
132 F.4th 493 (7th Cir. 2025)....................................................46

*In re FirstEnergy Corp. Sec. Litig.*,
149 F.4th 587 (6th Cir. 2025)....................................................47

*Jensen v. Clements*,
800 F.3d 892 (7th Cir. 2015)............................................. 30, 54

*Jewell v. Boughton*,
90 F.4th 1199 (7th Cir. 2024)....................................................34

*Jones v. Basinger*,
635 F.3d 1030 (7th Cir. 2011) ........................................... 30, 32

*Kelly v. United States*,
590 U.S. 391 (2020)....................................................................1

*Kolender v. Lawson*,
461 U.S. 352 (1983)................................................................51

*Krulewitch v. United States*,
336 U.S. 440 (1949)................................................................35

*Macquarie Infrastructure Corp. v. Moab Partners, L. P.*,
601 U.S. 257 (2024)................................................................48

*McConville v. SEC*,
465 F.3d 780 (7th Cir. 2006)................................................................50

*MCI Telecomm. Corp. v. AT&T Co.*,
512 U.S. 218 (1994)................................................................47

*Perrin v. United States*,
444 U.S. 37 (1979)................................................................46

*Pinkerton v. United States*,
328 U.S. 640 (1946)................................................................18

*Ruan v. United States*,
597 U.S. 450 (2022)................................................................60

*Ruiz v. United States*,
990 F.3d 1025 (7th Cir. 2021)................................................ 30, 54

*SEC v. SolarWinds Corp.*,
741 F.Supp.3d 37 (S.D.N.Y. 2024) ................................................................50

*SEC v. World-Wide Coin Invs., Ltd.*,
567 F.Supp.724 (N.D. Ga. 1983) ................................................................50

*Skilling v. United States*,
561 U.S. 358 (2010)................................................................ *passim*

*Snyder v. United States*,
603 U.S. 1 (2024)................................................ 3, 5, 20

*Sorich v. United States*,
709 F.3d 670 (7th Cir. 2013)................................................ 31, 35

*Sullivan v. Louisiana*,
    508 U.S. 275 (1993).................................................................. 30, 36

*Thompson v. United States*, |
    604 U.S. 408 (2025).................................................................. *passim*

*Turner v. United States*,
    693 F.3d 756 (7th Cir. 2012)...................................................31

*United States v. Behrens*,
    644 F.3d 754 (8th Cir. 2011)....................................................61

*United States v. Borrero*,
    771 F.3d 973 (7th Cir. 2014).....................................................56

*United States v. Brown*,
    135 F.4th 1102 (7th Cir. 2025)..................................................26

*United States v. Brown*,
    865 F.3d 566 (7th Cir. 2017).....................................................58

*United States v. Dick*,
    744 F.2d 546 (7th Cir. 1984).....................................................40

*United States v. Edwards*,
    869 F.3d 490 (7th Cir. 2017)................................................ 31, 34, 54

*United States v. Ellis*,
    50 F.3d 419 (7th Cir. 1995).......................................................40

*United States v. Erickson*,
    601 F.2d 296 (7th Cir. 1979)......................................................45

*United States v. Freed*,
    921 F.3d 716 (7th Cir. 2019)......................................................40

*United States v. Gaudin*,
    515 U.S. 506 (1995)................................................................28

*United States v. Gustafson*,
    130 F.4th 608 (7th Cir. 2025).....................................................27

*United States v. Hatfield*,
  591 F.3d 945 (7th Cir. 2010)........................................................................54

*United States v. Hwa*,
  No. 18-cr-538 (E.D.N.Y. filed Mar. 26, 2022)............................................49

*United States v. Mahkimetas*,
  991 F.2d 379 (7th Cir. 1993)........................................................................49

*United States v. Murphy*,
  406 F.3d 857 (7th Cir. 2005)........................................................................46

*United States v. Newman*,
  755 F.3d 543 (7th Cir. 2014)........................................................................35

*United States v. Pacilio*,
  85 F.4th 450 (7th Cir. 2023)........................................................................27

*United States v. Peak*,
  856 F.2d 825 (7th Cir. 1988)........................................................................61

*United States v. Reyes*,
  577 F.3d 1069 (9th Cir. 2009)......................................................................61

*United States v. Robinson*,
  724 F.3d 878 (7th Cir. 2013)........................................................................37

*United States v. Sarno*,
  37 F.4th 1249 (7th Cir. 2022)......................................................................27

*United States v. Segal*,
  644 F.3d 364 (7th Cir. 2011)........................................................................30

*United States v. Smith*,
  223 F.3d 554 (7th Cir. 2000)........................................................................35

*United States v. Sun-Diamond Growers of Cal.*,
  526 U.S. 398 (1999)........................................................................................6

*United States v. Van Eyl*,
  468 F.3d 428 (7th Cir. 2006)........................................................................60

*United States v. Walls,*
225 F.3d 858 (7th Cir. 2000)..................................................................36

*United States v. Yates,*
16 F.4th 256 (9th Cir. 2021)...................................................................38

*Van Buren v. United States,*
593 U.S. 374 (2021)................................................................................52

*Whitehead v. Cowan,*
263 F.3d 708 (7th Cir. 2001)..................................................................56

*Yates v. United States,*
354 U.S. 298 (1957)........................................................ 28, 29, 30, 50

*Zant v. Stephens,*
462 U.S. 862 (1983)................................................................................29

## Constitutional Provision

U.S. Const. amend. VI ...........................................................................28

## Statutes

15 U.S.C. §45b(b)(2)..............................................................................42

15 U.S.C. §77g(b)(1)...............................................................................42

15 U.S.C. §78ff(a)...................................................................... 5, 14, 21, 61

15 U.S.C. §78m(b)(2) ................................................................ 14, 50, 58

15 U.S.C. §78m(b)(5) ................................................................... *passim*

18 U.S.C. §77q(a)(2)...............................................................................41

18 U.S.C. §666............................................................................... 2, 13

18 U.S.C. §666(a)(2)...............................................................................13

18 U.S.C. §1014.......................................................................................41

18 U.S.C. §1038a......................................................................................41

18 U.S.C. §1371.......................................................................................58

18 U.S.C. §1515(b) ................................................................................41

18 U.S.C. §3231 ......................................................................................5

28 U.S.C. §1291 ......................................................................................5

Pub. L. 100-418, §5002, Aug. 23, 1988, 102 Stat. 1107...........................46

**Other Authorities**

Black's Law Dictionary (5th ed. 1979)............................................... 41, 50

Black's Law Dictionary (12th ed. 2024)...............................................28

Open Secrets, *Federal and State Lobbying*,
  https://tinyurl.com/4tvz82fx ...........................................................6

Oxford English Dictionary (2d ed. 1989) ...............................................41

## REQUEST FOR ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a) and Circuit Rule 34(f), Defendant-Appellant Anne Pramaggiore respectfully submits that oral argument will aid the Court's resolution of this case.

## INTRODUCTION

This appeal arises from the latest ill-advised effort by federal prosecutors to stray beyond cases of actual fraud and *quid-pro-quo* bribes in an effort to impose vague "standards of disclosure and good government for local and state officials." *Kelly v. United States*, 590 U.S. 391, 399 (2020).  The Supreme Court has repeatedly admonished such prosecutorial overreaching, and after trial, it issued a pair of opinions reversing decisions from this Court that should have doomed all the government's criminal charges against Appellant Anne Pramaggiore relating to a purported state-level "bribery" scheme that was missing proof of any actual bribery.  Although Judge Shah—who presided over this case during the post-trial phase after Judge Leinenweber's passing—correctly recognized that the Supreme Court's insistence that the government prove an actual *quid pro quo* left him no choice but to vacate the four substantive "bribery" counts, he salvaged the remainder of the government's case and left Pramaggiore convicted of five felony counts and facing a multi-year prison sentence—even though all five remaining convictions implicate the same flawed bribery theory and are irreconcilable with the Supreme Court's second intervening decision to boot.  That unprecedented result cannot stand.  The Court should vacate all of Pramaggiore's remaining convictions or acquit.

Between 2012 and 2018, Pramaggiore served as the CEO of the largest utility company in Illinois—Commonwealth Edison (ComEd).  Utility companies are

generally subject to close government regulation, and ComEd is no exception. As a result, ComEd has historically employed numerous lobbyists to protect and advance its interests at the state and local levels, including lobbyists with connections to powerful government officials like Michael Madigan, who served as the Speaker of the Illinois House of Representatives for nearly four decades. Such activity is not only a practical necessity for a utility company; it is protected by the Constitution's Petition Clause. Like other politicians, Madigan periodically made recommendations to ComEd lobbyists about individuals and firms that the company should consider hiring. ComEd sometimes listened to those recommendations and ignored others. As relevant here, over the course of an eight-year stretch that started before and ended after Pramaggiore's stint as CEO, ComEd worked with a Madigan-recommended law firm, welcomed an individual recommended by Madigan and others onto its Board of Directors, hired summer interns from Madigan's legislative district, and retained as subcontractors four Madigan-recommended lobbyists.

In 2020, federal prosecutors converted these anodyne lobbying practices into a grand jury indictment charging Pramaggiore and three others with multiple felonies. The crux of the indictment alleged that Pramaggiore committed four violations of a federal bribery statute—18 U.S.C. §666—on the theory that ComEd gave things of value to Madigan *after* the Illinois legislature enacted some legislation consistent with ComEd's interests. In addition, the government alleged that

2

Pramaggiore knowingly committed four domestic violations of obscure provisions of the Foreign Corrupt Practices Act (FCPA) because ComEd supposedly falsified its books and records by failing to disclose supposed bribe payments in corporate documents that otherwise affirmatively told the truth.  Finally, the government charged Pramaggiore with a conspiracy tying all the substantive counts together.

Over the course of four years, the government repeatedly minimized what it needed to prove over Pramaggiore's repeated objections.  As to the §666 counts, the government asserted that a gratuity, rather than an actual *quid pro quo*, would suffice. As to the FCPA counts, factually true, but misleading, statements were enough.  And the government demanded a *Pinkerton* instruction to lighten its burden further. Those efforts had some support in circuit precedent, but neither that circuit law nor the government's case can survive two intervening Supreme Court decisions.

First, in *Snyder v. United States*, 603 U.S. 1 (2024), the Supreme Court reversed a decision from this Court and held that §666 criminalizes only traditional *quid-pro-quo* bribery, not after-the-fact gratuities.  Second, in *Thompson v. United States*, 604 U.S. 408 (2025), the Supreme Court reversed another decision from this Court and held that false-statement statutes do not criminalize true albeit misleading statements.  Despite recognizing that *Snyder* devastated the §666 counts, the district court minimized the impact of *Thompson* and salvaged the government's case by leaving the FCPA and conspiracy convictions standing, even though both depended

on the notion that the payments were bribes that needed to be concealed. The upshot is that Pramaggiore is currently scheduled to spend two years in federal prison and pay a hefty fine based entirely on the FCPA tail of the government's §666 dog—an extraordinary result that, to our knowledge, has no historical precedent.

The district court's judgment is indefensible. *Snyder* alone requires vacating all nine counts. This case was tried as a scheme to "bribe" and conceal, and the government's concededly invalid theory that a gratuity was a bribe infected every count, especially in light of the *Pinkerton* instruction. Moreover, *Thompson* independently forecloses the non-§666 counts, as they all hinge on the rejected proposition that literally true statements can nonetheless be false and the basis for a felony conviction. And the errors do not end there. From start to finish, the government tried to minimize its burden and exclude exculpatory evidence that contradicted its preconceived narrative. Unlike cases where the Supreme Court has vindicated the need for the government to actually prove its case, this case does not involve Rolexes or contracts for a government official's side business. It involves the quotidian (and constitutionally protected) practices like hiring a former staffer to lobby a government official. This prosecution should have never been brought, and it certainly cannot survive the twin blows of *Snyder* and *Thompson*. The district court's contrary conclusions are wrong across the board. This Court should reverse the judgment below and either order a new trial or a judgment of acquittal.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. §3231. That court entered a judgment of conviction and sentence on July 21, 2025, *see* D.Ct.Dkt.467, and Pramaggiore timely filed a notice of appeal on August 4, 2025, *see* D.Ct.Dkt.489. This Court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

1.  Whether the district court erred in refusing to grant Pramaggiore a new trial on all nine counts in light of *Snyder v. United States*, 603 U.S. 1 (2024).

2.  Whether the district court erred in refusing to grant Pramaggiore a judgment of acquittal or a new trial on the FCPA and conspiracy counts in light of *Thompson v. United States*, 604 U.S. 408 (2025).

3.  Whether the district court erred in excluding relevant *mens rea* evidence.

4.  Whether the district court violated 15 U.S.C. §78ff(a) by imposing on Pramaggiore a sentence that includes a term of imprisonment.

## STATEMENT OF THE CASE

**A.  Factual Background**

Born and raised in Ohio, Anne Pramaggiore is a 67-year-old wife, mother, and professional pathmarker. *See* D.Ct.Dkt.442.at.2-3. After moving to Chicago to support her husband's career, Pramaggiore attended law school at DePaul, served as a law clerk on the U.S. District Court for the District of Illinois, made partner at a

Chicago law firm, and ultimately moved in-house to ComEd—the largest utility company in Illinois. *See* D.Ct.Dkt.442.at.2-3. In March 2012, after years of impressing colleagues and employees, Pramaggiore shattered the ultimate glass ceiling by being appointed CEO—ComEd's first and only female CEO in its nearly 120-year history. *See* D.Ct.Dkt.442.at.3. Pramaggiore served in that position until May 2018, when ComEd's parent company—Exelon Corp., which provides energy to customers in multiple states—appointed her CEO to run its even more extensive operations. *See* D.Ct.Dkt.245.at.9.

This prosecution concerns events at ComEd between 2011 and 2019, a period that coincided with Pramaggiore's transformation of ComEd into one of the most dependable businesses in the industry after a sustained period of decline—all without raising rates for customers. *See* Tr.3936-37. "As a utility, ComEd was subject to extensive regulation by the State of Illinois." D.Ct.Dkt.1.at.1. Accordingly, like virtually every other major company subject to extensive government regulation, *see* Open Secrets, *Federal and State Lobbying*, https://tinyurl.com/4tvz82fx (last visited Nov. 14, 2025), ComEd employed a "large team" of lobbyists, Tr.2347, to interact with government officials and "to build a reservoir of goodwill" for the company, as the law allows, *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 405 (1999); *see* Tr.361. ComEd's lobbying team included Michael McClain, who began lobbying for the company after serving

in the Illinois House of Representatives from 1973 to 1983.  *See* D.Ct.Dkt.1.at.9; Tr.281.  The team included John Hooker, who worked with McClain while serving as ComEd's head of government affairs and after his retirement, when he worked as an external lobbyist for ComEd.  *See* D.Ct.Dkt.1.at.10; Tr.4333-34.

During his time of service in the Illinois House of Representatives, McClain befriended Madigan, the powerful Speaker of the Illinois House of Representatives between 1983 and 2021.  *See* D.Ct.Dkt.245.at.17.  Due to that connection, McClain "was [the] lobbyist to the Speaker" for ComEd.  Tr.4330-31.  McClain therefore regularly communicated with Madigan, and during some of those discussions, Madigan recommended individuals or firms for roles at ComEd.  *See* Tr.4579. ComEd, in turn, sometimes took those recommendations into account, and other times rejected them.  *See* Tr.2566.1401-04.  Four categories of ComEd employment decisions, along with some associated documents, gave rise to this prosecution.

*First*, ComEd retained the services of a Madigan-recommended law/lobbying firm named Reyes Kurson.  *See* D.Ct.Dkt.1.at.14-16; Tr.1176-81.  That relationship started in 2011, when ComEd entered into an agreement that guaranteed the firm a certain amount of billable hours annually.  *See* Tr.1176-81.  Pramaggiore—who had not yet assumed the role of CEO at ComEd in 2011—had no involvement with the 2011 contract, which ComEd's General Counsel negotiated.  *See* Tr.1307.1375-76.3285.  In 2016, ComEd renewed its contract with Reyes Kurson, but reduced the

firm's guaranteed hours, overriding McClain's recommendation. *See* Tr.1376-77.1380.1411.1413-14. While Pramaggiore knew of the 2016 contract renewal, ComEd's General Counsel oversaw the contracting process. *See* Tr.1259. These were not no-show contracts. "Reyes Kurson … actually did work for ComEd" throughout the contract period: "It billed ComEd for that work, and ComEd paid for their billed hours." Tr.299.

*Second*, in 2017, the CEO of Exelon appointed Juan Ochoa to fill the a vacant seat on ComEd's Board of Directors. *See* Tr.1284-85.1383.4510-12. Ochoa had served as the chair of the Illinois Hispanic Chamber of Commerce and had prior experience on several other boards. *See* Tr.1381-82; GX454. Ochoa also had recommendations from prominent officials aside from Madigan, including then-Mayor of Chicago Rahm Emanuel, who personally called Pramaggiore to advocate for Ochoa. Tr.4510-11. Ochoa passed the due-diligence process without issue, and he ably performed the work expected of any Board member. *See* Tr.353.1381-83.3565.

*Third*, ComEd "set aside" "up to ten" "intern positions" for college students from Madigan's legislative district in Chicago (the 13th Ward) and occasionally relaxed "the usual [GPA] cutoffs" for candidates whom McClain "push[ed] for." Tr.303-04; D.Ct.Dkt.1.at.16. "Based on their performance during the internship, participating students could be considered for subsequent summer internship

positions or full-time jobs within ComEd." D.Ct.Dkt.1.at.1. As CEO, Pramaggiore did not select summer interns, and the practice began before her stint as CEO. *See* Tr.2088.4510.

*Fourth*, between 2011 and 2018, ComEd agreed to retain, as subcontractors, four lobbyists with ties to Madigan. ComEd retained the first two subcontractors (Frank Olivo and Ray Nice) in 2011—before Pramaggiore's tenure as ComEd CEO—and it retained the third and fourth subcontractors (Ed Moody and Michael Zalewski) in 2014 and 2018, respectively. *See* D.Ct.Dkt.1.at.13-14, Tr.290-97. Pramaggiore did not know about any of these four subcontractors except for Zalewski, whom ComEd intended to utilize for a "[v]ery big deal" for the company. Tr.2408-09. Consistent with the relevant contracts and ComEd's practice, ComEd delegated management of these lobbyists to a prime contractor—Jay D. Doherty & Associates (JDDA), which had provided various lobbying services for ComEd since 1985. *See* Tr.2907.2709.

As pertinent here, ComEd's relationship with JDDA generated substantial paperwork. To start, ComEd and JDDA entered into written contracts, which were sometimes amended. Four agreements are principally at issue here—those from February 2017, February 2018, June 2018 (*i.e.*, an amendment to the February 2018 contract), and March 2019. *See, e.g.*, GX868 (Feb. 2017; Count 3); GX764 (Feb. 2018; Count 4); GX769 (June 2018; Count 7); GX772 (Mar. 2019; Count 9). Those

9

agreements included a high-level description of the services that JDDA would provide to ComEd—*e.g.*, "Consultant will advise … ComEd and its subsidiaries, work with appropriate State and Local committees, leadership, and individual members to facilitate ComEd's agenda"—and they authorized JDDA to retain "employees, contractors or other persons."  GX868.at.6-7.  Because Pramaggiore had already left for Exelon by June 2018, Pramaggiore had no involvement with the June 2018 or March 2019 contracts.  *See* D.Ct.Dkt.245.at.9; Tr.2406-07.  Nor did she sign or otherwise read the February 2017 or February 2018 contracts.  *See* D.Ct.Dkt.357.at.42.

In addition to these contracts with JDDA, ComEd prepared documents known as "single source justification" forms.  In general, ComEd used a competitive-bidding process when engaging vendors.  *See* Tr.1928.  Because consulting services are inherently "unique[]," however, ComEd "never" utilized competitive bidding for consulting services and instead used single source justification forms that listed one or more reasons for engaging a particular consultant.  *See* Tr.1928.2358.  The single source justification forms at issue here—which are from 2017, 2018, and 2019 and which relate to three of the aforementioned JDDA contracts—highlighted the "unique insight and perspective" that JDDA offered in different areas of interest to ComEd, including in "Cook County," which encompasses Chicago.  *See* GX868.at.2; GX484.at.3; GX867.at.1.  Pramaggiore signed the first two of these

10

single source justification forms (though, in the normal course of business, she did not read such forms either), *see* Tr.2836-39.3415-16.4510; GX218, but she did not sign the third because she no longer worked for ComEd in 2019.  Regardless, as later confirmed by a ComEd executive named Fidel Marquez—who succeeded Hooker as ComEd's head of government affairs in 2012 and who ultimately served as a cooperating witness for the government in this case—JDDA provided valuable services to ComEd for decades, including in Cook County.  *See* Tr.1828.2709.

Lastly, ComEd's relationship with JDDA generated invoices from JDDA and corresponding ledger entries on ComEd's internal accounting system (known as Asset Suite).  The invoices included language like "for services rendered," *see, e.g.*, GX543.544.799.901.905, and the ledger entries included an assortment of accounting information and billing codes, *see* GX701-07.799.895.  Pramaggiore did not prepare JDDA's invoices or operate Asset Suite for ComEd.

As noted, JDDA performed important services for ComEd for many decades, but it turned out that the four particular subcontractors recommended by Madigan did "little or no work."  D.Ct.Dkt.1.at.13.  When Pramaggiore learned that news—from Marquez, after she had moved to Exelon—she responded by saying "Oh my god" and recommended that her successor at ComEd consider changes.  GX131.at.1-3; *see* Tr.4633-34.  That recommendation accorded with her own efforts to subject ComEd contractors to scrutiny.  In particular, in June 2012—one month after starting

11

as CEO and immediately after Chicago media published an article about a separate controversy regarding a ComEd lobbyist—Pramaggiore wrote to several ComEd executives that "I want to make sure we have done everything we can … to insure we have protected the company against exposure to public embarrassment or worse." DX1135. Accordingly, during that same discussion, she instructed Marquez to "take a look at our other lobbyists as well," including those associated with JDDA. DX1135.

### B.    Procedural History

#### 1.    Indictment.

1.    Based on the foregoing events, state and local prosecutors in Illinois pursued a grand total of zero charges against Pramaggiore or anyone else involved. Nevertheless, in November 2020, federal prosecutors in the Northern District of Illinois obtained a 50-page, nine-count indictment against Pramaggiore, McClain, Hooker, and JDDA executive Jay Doherty (collectively, Defendants), which alleged that they had engaged in an elaborate scheme to bribe Madigan between 2011 and 2019 and had concealed that bribery scheme in ComEd's books and records. *See* D.Ct.Dkt.1.

Four counts in the indictment—Counts 2, 5, and 6, which the government brought only against Pramaggiore and McClain, and Count 8, against all Defendants—alleged substantive violations of the federal programs bribery statute.

12

*See* 18 U.S.C. §666. In relevant part, that statute proscribes "corruptly giv[ing], offer[ing], or agree[ing] to give anything of value to any person, with intent to influence or reward an agent … of a State, … in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more." 18 U.S.C. §666(a)(2). The §666 counts highlighted four supposed "things of value" provided to Madigan: that ComEd retained the Reyes Kurson law firm in 2011 and 2016; that Ochoa secured a Board seat in 2017; that ComEd retained one of the four subcontractor lobbyists (Zalewski) in 2018; and that ComEd renewed JDDA's lobbying contract in 2019. *See* D.Ct.Dkt.1.at.43.46-47.49. The indictment asserted that these actions amounted to bribery of Madigan because the Illinois General Assembly enacted certain legislation consistent with ComEd's interests in 2011, 2013, and 2016—*i.e.*, the Energy Infrastructure and Modernization Act in 2011 (EIMA), Senate Bill 9 in 2013, and the Future Energy Jobs Act (FEJA) in 2016. *See* D.Ct.Dkt.1.at.7. The government's theory was difficult to square with the chronology of actual events. With the exception of the Reyes Kurson contracts, all of the so-called bribes post-dated all that legislative activity, with the last of them (the 2019 JDDA contract) post-dating Pramaggiore's ComEd tenure as well. Furthermore, as discussed, Pramaggiore was not yet ComEd's CEO in 2011, when ComEd originally retained Reyes Kurson and when the Illinois legislature enacted EIMA. Further complicating

13

the narrative, Madigan himself did not even vote for FEJA in 2016, when ComEd renewed Reyes Kurson's contract. *See* Tr.4440.

Four other counts in the indictment—brought against all four Defendants—alleged domestic violations of the FCPA. In pertinent part, the FCPA requires public companies to "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of [its] assets" and to "devise and maintain a system of internal accounting controls." 15 U.S.C. §78m(b)(2)(A)-(B). These crimes require the government to prove knowledge. "[K]nowingly falsify[ing]" books or records, or "knowingly circumvent[ing]" internal accounting controls, triggers criminal liability. *Id.* §§78m(b)(5), 78ff(a). These FCPA counts alleged that Defendants violated the FCPA because, by failing to disclose supposed bribe payments to the four subcontractors, Defendants had knowingly falsified otherwise-true books and records associated with JDDA contracts from 2017, 2018, and 2019. *See, e.g.*, Tr.274 ("[T]he defendants are charged with concealing the fact that these payments were bribes by falsifying ComEd records[.]").

The remaining count—also brought against all four Defendants—charged a four-object conspiracy. The first two objects pertained to an alleged agreement to bribe Madigan, which the conspirators supposedly advanced because ComEd retained the four subcontractors between 2011 and 2018; ComEd contracted with

Reyes Kurson in 2011 and 2016; ComEd appointed Ochoa as a Board member in 2017; and ComEd set aside summer-internship positions for college students from Madigan's ward. *See* D.Ct.Dkt.1.at.11-17. The other two objects concerned a purported agreement to violate the FCPA: The third object alleged a conspiracy to falsify otherwise-true ComEd books and records to conceal the alleged bribery scheme, while the fourth object alleged a conspiracy to accomplish the same goal by circumventing ComEd's "internal accounting controls"—which the indictment described as Exelon's "Code of Business Conduct." *See*, *e.g.*, D.Ct.Dkt.1.at.12-13 ("It was part of the conspiracy that, for the purpose of influencing and rewarding [Madigan] … , "the conspirators … created and caused the creation of false contracts, invoices and other books and records … and to circumvent internal controls."); D.Ct.Dkt.1.at.3.

2. In response to the indictment, Defendants moved to dismiss the four §666 counts and the one conspiracy count to the extent that the latter rested on bribery allegations. Defendants argued that the indictment failed to allege any *quid pro quo*, as Supreme Court precedent required. *See* D.Ct.Dkt.46.at.1. The government opposed the motion, contending that "[t]he Seventh Circuit repeatedly has held that no *quid pro quo* agreement or understanding is required to establish a violation of §666." D.Ct.Dkt.54.at.2. Judge Leinenweber—who presided over the majority of the proceedings below—sided with the government, citing Seventh

15

Circuit precedent that "decline[d] to import a[] … *quid pro quo* requirement into the elements of §666(a)(2).  D.Ct.Dkt.83.at.13.

### 2.     Trial and conviction.

1.     As the trial neared, Defendants proposed a set of instructions requiring the jury to find that Defendants must have intended to engage in a *quid pro quo* to convict for either the §666 counts or the §666-related objects of the conspiracy count.  *See* D.Ct.Dkt.94.  In opposition, the government once again argued that "[a] *quid pro quo* is not an element of §666" and that the statute "does not require that the defendants contemplate an exchange for a discrete official act," *see* D.Ct.Dkt.98.at.4-5, and the district court again agreed, D.Ct.Dkt.101.at.4.

2.     The trial began in March 2023 and consumed over six weeks.  At trial, the government again disclaimed any obligation to prove a *quid pro quo* for the §666 charges and instead told the jury that it could convict Pramaggiore of bribery because ComEd hired certain people to "reward past beneficial conduct to ComEd." Tr.274.5158.5213-14.5437.  The government repeatedly tied the so-called "bribes" to the FCPA counts by telling the jury that Defendants had knowingly falsified ComEd documents to conceal this so-called "bribery" scheme.  *See, e.g.*, Tr.273 ("[T]he defendants further concealed that these payments were bribes by falsifying ComEd's records."); 274 ("As part of this conspiracy, the defendants are charged with concealing the fact that these payments were bribes by falsifying ComEd

16

records."); 314 ("Pramaggiore signed single-source justification documents … to cover up the bribery scheme by not mentioning the payments to the subcontractors."); 5184-85 ("[T]he subs were kept a secret" because "[t]hey were part of the bribe that was being paid to Madigan."). At the same time, the government barely mentioned its theory that Defendants had hatched a plan to circumvent ComEd's internal accounting controls. *See* D.Ct.Dkt.416-1.at.5.&.n.4. And although the government had to prove that Pramaggiore knew of the alleged bribery scheme and knew of the supposedly false documents concealing it, the district court refused to allow her to present exculpatory evidence relating to that issue—namely, her instruction to ComEd executives in June 2012 (after the alleged conspiracy began) to conduct a thorough investigation of all ComEd lobbyists, including JDDA subcontractors. *See* Tr.4549-552.

At the close of the government's case, Pramaggiore moved for acquittal under Federal Rule of Criminal Procedure 29(a). That motion again argued that §666 criminalized only *quid pro quos*. *See* D.Ct.Dkt.215.at.5-6. It also argued that the relevant FCPA provisions do not criminalize literally true statements (even if they are misleading), but rather criminalize only false statements—and that the government failed to prove the existence of any false statement in ComEd's books and records. *See* D.Ct.Dkt.215.at.15-18. The government opposed those arguments, and the district court again denied relief. *See* D.Ct.Dkt.222.

17

The case thus went to the jury. Over Defendants' objection, the district court did not instruct the jury that it had to find a *quid pro quo* to convict on the bribery counts. *See* D.Ct.Dkt.249.at.37-38. The court also did not inform the jury that, contrary to the government's repeated suggestions, the existence of merely misleading statements in corporate books and records does not amount to an effort to falsify books and records under the FCPA. *See* D.Ct.Dkt.249.at.43. But the court did instruct the jury that it could convict Defendants under *Pinkerton v. United States*, 328 U.S. 640 (1946), which authorizes substantive criminal liability based on the actions of co-conspirators. *See* D.Ct.Dkt.249.at.48.

After receiving its instructions, the jury deliberated for four days. On the fourth and final day, the jury asked a question regarding *Pinkerton*: "If on instruction page 43 you don't believe the government proved 'beyond reasonable doubt,' can page 48 of the instructions still be applied?" Tr.5517. "Instruction page 43" related to the FCPA counts, and "page 48 of the instructions" contained the *Pinkerton* instruction. *See* D.Ct.Dkt.249.at.43.48. The court instructed the jury to reread both instructions carefully. Tr.5526. Less than an hour later, the jury convicted all Defendants of all charges using a general-verdict form, *see* Dkts.250-53—over Defendants' request that the jury use a special-verdict form to identify the object or objects of any conspiracy for which it reached a guilty verdict, *see* Tr.5067-73; D.Ct.Dkt.140.at.89-91; D.Ct.Dkt.237.at.10-11.

18

3.    Following the verdict, Pramaggiore renewed her motion for acquittal and simultaneously moved for a new trial.  Pramaggiore again raised her *quid-pro-quo* and falsity arguments, while also challenging the *Pinkerton* instruction and the district court's exclusion of evidence showing that she called for an investigation into ComEd lobbyists at the very time that she allegedly participated in the supposed conspiracy.  *See, e.g.*, D.Ct.Dkt.264.at.9.22.41.50-51.57.

In January 2024, the district court denied that motion—while recognizing that "the Government's case" lacked "the proverbial smoking gun."  D.Ct.Dkt.357.at.4. As to the §666 counts, although the court acknowledged that "the Government's case was consistent with gratuities," it found that consistency immaterial based on this Court's panel decision in *Snyder*, which reiterated the view that §666 does not require a *quid pro quo*.  *See* D.Ct.Dkt.357.at.13.  As to the FCPA counts, the court held that a jury could find the documents at issue false because they "were at least incomplete" by "failing to disclose the subcontractors or the reason for hiring the subcontractors."  D.Ct.Dkt.357.at.36.38.  The court saw no issue with the *Pinkerton* instruction and emphasized that "a reasonable jury could have found Pramaggiore guilty under a *Pinkerton* theory of liability as to the books-and-records charges." D.Ct.Dkt.357.at.43.  Finally, the court reaffirmed its decision to exclude the evidence demonstrating that Pramaggiore called for an investigation into ComEd lobbyists,

19

reasoning that it would have "unnecessarily expand[ed] the scope of the trial by demanding significant time on a narrow ancillary issue." D.Ct.Dkt.357.at.64-65.

### 3. The Supreme Court's *Snyder* and *Thompson* decisions undermine the convictions.

1. Several significant developments occurred after the resolution of that post-trial motion. First, in June 2024, Judge Leinenweber passed away, prompting a reassignment to Judge Shah. *See* D.Ct.Dkt.369. Then, just weeks later, the Supreme Court reversed this Court's decision in *Snyder* and vindicated Pramaggiore's consistent position that §666 criminalizes only *quid-pro-quo* bribes, not "gratuities" given to "state and local officials" "for their past official acts." 603 U.S. at 10; *see also id.* at 15 ("read[ing] §666 to ban all gratuities, no matter how trivial, in connection with covered official acts" would amount to a "draconian approach … border[ing] on the absurd"). Because that decision undermined the government's entire theory of the case—since four counts were "bribery" charges, the FCPA counts were premised on the knowing concealment of the purported bribes, and the conspiracy count and *Pinkerton* instruction tie the substantive counts together—Pramaggiore filed a motion asking Judge Shah to reconsider Judge Leninenweber's denial of her post-trial motions. Although the district court agreed that it had to vacate Pramaggiore's §666 convictions because the jury received an erroneous bribery instruction, it nevertheless  salvaged her FCPA convictions (Counts 3, 4, 7, and 9) and her conspiracy conviction (Count 1), on theory that the

20

evidence is "sufficient … to prove that each defendant agreed" to violate the FCPA, and the "evidence … suffices to prove … a conspiracy to violate the FCPA." D.Ct.Dkt.398.at.6.

2.      Next, the Supreme Court once again reversed circuit precedent—this time unanimously—in *Thompson*, holding that laws criminalizing false statements cover only literally false statements, not merely misleading ones. *See* 604 U.S. 408. Pramaggiore thus filed a second motion for reconsideration in light of *Thompson*, but the district court was unmoved. The court began by observing that "framing this case now as an all-or-nothing battle about the internal accounting records of ComEd feels probably strange to those of you who were in the room trying the case, but here you are." D.Ct.Dkt.419.at.4-5. Nonetheless, Judge Shah, who was admittedly not "in the room," distinguished *Thompson* because it construed the adjective "false" rather than the FCPA's "falsify" and in any event, the jury could have found the documents at issue here false because they contained only partial truths. *See* D.Ct.Dkt.419.at.6-7.

### 4.      Sentencing.

During the sentencing phase, Pramaggiore argued that the district court could not impose a prison sentence because the FCPA states that "no person shall be subject to imprisonment … for the violation of any rule or regulation if [s]he proves that [s]he had no knowledge of such rule or regulation," 15 U.S.C. §78ff(a), and because

she had no knowledge of the relevant FCPA provision here. *See* D.Ct.Dkt.442 at 34-37.[1] Although the government acknowledged that at least two courts of appeals have applied this "No Knowledge Clause" in cases involving statutory violations, *see* D.Ct.Dkt.439.at.46, the court sentenced Pramaggiore to 24 months in prison on each of her FCPA and conspiracy convictions, running concurrently, and also imposed a $750,000 fine, *see* D.Ct.Dkt.467.

### 5.    Bail pending appeal proceedings.

Pramaggiore sought bail pending appeal. After two months of deliberation, the district court denied her motion, while again admitting that it "is no doubt a matter of some dissonance" that "this case is now only about accounting controls and books and records" under the FCPA since it originally hinged on an alleged "bribery" scheme. D.Ct.Dkt.521.at.4. Pramaggiore then sought bail pending appeal from this Court. *See* CA7.Dkt.22. Although the government's trial lawyers had opposed bail pending appeal in the district court, the government's appellate lawyers did not file any opposition. Nonetheless, on November 10, 2025, this Court denied Pramaggiore's unopposed bail motion in a one-page order, *see* CA7.Dkt.23, and she is scheduled to surrender on December 1, 2025.

---

[1] Probation recommended against incarceration. *See* D.Ct.Dkt.443.at.1.

## SUMMARY OF ARGUMENT

At its core, this case concerns a failed bribery prosecution, and the district court's strained effort to reimagine it as a standalone FCPA case is flawed on multiple levels. In reality, the government's *Snyder*-defying bribery theory contaminated all nine counts against Pramaggiore. And the government's *Thompson*-defying falsity theory also infected all five non-§666 counts. Whether by ordering a new trial or a judgment of acquittal, this Court should reverse the unprecedented judgment below and make clear that the government cannot send Pramaggiore to prison based on the FCPA tail of this case when the §666 dog has disappeared.

I.    The district court should have vacated Pramaggiore's conspiracy conviction and her four FCPA convictions, along with her four §666 convictions. The jury in this case returned a general verdict on the conspiracy count, and the conspiracy charge involved four alleged objects. It is now clear that two of those objects violate *Snyder*. Under longstanding Supreme Court precedent, the conspiracy conviction is constitutionally flawed, and the government can salvage it only by proving beyond a reasonable doubt that the *Snyder*-defying bribery instruction had no impact at all on the jury's conspiracy verdict. The government plainly cannot carry its heavy burden here. Indeed, Judge Shah's acknowledgment that it feels strange to think of this case as an FCPA case reflects the reality that the government's "bribery" theory served as the government's leitmotif and tainted

23

everything here, including the conspiracy count. The district court managed to uphold Pramaggiore's conspiracy conviction only because it failed to conduct actual harmless-error analysis and instead conducted ordinary sufficiency-of-evidence review. That is precisely what the Supreme Court and this Court have repeatedly told lower courts not to do.

Once Pramaggiore's conspiracy conviction falls, her four FCPA convictions follow suit. There is a high probability that the jury convicted Pramaggiore on the FCPA counts by applying *Pinkerton*, which is a doctrine that presupposes the existence of a valid conspiracy. Because the conspiracy here is *invalid*, *Pinkerton* has no role to play, and Pramaggiore's FCPA convictions cannot survive. In all events, the FCPA convictions cannot stand, as the government repeatedly told the jury that ComEd's books and records are false precisely because they concealed a "bribery" scheme that does not survive *Snyder*. The district court's contrary views require this Court not only to indulge the fiction that the conspiracy count is legitimate, but also to ignore how the government prosecuted this case every step of the way below.

II.　　*Thompson* is independently sufficient to dispose of all five remaining non-§666 counts. In fact, Pramaggiore is entitled to even broader relief on the remaining counts—acquittal—in light of *Thompson*. Securing convictions on the four substantive FCPA counts required the government to prove that the relevant

24

ComEd books and records—*i.e.*, JDDA contracts, single-source justification forms, invoices, and ledger entries—were knowingly falsified to reflect false statements. But those documents contain nothing of the sort. Instead, all the statements in those documents are literally true, and the lesson of *Thompson* is that true statements are not false statements even if they are misleading. The district court nevertheless upheld the FCPA convictions after *Thompson* based on its views that the noun "false" has a materially different meaning than the verb "falsify"—and thus *Thompson* is irrelevant—and that the documents here are false anyway because ComEd failed to affirmatively disclose additional information about the four JDDA subcontractors. Relevant dictionaries confirm that the court's strained interpretation of "falsify" is incorrect, and the proposition that statements containing half-truths are false statements is the very proposition that *Thompson* rejected.

Pramaggiore's conspiracy conviction similarly cannot survive *Thompson*. Because three of the four conspiracy objects are plainly irreconcilable with *Thompson* or *Snyder*, the conspiracy conviction hinges on the fourth object—Pramaggiore's purported circumvention of ComEd's internal accounting controls. But the validity of that object turns on the government's theory that Exelon's aspirational "Code of Conduct" is an "internal accounting control" within the meaning of the FCPA. That proposition is absurd. The district court embraced that absurdity by emphasizing certain language on a single page of the Code of Conduct,

25

but even that page assumes that the internal accounting controls are external to the Code of Conduct and not the Code itself.  The district court's reasoning thus does not disturb the conclusion that Pramaggiore is entitled to acquittal because of *Thompson*, but in all events, she is at least entitled to a new trial on the remaining counts in light of *Thompson* for many of the same reasons why she is entitled to a new trial on those counts in light of *Snyder*.

III.   Although *Snyder* and *Thompson* resolve this appeal, the district court committed at least two other errors that also would warrant relief.  First, the court below erroneously excluded critical evidence bearing on Pramaggiore's *mens rea*— namely, her 2012 call for an investigation into ComEd lobbyists—even as the court described her state of mind as a central issue in this case.  Second, the court erroneously imposed on Pramaggiore a sentence that includes a term of imprisonment, in contravention of the FCPA's No Knowledge Clause.  Those errors justify a new trial or resentencing.  One way or another, the district court's profoundly flawed judgment below cannot remain in place.

## STANDARD OF REVIEW

This Court reviews the denial of a motion for judgment of acquittal *de novo*. *See United States v. Brown*, 135 F.4th 1102, 1107 (7th Cir. 2025).  The Court reviews the denial of a motion for new trial, the denial of a motion for reconsideration, and evidentiary rulings for abuse of discretion.  *See United States v. Gustafson*, 130 F.4th

608, 613 (7th Cir. 2025); *United States v. Pacilio*, 85 F.4th 450, 464 (7th Cir. 2023); *United States v. Sarno*, 37 F.4th 1249, 1253 (7th Cir. 2022).

## ARGUMENT

**I.     The District Court Should Have Vacated All Of Pramaggiore's Convictions, Not Just Her Bribery Convictions, In Light Of *Snyder*.**

For four years, the government ridiculed as "frivolous" Pramaggiore's position that §666 requires a *quid pro quo*. D.Ct.Dkt.325.at.85-86. The Supreme Court's decision in *Snyder* confirmed that Pramaggiore was right all along: "§666 is a bribery statute" and simply does not criminalize "gratuities" given to officials after the fact or anything else lacking a *quid pro quo*. 603 U.S. at 10. As the district court thus correctly recognized, *Snyder* was the death knell of the bribery counts, as the jury instructions allowed the jury to convict Pramaggiore of bribery in the absence of an actual *quid-pro-quo* bribe. *See* D.Ct.Dkt.398.at.16-18. The court below nevertheless concluded that this glaring error had no collateral effect on the conspiracy or FCPA convictions. *See* D.Ct.Dkt.398.at.5-8. That is wishful thinking. All nine convictions are inseparable from one another, and *Snyder* should have resulted in vacatur *in toto*.

**A.     The Conspiracy Conviction May Have Rested on the Two Legally Flawed Bribery Objects of the Conspiracy.**

1.     Pramaggiore's conspiracy conviction is constitutionally untenable after *Snyder*. The Sixth Amendment states that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." U.S.

27

Const. amend. VI.  And the Fifth Amendment states that the government may not deprive individuals of their liberty "without due process of law."  U.S. Const. amend. V.  The Constitution thus provides a "promise that safeguards for criminal defendants those procedural protections well established at common law, including the 'ancient rule' that the government must prove to a jury every one of its charges beyond a reasonable doubt."  *Erlinger v. United States*, 602 U.S. 821, 830-31 (2024).

At common law, juries "were entitled to deliver a general verdict pronouncing the defendant's guilt or innocence" in an up or down vote.  *United States v. Gaudin*, 515 U.S. 506, 513 (1995).  In other words, juries did not necessarily need to issue a "special verdict"—*i.e.*, a verdict issued after "the jury makes findings only on factual issues submitted to them by the judge, who then decides the legal effect of the verdict."  *Verdict*, Black's Law Dictionary (12th ed. 2024).  But general verdicts can raise serious constitutional concerns in certain circumstances.  That is because it is not uncommon for a trial court to instruct a jury on "alternative theories of guilt" on particular charges, only to have at least one of those theories declared legally "invalid" in the end.  *Hedgpeth v. Pulido*, 555 U.S. 57, 58 (2008) (per curiam).  In those situations, "it is impossible to tell which ground the jury selected" if it delivered its verdict via a general verdict.  *Yates v. United States*, 354 U.S. 298, 312 (1957).  That raises the real possibility that the jury may *not* have found beyond a reasonable doubt that the defendant committed an actual crime—and that the jury

28

may have instead convicted the defendant for perfectly *lawful* conduct. *See Carella v. California*, 491 U.S. 263, 265 (1989) (per curiam) ("Jury instructions relieving [the government] of th[e] burden" to "prove[] beyond a reasonable doubt every element of the charged offense" "violate a defendant's due process rights."). To avoid that unseemly possibility, the Supreme Court has established a presumptive rule that "a general verdict must be set aside if the jury was instructed that it could rely on any of two or more independent grounds, and one of those grounds is insufficient" as a legal matter, "because the verdict may have rested exclusively on the insufficient ground." *Zant v. Stephens*, 462 U.S. 862, 881 (1983).

That rule applies with full force in the context of conspiracy charges involving multiple objects. The Supreme Court first held as much decades ago in *Yates*, and it reaffirmed the rule from *Yates* more recently in *Skilling v. United States*, 561 U.S. 358 (2010). *Skilling* involved an indictment that alleged "three objects of the conspiracy—honest-services wire fraud, money-or-property wire fraud, and securities fraud." *Id.* at 414. The jury convicted on the conspiracy charge via general verdict, but the Court found the honest-services-wire-fraud theory legally deficient. *See id.* at 369, 375, 413. The Court thus deemed the conspiracy conviction "flawed," explaining that "constitutional error occurs when a jury is instructed on alternative theories of guilt and returns a general verdict that may rest on a legally invalid theory." *Id.* at 414 (citing *Yates*, 354 U.S. 298). The Court therefore concluded that

29

the conspiracy conviction would have to go unless the government could show that "the error was harmless." *Id.*; *see also Hedgpeth*, 555 U.S. at 60-61.

The harmless-error standard is exceptionally demanding in this context. Consistent with ancient common-law principles reflected in the Constitution and the government's burden throughout trial, the government must prove that the error is "harmless *beyond a reasonable doubt.*" *United States v. Segal*, 644 F.3d 364, 365-66 (7th Cir. 2011) (emphasis added); *see Ruiz v. United States*, 990 F.3d 1025, 1031 (7th Cir. 2021). "Time and again," moreover, "the Supreme Court has emphasized that a harmless-error inquiry is *not* the same as a review for whether there was sufficient evidence at trial to support a verdict," such that "a rational jury could alone conclude beyond a reasonable doubt" that the defendant committed the crime. *Jensen v. Clements*, 800 F.3d 892, 902-03 (7th Cir. 2015) (emphasis added). "The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Jones v. Basinger*, 635 F.3d 1030, 1053-54 (7th Cir. 2011). And "[t]hat must be so, because to hypothesize a guilty verdict that was never in fact rendered—no matter how inescapable the findings to support that verdict might be—would violate the jury-trial guarantee." *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993). Accordingly, even if "[i]t's true that the government's evidence was legally sufficient to support [a]

guilty verdict[]," a court still "cannot treat [an] error as harmless" so long as the jury in the actual case "*could* still have convicted … on the basis of … non-criminal" conduct.  *United States v. Edwards*, 869 F.3d 490, 500 (7th Cir. 2017) (emphasis added).

This Court's decision in *Sorich v. United States*, 709 F.3d 670, 674 (7th Cir. 2013), illustrates this approach.  In *Sorich*, the "jury was instructed that the defendants were guilty of mail fraud if they deprived the City [of Chicago] of money or property, or if they deprived the City of its right to honest services."  *Id.* at 671. After the jury convicted, the Supreme Court issued *Skilling* and held that the honest-services statute is limited only to schemes involving bribes or kickbacks—a clarification never communicated to the jury in *Sorich*.  *See id.* at 673.  The government thus conceded that the jury received erroneous instructions but insisted that "the error was harmless."  *Id.* at 673.  This Court agreed, but only because "the two fraud theories" at issue in the case "were coextensive"—meaning that "any honest-services violation had to be premised on" a valid theory of "money/property fraud."  *Id.* at 674.  As a result, this Court could safely say that the jury could not have convicted based only on non-criminal conduct.  *See id.* at 674-75; *see also, e.g.*, *Turner v. United States*, 693 F.3d 756, 759 (7th Cir. 2012).

Those principles confirm that a new trial on the conspiracy count is required. There is no disputing that the indictment in this case identified four objects of the

31

alleged conspiracy. *See* D.Ct.Dkt.1.at.12-13. There is also no denying that two of those objects are legally invalid under *Snyder* and that the "the instructions were erroneous" because they empowered the jury to convict Pramaggiore for conduct that is not a federal crime. D.Ct.Dkt.398.at.17. And it is equally clear that the jury found Pramaggiore guilty of the conspiracy charge via a general verdict. *See* D.Ct.Dkt.249.at.57-58; D.Ct.Dkt.251; *see also* D.Ct.Dkt.249.at.36 ("You must agree unanimously on at least one offense a defendant agreed to commit."). It follows that Pramaggiore's conspiracy conviction is "constitutional[ly]" "flawed" and may remain in place only if the erroneous bribery instruction amounts to "harmless" error. *Skilling*, 561 U.S. at 414.

The error is far from harmless. As Judge Shah rightly observed, "framing this case … as an all-or-nothing battle about the internal accounting records of ComEd" "feels … strange." D.Ct.Dkt.419.at.4. The explanation for that strange feeling is no mystery: The government charged, argued, and tried this case as a *Snyder*-defying bribery case, with the FCPA counts the tail on the §666 dog. As a result, the notion that "the guilty [conspiracy] verdict actually rendered in *this* trial was surely unattributable to the [§666] error"—and that the jury surely convicted on the conspiracy charge for reasons having absolutely nothing to do with the bribery allegations—beggars all belief. *Jones*, 635 F.3d at 1053-54. In reality, by far the more likely explanation is that the jury convicted precisely because it concluded that

Pramaggiore conspired to engage in "bribery" that does not actually meet the definition of bribery under *Snyder*—because that is the theory that consumed the vast majority of the trial (and sentencing hearing). At a minimum, because the government cannot foreclose the possibility of a "bribery"-tainted conspiracy conviction beyond a reasonable doubt, Pramaggiore is entitled to a new trial on the conspiracy count because of *Snyder*.

2.    The district court nevertheless concluded that "[a]ny *Yates* error as it relates to the objects of the conspiracy was harmless" and thus refused to vacate the conspiracy conviction. D.Ct.Dkt.398.at.7. According to the court below, the evidence in the trial record is "sufficient … to prove that each defendant agreed" to violate the FCPA—*i.e.*, "to hide what they were paying for from the company's book and records and to evade the company's internal accounting controls." D.Ct.Dkt.398.at.6; *see also* D.Ct.Dkt.398.at.6 (stating that the "evidence … suffices to prove … a conspiracy to violate the FCPA"). The notion that the record contains sufficient evidence to support the conclusion that Pramaggiore agreed to violate the FCPA is dubious (especially in light of *Thompson*, *see* pp.40, *infra*), but the more salient point for present purposes is that this is precisely the sort of analysis that the Supreme Court and this Court have consistently *rejected* in the harmless-error context. In that context, "[t]he question is *not* whether the legally admitted evidence was sufficient, but rather whether the [government] proved 'beyond a reasonable

33

doubt that the error complained of did not contribute to the verdict obtained'" to any degree. *Jewell v. Boughton*, 90 F.4th 1199, 1204 (7th Cir. 2024) (emphasis added).

As to *that* question, the district court had virtually nothing to say. The closest that it came to addressing the error complained of—*i.e.*, that the government advanced a bribery theory hopelessly incompatible with *Snyder* that infected all counts—is its suggestion that "[l]ying about what post-*Snyder* might be called 'corrupt gratuities' that are not prohibited by 666 … is still a lie and undermines the accuracy of the books and records at issue." D.Ct.Dkt.398.at.5. That reasoning is doubly deficient. To begin with, it does nothing to undermine the conclusion that the jury "*could* still have convicted" Pramaggiore on the conspiracy count based on the two invalid bribery objects. *Edwards*, 869 F.3d at 500 (emphasis added). And while that shortcoming is dispositive here, it also ignores that the government pressed a books-and-records theory that hinged on its pre-*Snyder* understanding of bribery. As the government told the jury in no uncertain terms, the alleged "conspiracy" here is that "the defendants … conceal[ed] the fact that these payments were *bribes* by falsifying ComEd records." Tr.274 (emphasis added); *see also, e.g.*, Tr.273 ("[T]he defendants further concealed that these payments were bribes by falsifying ComEd's records."); 314 ("Pramaggiore signed single-source justification documents … to cover up the bribery scheme by not mentioning the payments to the subcontractors."); 5184-85 ("[T]he subs were kept a secret" because "[t]hey were

34

part of the bribe that was being paid to Madigan."). Thus, even if the court below could legitimately focus only on the FCPA objects and disregard the bribery objects, this is still not a situation where it is fair to say that the verdict "had to be premised" on conduct that is unquestionably unlawful. *Sorich*, 709 F.3d at 674. The conspiracy conviction thus is invalid.

**B.     The FCPA Convictions Likely Resulted From an Improper Application of *Pinkerton*, and Those Convictions Fail on Their Own Terms in Any Event.**

1.     The *Snyder*-related problems are not confined to the conspiracy count and should have resulted in vacatur of all the FCPA counts. Most obviously, that is because the FCPA convictions likely resulted from an application of *Pinkerton*. *Pinkerton* is a controversial doctrine that was not "recognize[d] … at common law," and has long been subject to cogent criticism. *See, e.g., Krulewitch v. United States*, 336 U.S. 440, 445 (1949) (Jackson, J., concurring). This case well illustrates its dangers, but also how the government's reliance on it requires a new trial when the jury could have convicted based on an invalid conspiracy. Under *Pinkerton*, "[e]very conspirator is liable for acts of other conspirators within the scope of the agreement." *United States v. Newman*, 755 F.3d 543, 545 (7th Cir. 2014). The *sine qua non* of *Pinkerton* liability thus "is of course … that a conspiracy existed" in the first place. *United States v. Smith*, 223 F.3d 554, 573 (7th Cir. 2000). Here, the district court instructed the jury that it could convict Pramaggiore on the FCPA counts under

35

*Pinkerton* after finding that she "was a member of the conspiracy alleged in Count One." D.Ct.Dkt.249.at.48-49. But as just explained, the "Count One" conspiracy conviction is no longer viable in light of *Snyder*. It follows that the Court must jettison the FCPA convictions unless the government can demonstrate that the *Pinkerton* instruction proved "harmless … beyond a reasonable doubt." *United States v. Walls*, 225 F.3d 858, 866 (7th Cir. 2000).

Here, there is indisputably a reasonable possibility that "the jury *actually rested* its [FCPA] verdict" on *Pinkerton* grounds, confirming that the error is far from harmless. *Sullivan*, 508 U.S. at 279. Just as the government sought to relax its burden on the §666 counts by eschewing the need for any *quid-pro-quo* showing, it sought to minimize its burden on the FCPA counts by relying on *Pinkerton*. *See* Tr.5444. This Court need not take Pramaggiore's word for it. The government itself argued below that the jury "could have found Pramaggiore guilty under a theory of *Pinkerton* liability as to the substantive counts of the indictment, including the books and records charges." D.Ct.Dkt.325.at.74. Judge Leinenweber, who actually was "in the room" and oversaw the trial, agreed that the jury "could have found Pramaggiore guilty under a *Pinkerton* theory of liability as to the books-and-records charges." D.Ct.Dkt.357.at.43. Indeed, it is hard to see how the jury could find Pramaggiore liable for knowing FCPA violations without relying on *Pinkerton*. And the jury itself asked a question about *Pinkerton* and was told to reread the *Pinkerton*

36

instruction immediately before it issued its verdict after expressing doubt about the government's proof of direct FCPA liability. *See* Tr.5516; D.Ct.Dkt.249.at.43.48.

The jury's interest is *Pinkerton* is unsurprising, as the evidence of Pramaggiore's "knowing[]" and direct participation in any FCPA violations is wafer thin. 15 U.S.C. §78m(b)(5). Two FCPA counts (Counts 7 and 9) concerned allegedly falsified ComEd-JDDA contracts signed *after* Pramaggiore left ComEd, indicating that the jury necessarily convicted Pramaggiore based on third-party conduct. *See* D.Ct.Dkt.1.at.48.50; D.Ct.Dkt.245.at.11; Tr.2406-07. And the government introduced no evidence that Pramaggiore ever read (let alone signed) the ComEd-JDDA contracts undergirding the two other FCPA counts (Counts 3 and 4). *See* GX764; GX868.

"Particularly where there is reason to think that the jury had difficulty in reaching its verdict"—as there is here in light of the jury's *Pinkerton* question vis-à-vis the FCPA counts—"we must tread cautiously before concluding that an error was harmless." *United States v. Robinson*, 724 F.3d 878, 890 (7th Cir. 2013). That cautious approach confirms that there is no basis to conclude that the *Pinkerton* instruction amounted to harmless error.

But even assuming *arguendo* that the *Pinkerton* instruction surely did not affect the outcome here, vacatur of the FCPA counts is still appropriate. That is because the government told the jury over and again that the FCPA counts and the

37

bribery counts are joined at the hip—*i.e.*, that Defendants "falsif[ied] ComEd's records" to "conceal[] that these payments" to the subcontractors "were *bribes*." Tr.273 (emphasis added). The jury's verdict on the substantive FCPA counts thus is beset by the same fundamental *Snyder* errors that infected every other count. A new trial on the FCPA counts thus is warranted twice over.

2.      The district court's contrary conclusion does not withstand scrutiny. The district court first dismissed the *Pinkerton* instruction as "harmless" because there purportedly "was no harmful error" with the underlying conspiracy conviction. D.Ct.Dkt.398.at.8. The notion that the conspiracy is valid is no more persuasive the second time around. The court also asserted that the record contained "sufficient proof of direct [FCPA] liability." D.Ct.Dkt.398.at.6.8. Even setting aside that the court never engaged with any of the record facts demonstrating that the so-called "proof of direct FCPA liability" turned on the government's legally inadequate bribery theory, the more fundamental problem is that the court never even addressed the relevant question: whether the verdict "may have" rested on *Pinkerton* liability without a valid conspiracy. *United States v. Yates*, 16 F.4th 256, 262 (9th Cir. 2021). The answer to *that* question is almost certainly yes. After all, when "jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error." *Griffin v. United States*, 502 U.S. 46, 59 (1991).

38

*     *     *

As the government explained below in its post-*Snyder* briefing, the "bribery allegations" and the "FCPA allegations" here are part of a single "overarching scheme," and "the government's central theory was that the payments to the Madigan subcontractors were bribes." D.Ct.Dkt.390.at.19-20. Because the bribery convictions are deficient in light of *Snyder*, the remaining convictions should "fall" "like dominoes." *Skilling*, 561 U.S. at 414.

## II. *Thompson* Independently Forecloses Pramaggiore's Remaining Convictions.

Pramaggiore's FCPA and conspiracy convictions also suffer problems even independent of the devastating impact of *Snyder* on this whole case. Indeed, this is the rare case where the convictions are doomed not just by one intervening Supreme Court decision but two. The Supreme Court's decision in *Thompson* changed circuit precedent and confirms that the government cannot prove the indispensable element of falsity—a shortcoming that impacts all five of Pramaggiore's remaining convictions.

### A. The District Court Should Have Acquitted Pramaggiore of All Remaining Charges in Light of *Thompson*.

#### 1. The FCPA convictions are invalid because none of the books and records are false under *Thompson*.

1. The primary FCPA provision at issue in this case—15 U.S.C. §78m(b)(5)—provides that "[n]o person shall knowingly circumvent … a system of

39

internal accounting controls or knowingly falsify any book, record, or accounts." All the substantive FCPA counts here (Counts 3, 4, 7, and 9) turn on the latter clause—*i.e.*, the "knowingly falsify" clause. *See* D.Ct.Dkt.1.at.44-45.48.50. The government's position is that Pramaggiore and the other Defendants knowingly "falsified" ComEd contracts, single-source-justification forms, invoices, and general ledger entries by failing to disclose the names of the subcontractors or specifying that some of the money paid to JDDA would go to those subcontractors—in other words, by rendering the corporate documents incomplete and misleading. Although Pramaggiore argued for years that omissions and misleading statements are not "false" under the FCPA, *see* D.Ct.Dkt.215.at.15-18; D.Ct.Dkt.264.at.22-25; D.Ct.Dkt.383.at.11-12; D.Ct.Dkt.413.at.6-15, Judge Leinenweber embraced the government's contrary theory, *see* D.Ct.Dkt.357. And to be fair, that determination accorded with circuit precedent similarly concluding that misleading omissions qualify as false statements. *See, e.g.*, *United States v. Freed*, 921 F.3d 716, 723 (7th Cir. 2019) (not disclosing certain details in otherwise technically true presentations amounts to a "false statement"); *United States v. Ellis*, 50 F.3d 419, 423 (7th Cir. 1995); *Emery v. Am. Gen. Fin., Inc.*, 71 F.3d 1343, 1347-48 (7th Cir. 1995); *United States v. Dick*, 744 F.2d 546, 553 (7th Cir. 1984). But all that circuit precedent culminated in *Thompson*, where the Supreme Court granted certiorari and adopted a very different rule where misleading half-truths are not sufficient to prove falsity.

40

*Thompson* addressed a statute in Title 18 proscribing any "false statement or report" in connection with loan and credit applications. 18 U.S.C. §1014. In construing that statute, this Court had held at the panel stage that "the prohibition … against 'false statement[s]' extends to misleading ones as well." *Thompson*, 604 U.S. at 410. The Supreme Court disagreed. As the Court explained, "false and misleading are two different things" as a matter of ordinary English, as false means "not true" whereas "[a] misleading statement can be true." *Id.* at 413-14. "[B]y definition," then, "a statement that is misleading but true is … not a 'false statement.'" *Id.* at 414. When Congress wants to criminalize misleading omissions in addition to false statements, the Court continued, it does so explicitly, as it has in "other criminal statutes in Title 18." *Id.* at 415 (citing 18 U.S.C. §§1038a, 1515(b), 77q(a)(2)).

That same reasoning applies here. Like the statute at issue in *Thompson* that criminalizes "false" statements, 18 U.S.C. §1014, the FCPA provision at issue here criminalizes efforts to knowingly "falsify" documents, 15 U.S.C. §78m(b)(5). Falsify, of course, simply means "to make false." Oxford English Dictionary (2d ed. 1989); *see also Falsify*, Black's Law Dictionary (5th ed. 1979) (defining "falsify" as "to make something false"). Furthermore, just like the statute at issue in *Thompson*, the FCPA provision at issue here never mentions the word "misleading." And just as in *Thompson*, the absence of that word is telling, since Congress has repeatedly

41

used that very word elsewhere in Title 15. *See, e.g.,* 15 U.S.C. §§45b(b)(2)(C)(iii) ("false or misleading"), 77g(b)(1)(A) ("misleading"), 78u-2(a)(1)(C) ("false or misleading"). The ineluctable upshot is that the FCPA provision at issue here does *not* criminalize conduct that results in books and records that are literally true but misleading due to omissions. And once that much is recognized, the government's FCPA case collapses yet again, as all of the relevant ComEd documents—the JDDA contracts, the single-source-justification forms, the invoices, and the ledger entries— *are* literally true.

*JDDA Contracts:* The government posited that four contracts between ComEd and JDDA qualify as "false" books or records. *See* GX868 (Feb. 2017; Count 3); 764 (Feb. 2018; Count 4); 769 (June 2018; Count 7); and 772 (Mar. 2019; Count 9). In relevant part, those contracts all included the following language, which explained that JDDA would provide consulting services for ComEd:

1. Advisory Services. Consultant will advise ComEd on legislative issues affecting ComEd and its subsidiaries, work with appropriate State and Local committees, leadership, and individual members to facilitate ComEd's agenda (the "Services"). In this role, Consultant shall also assist ComEd in its legislative risk management activities and expanding its government outreach activities including lobbying on behave of ComEd. Consultant agrees to perform the services in a diligent and competent manner and to complete the services on or before any completion dates specified by the ComEd. Consultant further agrees to furnish the ComEd, from time to time, with such reports regarding the status and progress of assignments and/or Consultant findings and conclusions with respect to projects, and in such degree of detail, as may be requested by the ComEd.

GX868.at.6 (Feb. 15, 2017); GX764.at.2 (Feb. 15, 2018); and GX772.at.2 (Mar. 11, 2019). The evidence in this case confirmed, however, that ComEd did in fact expect

JDDA to provide consulting services and that JDDA followed through.  Indeed, the government's star witness—Marquez—testified that JDDA lobbied for ComEd and served as ComEd's only external lobbyist for "lobbying activities for Cook County." Tr.1828.  Marquez confirmed that JDDA served that role since 1985.  Tr.2709.

One JDDA contract—an amendment to the 2018 contract—differed from the others because it also stated that JDDA would have an "expanded role" in Cook County.  GX769.  That statement is likewise true:  The evidence here showed that, at the time of that contract amendment, ComEd anticipated that JDDA would undertake an expanded role because it had just hired the last of the four subcontractors, Zalewski.  Marquez described Zalewski as a "well respected" "good hire" and that he intended to "use [Mr.] Zalewski as a lobbyist," including on the "Chicago franchise agreement"—a "[v]ery big" deal for ComEd.  Tr.2408-09.  The JDDA contracts thus are not false under *Thompson*.

*Single-Source-Justification Forms:*   The government also contended that Defendants falsified three single-source-justification forms, but those forms contained no false statements either.  *See* GX868.at.2-3 (Jan. 2017; Count 3); GX484.at.3-4 (Jan. 2018; Count 7); GX867 (Jan. 2019; Count 9).  All three forms justified exempting the JDDA consulting contracts from competitive bidding because of the unique contributions that JDDA might bring:

43

**Reason for Justification:**
The consultant provides unique insight & perspective to promote ComEd and its business matters to further develop, execute and manage its Government Relations presence.
Government relations will be provided in connection with the City of Chicago, including the Office of the Mayor, Department Agency leadership and Aldermanic offices; Cook County, including Board President's office & Department Agency heads and State of Illinois, including the Governor's Office and State Agency heads.

GX868.at.2 (Jan. 2017).

**Reason for Justification:** Consultant has specific knowledge that cannot be sourced from another consultant/supplier. Will advise ComEd leadership on various ComEd proposals which involve City of Chicago, County of Cook, and State of Illinois per Anne Pramaggiore, Fidel Marquez, and Com Ed leadership's direction.

GX484.at.3 (Jan. 2018).

**Reason for Justification** *(attach additional page if needed and mark justification on page 2)*:

Consultant has specific knowledge that cannot be sources from another supplier/contractor. Will advise ComEd leadership on various ComEd proposals which involve the City of Chicago, Count of Cook and State of Illinois, per Joseph Dominquez, Fidel Marquez and the ComEd leadership team.

GX867.at.1 (Jan. 2019). Those statements are literally true too. The evidence demonstrated that the "consultant" referenced in the forms (*i.e.*, JDDA) contributed significantly to ComEd's efforts in Cook County and the City of Chicago—all "owing to [JDDA's] relationships with the folks in the City of Chicago." Tr.1824-28.

*Invoices:* The various invoices submitted pursuant to these contracts, *see, e.g.*, GX543-44.799.901.905, are not false either. No one testified that the dates, amounts, or recipients on the invoices are false. Furthermore, Marquez confirmed that the invoices are not false in the scope of services: Part of the service provided

44

by ComEd's consultants is to "be available if [ComEd] needed them," so consultants customarily sent invoices—and ComEd customarily paid those invoices—regardless "whether they worked or not that month." Tr.2347; *see also* Tr.2353 (Marquez agreeing that consultants "got paid if they did nothing because they were paid a retainer each month").

*Ledger Entries:* If the contracts, invoices, and single-source-justifications forms are not false, it follows that the ComEd ledger entries recording those invoices and making disbursements pursuant to the terms of the contracts are not false either. *See United States v. Erickson*, 601 F.2d 296, 302 (7th Cir. 1979) (finding that "an entry recording an actual transaction on a bank's books exactly as it occurred is not a false entry under [18 U.S.C. §1005] even though it is a part of a fraudulent or otherwise illegal scheme"). The government theorized that those underlying documents resulted in false information on ComEd's general ledger via ComEd's internal accounting system, Asset Suite. *See* GX701-06.799.895.901.905. But no one testified that Asset Suite created false financial records in ComEd's general ledger. No one disputed the truthfulness of the dates, payment amounts, remittance details, or other information included in the Asset Suite entries. And Asset Suite did not prompt anyone at ComEd to say anything about subcontractors. *See* Tr.3501-02.

In sum, the FCPA counts require proof of false statements, and "the record contains no evidence on which a rational jury could have returned a guilty verdict"

45

on that score, as all of the relevant statements are true. *United States v. Murphy*, 406 F.3d 857, 861 (7th Cir. 2005). Because true does not mean false, Pramaggiore is entitled to acquittal on the FCPA counts in light of *Thompson*.

2.    In reaching the contrary conclusion, the district court started off on the wrong foot in suggesting that *Thompson* had no bearing here merely because it interpreted the term "false" whereas the FCPA uses the word "falsify." D.Ct.Dkt.419.at.6. That is deeply flawed. As already explained, when Congress enacted the FCPA provision at issue in 1988, *see* Pub. L. 100-418, §5002, Aug. 23, 1988, 102 Stat. 1107, contemporaneous dictionaries described "falsify" simply and accurately as the verb form of "false," *see* pp.42, *supra*. Indeed, if anything, the verb form connotes an effort to take records that are otherwise truthful and knowingly make them false. The court below resisted that conclusion because, in more recent dictionaries (including one from 2024), it found a more expansive definition of "falsify" that encompasses the term "misrepresent." D.Ct.Dkt.419.at.6-7. But "[a] fundamental canon of statutory construction is that … words will be interpreted as taking their ordinary, contemporary, common meaning … *at the time Congress enacted the statute*." *Perrin v. United States*, 444 U.S. 37, 42 (1979) (emphasis added) (citations omitted). This Court strictly enforces that rule. *See, e.g.*, *Hulce v. Zipongo Inc.*, 132 F.4th 493, 498 & n.3 (7th Cir. 2025) ("The parties rely on present-day dictionary definitions even though we should consider the meaning 'at the time

Congress enacted the statute.'").  Moreover, even in contexts that do not implicate the rule of lenity, the Supreme Court has warned against elevating an outlying dictionary definition reflecting a looser meaning over the standard definition of a term.  *See MCI Telecomm. Corp. v. AT&T Co.*, 512 U.S. 218, 225-28 (1994).  The rule of lenity would demand the same result, *a fortiori.  See Skilling*, 561 U.S. at 410-11.

Perhaps recognizing as much, the district court asserted that, "even if 'falsify' means … to 'make false,'" the evidence here is sufficient for a jury to conclude that the documents at issue here are false.  D.Ct.Dkt.419.at.8.  That conclusion likewise misses the mark.  The court first suggested that "it's not a true statement to say that ComEd purchased JDDA's services when JDDA was, in part, a pass-through for a non-consulting, non-lobbying stream of benefits for Mr. Madigan." D.Ct.Dkt.419.at.9.  But as the court conceded in the very next sentence, "there *were* some services rendered" by JDDA.  D.Ct.Dkt.419.at.9 (emphasis added).  The court's real position thus is that the JDDA contracts are false because they contained only half-truths.  But as the Sixth Circuit recently summarized, *Thompson* "was saying that a half-truth is not a *false* statement because a half-truth is a true statement (though a misleading one)." *In re FirstEnergy Corp. Sec. Litig.*, 149 F.4th 587, 609 (6th Cir. 2025).

Turning to the single source justification forms, the district court conceded that Pramaggiore's argument "about … the literal truth of [those] forms" is even "stronger." D.Ct.Dkt.419.at.10. But the court nevertheless found those forms false too because the real "truth was that the consultant [*i.e.*, JDDA] provided an opportunity or a pass-through for benefits to be conferred on Mr. Madigan"—not that JDDA provided "unique insight and perspective." D.Ct.Dkt.419.at.10. The court did not and could not dispute, however, that the evidence in this case amply demonstrated that JDDA did in fact provide unique services. *See* pp.43, *supra*. Hence, the court's basic beef is that the forms—while literally true—are misleading because they omit some supposedly pertinent information. To reiterate, "a statement that is misleading but true is by definition not a 'false statement.'" *Thompson*, 604 U.S. at 414.

The district court's other reasoning suffers from similar flaws. The court deemed the invoices and ledger entries false because, "[e]ven if some of the money" related to "actual services rendered, not all of it was." D.Ct.Dkt.419.at.7. Once again, that is just another way of saying that those records contained half-truths. As the Supreme Court has explained, half-truths "*state the truth* … far as [they] go[]." *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 263 (2024) (emphasis added).

> **2.** **The conspiracy conviction is independently invalid because the only conspiracy object remaining after *Thompson* is legally flawed.**

1. *Thompson* also independently entitles Pramaggiore to acquittal on the conspiracy count. After *Thompson*, it is beyond debate that three of the four objects of the conspiracy relate to *lawful* conduct, which is not a permissible basis for criminal prosecution. *See United States v. Mahkimetas*, 991 F.2d 379, 383 (7th Cir. 1993) ("A conspiracy is an agreement between two or more people to commit an *unlawful* act[.]" (emphasis added)). The conspiracy conviction thus hinges entirely on what Judge Shah correctly described as an afterthought in this case—*viz.*, that Pramaggiore conspired to "circumvent … a system of internal accounting controls" in violation of the FCPA.[2]    15 U.S.C. §78m(b)(5); *see* D.Ct.Dkt.419.at.11 ("[C]ircumventing the accounting controls was not a big part of the trial[.]"). That conspiracy object does not get the job done for the government either, as it is itself legally invalid.

The government's theory that Pramaggiore conspired to circumvent a "system of internal accounting controls" rests entirely on alleged violations of Exelon's Code of Conduct. *See* D.Ct.Dkt.1.at.2-6.9-10.12.18. But the Code of Conduct is not a

---

[2] The first criminal trial *ever* alleging that a defendant conspired to willfully circumvent internal accounting controls in violation of the FCPA occurred only in 2022, the year before Pramaggiore's trial. *See* Dkt.186 at 6, *United States v. Hwa*, No. 18-cr-538 (E.D.N.Y. filed Mar. 26, 2022).

"system of internal accounting controls" within the meaning of 15 U.S.C. §78m(b)(5). As the word "accounting" in that statutory phrase would suggest, a "system of internal accounting controls" "refers to a company's *financial accounting*." *SEC v. SolarWinds Corp.*, 741 F.Supp.3d 37, 106 (S.D.N.Y. 2024); *see SEC v. World-Wide Coin Invs., Ltd.*, 567 F.Supp.724, 750 (N.D. Ga. 1983); *see also Oxford English Dictionary* 87-88 (2d ed. 1989) ("[T]he management of financial affairs, e.g., those of a business enterprise."); *Accounting*, Black's Law Dictionary (5th ed. 1979) ("An act or system of making up or settling accounts; a statement of account, or a debit and credit in financial transactions."). That understanding is reinforced by the reality that §78m(b)(5) cross-references §78m(b)(2)(A), which in turn discusses "transactions," "financial statements," "generally accepted accounting principles," and "books [and] records." 15 U.S.C. §78m(b)(2)(A). These terms "are uniformly consistent with *financial* accounting." *SolarWinds*, 741 F.Supp.3d at 106; *see also Yates v. United States*, 574 U.S. 528, 543 (2015). That is why this Court has stated that "[e]xamples" of systems of internal accounting controls are those systems that "include manual or automated review of records to check for completeness, accuracy and authenticity; a method to record transactions completely and accurately; and reconciliation of accounting entries to detect errors." *McConville v. SEC*, 465 F.3d 780, 790 (7th Cir. 2006).

50

The Code of Conduct is no such system. It is instead an aspirational document that touches on a host of things that have nothing to do with financial accounting, such as workplace safety standards, GX739.at.14 ("Never possess any weapons, explosives, or incapacitating devices while on duty."); drug and alcohol policies, *see id.* at 15 ("Recognize the signs of others being under the influence of alcohol, including slurred speech, bloodshot eyes, uneven gait or stumbling, or the odor of alcohol."); diversity and inclusion guidelines, *see id.* at 16 ("Consider a diverse range of candidates in hiring, promotion, and other employment decisions."); and basic workplace etiquette, *see id.* at 17 ("Apologize if something we do or say causes offense."). Thus, while it is perhaps fair to describe the Code of Conduct as "internal" to Exelon, it is simply not Exelon's (or ComEd's) actual "*system of internal accounting control*s." Indeed, Exelon's Chief Compliance Officer—while testifying for the government—confirmed that the Code is not an "internal control" over "financial reporting."[3] Tr.3250-53.

2. The district court claimed otherwise, *see* D.Ct.Dkt.419.at.11, because one page of the 42-page Code of Conduct includes language instructing employees to "[r]ecord all business transactions, events and conditions accurately, completely,

---

[3] In all events, if the FCPA is malleable enough to encompass violations of a code of conduct, it is unconstitutionally vague. *See, e.g.*, *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983); *see also Skilling*, 561 U.S. at 415-16 (Scalia, J., concurring).

and in a timely fashion," D.Ct.Dkt.357.at.46; *see also* GX739.at.22. But that page affirmatively undermines the theory that the Code of Conduct amounts to a system of internal controls. The referenced page also states that Exelon employees should "[f]ollow generally accepted accounting principles and all record-keeping procedures and guidelines in our internal controls systems." GX739.at.22. The Code of Conduct itself thus contemplates that Exelon's "internal controls systems" are something *other* than the Code of Conduct. And other Code of Conduct pages are in a similar vein. One of them states that Exelon is required to "have accounting controls to assure that all transactions are recorded fairly and accurately in our financial books and records." D.Ct.Dkt.739.at.35. Again, that language assumes that the system of "accounting controls" are external to the Code of Conduct.[4]

Perhaps recognizing the oddity of describing the Code of Conduct as a system of internal accounting controls, the district court alternatively suggested that Pramaggiore conspired to circumvent the system of internal accounting controls based on the testimony of a few witnesses who described ComEd rules like "requiring the submission of invoices before payment" and "the requirement that

---

[4] The government's effort to convert a code of conduct into a system of internal controls that can serve as the basis for a federal felony raises the same concerns that caused the Supreme Court to balk at the government's efforts to felonize codes of conduct in other contexts. *See Van Buren v. United States*, 593 U.S. 374, 395-96 (2021). There is no basis for courting those difficulties when Exelon's Code distinguishes itself from Exelon's internal controls systems.

payments be for services actually rendered." D.Ct.Dkt.357.at.45; *see* Tr.3513-14.3487-88. But the record contains no evidence that Pramaggiore or anyone else *circumvented* those or any other requirements. To the contrary, the reams of invoices (and other documents) in the record underscore that the very opposite is true. *See, e.g.*, GX702-05. And to the extent that the court meant to imply that Pramaggiore and other co-conspirators circumvented internal accounting controls by producing *false* books and records, that misses the mark for all the same reasons provided above: The books and records are not false under *Thompson*.

### B.    At a Minimum, the District Court Should Have Ordered a New Trial on All Remaining Counts in Light of *Thompson*.

As the foregoing demonstrates, *Thompson* makes clear that Pramaggiore is entitled to acquittal on the five remaining non-§666 counts. At a minimum, though, the district court should have granted Pramaggiore a new trial on those counts.

#### 1.    After *Thompon* and *Snyder*, the conspiracy conviction may have rested on three flawed objects.

While the need for a new trial on the conspiracy count is already clear in light of *Snyder,* adding *Thompson* to the mix further confirms the point. As explained, it is "constitutional error" for a jury to "return[] a general verdict" on a multi-object conspiracy charge when at least one of those objects is "legally invalid," and the government can cure the error only by proving that it is "harmless." *Skilling*, 561 U.S. at 414. Two of the four conspiracy objects are legally invalid after *Snyder*, and

53

the third object—the false-statement object—has now fallen by the wayside too because of *Thompson*.

The government thus can satisfy the harmless-error standard only by proving "beyond a reasonable doubt" that the jury rested its conspiracy verdict *exclusively* on the circumventing-internal-accounting-controls object, which all agree was an afterthought at trial. *Ruiz*, 990 F.3d at 1030-31. Even assuming that this object is legally valid and is distinguishable from the false-statement object, *but see* pp.49-52, *supra*, it hardly furnishes a basis to satisfy harmless-error review. As the district court acknowledged, the circumventing-internal-accounting-controls theory barely even made a cameo appearance at trial. *See* D.Ct.Dkt.419.at.11. It follows that the jury certainly "could" have convicted Pramaggiore on the conspiracy count based on an invalid object. *Edwards*, 869 F.3d at 500.

The district court nevertheless determined that the government had carried its beyond-a-reasonable-doubt burden after deeming the evidence "sufficient" to establish this barely mentioned object. D.Ct.Dkt.419.at.12. But that "is not a statement of a harmless-error inquiry"; it is instead a statement as to "whether there is sufficient evidence to support a verdict," which "is not the question here." *Jensen*, 800 F.3d at 903; *see also, e.g.*, *United States v. Hatfield*, 591 F.3d 945, 951 (7th Cir. 2010) (finding error not harmless while describing the evidence as "strong enough

54

to justify a verdict of guilt beyond a reasonable doubt"). Pramaggiore thus is at least entitled to a new trial on the conspiracy count in light of *Thompson*.

### 2. The FCPA convictions likely resulted from an application of *Pinkerton*, and the government's misstatements of law regarding falsity at trial compound the problems.

For at least two reasons, *Thompson* entitles Pramaggiore, at a minimum, to a new trial on the FCPA counts. First, and as already explained, *see* pp.35, *supra*, the district court instructed the jury that it could find Pramaggiore guilty based on co-conspirator conduct by applying *Pinkerton*. *See* D.Ct.Dkt.249.at.48. Because, as just explained, the conspiracy conviction cannot survive *Thompson* (or *Snyder*) and the jury was allowed to convict on the substantive FCPA counts based on the conspiracy and the *Pinkerton* instruction, there must be a new trial on the FCPA counts. Nor is the error harmless here either. The government has already acknowledged that the jury "could have found Pramaggiore guilty" on all substantive FCPA counts "under a theory of *Pinkerton* liability," D.Ct.Dkt.325.at.74, so it is "completely impossible for us to say that … the [*Pinkerton*] instruction did not contribute to [Pramaggiore's] conviction[]," *Chapman v. California*, 386 U.S. 18, 26 (1967). While the government could have avoided this problem by joining Pramaggiore's request for a special-verdict form, it instead adamantly opposed it. *See* D.Ct.Dkt.140.at.89-91; D.Ct.Dkt.237.at.10-11. Because no one "know[s] what evidence the jury credited" as a result of that decision, the proper course is to grant

55

a new trial on the FCPA counts if the Court does not otherwise order acquittal. *United States v. Borrero*, 771 F.3d 973, 977 (7th Cir. 2014).

Second, the government repeatedly insisted that the documents at issue here contained falsehoods merely because they failed to disclose the JDDA subcontractors, thus leaving the mistaken impression that the jury could convict based on a theory that is illegitimate under *Thompson*.  *See, e.g.*, Tr.297.314.5178-79.5185.5187-89.  It is well-established that "a misstatement of law by a prosecutor can invalidate a conviction."  *Whitehead v. Cowan*, 263 F.3d 708, 729 (7th Cir. 2001).  As this Court has explained, "[s]ix factors" inform that inquiry:  "(1) whether the prosecutor misstated evidence; (2) whether the remarks implicate specific rights of the accused; (3) whether the defense invited the comments; (4) the trial court's instructions; (5) the weight of the evidence against the defendant; and (6) the defendant's opportunity to rebut the improper remarks."  *Evans v. Jones*, 996 F.3d 766, 778-79 (7th Cir. 2021).

All six factors militate in favor of (at least) a new trial here.  Indeed, the first factor is satisfied in spades given the government's numerous misstatements reflecting an erroneous understanding of falsity.  *See* pp.40, *supra*.  Those misstatements also implicated Pramaggiore's constitutional rights to a trial at which the jury determines guilt and innocence based on a correct legal standard. Pramaggiore obviously did not invite the misstatements herself, and the trial court's

instructions on the issue did not offset those misstatements, as they simply referenced the FCPA's "falsify" language without correcting the government's mistaken understanding of the term. *See* D.Ct.Dkt.249.at.43. These misstatements, moreover, carried significant weight since the government could not point to any statements that are literally false under *Thompson*. And because *Thompson*'s clarification of the law came down after trial, Pramaggiore had no opportunity to meaningfully rebut the government's improper remarks.

*   *   *

In short, the problems with sending Pramaggiore to prison based on the FCPA tail of a case where all agree that the §666 counts cannot survive *Snyder* are manifold and fundamental. From the outset, the government pressed the theory that Defendants falsified records and circumvented accounting systems to cover up an unlawful bribery scheme. A jury convinced that the *quid-pro-quo*-less scheme nonetheless amounted to criminal bribery could likewise conclude that the malefactors would knowingly cover their tracks to disguise their federal felony. But after *Snyder*, no federal bribery scheme existed to cover up at all. Leaving the FCPA tail in place, while vacating the §666 counts, blinks all reality and creates an injustice that cannot stand.

57

**III.  The District Court Committed At Least Two Other Errors That Warrant Retrial Or Resentencing.**

Because *Snyder* and *Thompson* are sufficient to wipe out all of Pramaggiore's convictions, this Court need not proceed any further.  In all events, the district court committed two other errors—an evidentiary error and a sentencing error—that would warrant relief in the unlikely event that *Snyder* and *Thompson* do not resolve this appeal.

**A.  The District Court Improperly Excluded Relevant *Mens Rea* Evidence.**

The conspiracy and FCPA counts required the government to prove that Pramaggiore acted with knowing intent.  *See* 15 U.S.C. §78m(b)(2)(A); 18 U.S.C. §1371; *United States v. Brown*, 865 F.3d 566, 570 (7th Cir. 2017).  Given that much of the underlying conduct occurred outside Pramaggiore's tenure, this was no small task.  At trial, Pramaggiore sought to offer exculpatory evidence demonstrating that she represented part of the solution, not part of the problem/conspiracy.  *See* Tr.4549-50.  More precisely, in June 2012—after ComEd had hired two of the four JDDA subcontractors and after the supposed conspiracy had already begun—Pramaggiore contacted multiple senior executives at ComEd, including multiple individuals not alleged to have participated in the alleged conspiracy, and requested an investigation into *all* ComEd lobbyists (including JDDA subcontractors) after the *Chicago Sun-Times* ran a story describing "a connection between a ComEd lobbyist and a

58

company whose owners had been convicted of fraud." D.Ct.Dkt.357.at.64. Pramaggiore also asked those executives to update Exelon's General Counsel—Darryl Bradford, who also did not participate in the alleged conspiracy—and to disclose the results of the investigation in corporate records:

---

**From:** Pramaggiore, Anne R:(ComEd)
**Sent:** Tuesday, June 12, 2012 4:03 PM
**To:** Marquez, Fidel:(ComEd)
**Cc:** Pramaggiore, Anne R:(ComEd); O'Neill, Thomas S:(ComEd); Falcone, Mark A.:(ComEd)
**Subject:** Re: Sun-Times Story

We need a more aggressive approach on this. Do we have company ethics involved?

Tom -- we need to bring Darryl into the loop here. We need a full investigation into what Marybeth is involved in and we need to have formally laid out in company records to protect ourselves.



CONFIDENTIAL – PROTECTED FROM DISCLOSURE UNDER FOIA

DEFENSE EXHIBIT
**1135**
Case No. 20 CR 812

EXE00941955
EXE00941955

DX 1135, Page 1 of 5

---

Please give an plan of action tomorrow.

Anne

Sent from my iPad

---

**From:** Pramaggiore, Anne R:(ComEd)
**Sent:** Tuesday, June 12, 2012 4:36 PM
**To:** Marquez, Fidel:(ComEd)
**Cc:** Pramaggiore, Anne R:(ComEd); O'Neill, Thomas S:(ComEd); Falcone, Mark A.:(ComEd)
**Subject:** Re: Sun-Times Story

Yes. I want to make sure we have done everything we can (including a broader investigation if need be) to insure we have protected the company against exposure to public embarrassment or worse. I want To make sure Darryl is fully briefed and If he some thoughts on how we can best protect ComEd and Exelon we take stock of those thoughts. Anne
Sent from my iPad

---

```
Message
From:        Pramaggiore, Anne R:(ComEd) [/O=UCM/OU=COMED/CN=RECIPIENTS/CN=VPLAR]
Sent:        6/13/2012 9:29:15 AM
To:          O'Neill, Thomas S:(ComEd) [thomas.oneill@comed.com]
CC:          Pramaggiore, Anne R:(ComEd) [anne.pramaggiore@comed.com]; Marquez, Fidel:(ComEd)
             [fidel.marquez@comed.com]; Falcone, Mark A.:(ComEd) [mark.falcone@comed.com]
Subject:     Re: Sun-Times Story


Fidel -- you need to take a look at our other lobbyists as well and determine whether we need to do any
assessments.  Anne
```

Although the evidence is both admissible, *see* Fed. R. Evid. 803(3), and highly probative, as conspirators do not often blow the whistle on their own alleged criminal conduct in front of non-conspirators, the district court prevented the jury from seeing it. According to the court, the evidence would have "unnecessarily expand[ed] the scope of the trial by demanding significant time on a narrow ancillary issue." D.Ct.Dkt.357.at.64-65. That assertion is bewildering, as whether Pramaggiore had the necessary *mens rea* is no sideshow; it is at least half of a criminal case. As the Supreme Court has explained, "*mens rea* … separate[s] wrongful conduct" from "otherwise innocent conduct." *Ruan v. United States*, 597 U.S. 450, 458 (2022). In fact, even the court below elsewhere conceded that "Pramaggiore's state of mind was the key issue in dispute at trial." D.Ct.Dkt.357.at.77. This Court has stated that "[a] defendant is entitled to a new trial if there is a reasonable possibility that a trial error had a prejudicial effect upon the jury's verdict." *United States v. Van Eyl*, 468 F.3d 428, 436 (7th Cir. 2006); *see also United States v. Peak*, 856 F.2d 825, 834-35

(7th Cir. 1988). Given the centrality of Pramaggiore's "state of mind" to the outcome of this case, that standard is readily met here.

## B.     The District Court Improperly Imposed a Prison Sentence in Violation of the FCPA's No Knowledge Clause.

The district court's sentencing error is equally clear. The FCPA's penalties provision provides that "no person shall be subject to imprisonment" under the FCPA "for the violation of any rule or regulation if [s]he proves that [s]he had no knowledge of such rule or regulation." 15 U.S.C. §78ff(a). As the government explained below, at least two courts of appeals have held that this No Knowledge Clause applies in circumstances involving statutory violations. *See, e.g.*, D.Ct.Dkt.439.at.46 (citing *United States v. Behrens*, 644 F.3d 754, 757 (8th Cir. 2011); *United States v. Reyes*, 577 F.3d 1069, 1081 (9th Cir. 2009)). Accordingly, if the "preponderance of the evidence," *Reyes*, 577 F.3d at 1081, demonstrates that Pramaggiore had no knowledge of the books-and-records statute here, *see* 15 U.S.C. §78m(b)(5), she is entitled to resentencing—and to no prison time.

All the relevant evidence makes clear that Pramaggiore did not have any such knowledge. The books-and-records statute, 15 U.S.C. §78m(b)(5), is an esoteric provision that is rarely enforced in the criminal context and even more rarely in cases without a foreign bribery component. Indeed, this Court almost never confronts cases involving the statute. And Pramaggiore testified at trial that she had only "limited interaction" with the FCPA herself, which came while serving on the board

61

of a different company that had a Chinese subsidiary. Tr.4572-73. By contrast, the government introduced only Exelon's Code of Conduct in its quest to prove Pramaggiore's knowledge of the provision. *See* GX739; Tr.4658-61. But the Code of Conduct just says that the FCPA "[r]equires that publicly held companies, like Exelon, have accounting controls to assure that all transactions are recorded fairly and accurately in our financial books and records." GX739.at.35. The Code of Conduct conspicuously never mentions 15 U.S.C. §78m(b)(5) and never suggests that individuals (as opposed to "publicly held companies") face criminal liability. Thus, while this case never should have reached the sentencing phase for all the reasons provided above, the district court at least should have refrained from imposing a prison sentence given that Pramaggiore had no knowledge of the statute that she supposedly violated.

# CONCLUSION

For the foregoing reasons, this Court should reverse the district court's judgment and order a judgment of acquittal, a new trial, or resentencing.

Respectfully submitted,

Scott R. Lassar
Daniel C. Craig
Jennifer M. Wheeler
Emily R. Woodring
Joan E. Jacobson
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603

s/Paul D. Clement
Paul D. Clement
  *Counsel of Record*
Andrew C. Lawrence
Kevin Wynosky
Julia Grant*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Supervised by principals of the firm who are members of the Virginia bar

*Counsel for Defendant-Appellant Anne Pramaggiore*

November 14, 2025

63

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(c) because, according to the "word count" function of Microsoft Word 2016, the Brief contains 13,906 words, excluding the parts of the brief exempted from the word count by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because the Brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

November 14, 2025

<u>s/Paul D. Clement</u>
Paul D. Clement

## CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(d)

Pursuant to Circuit Rule 30(d), counsel certifies that all materials required by

Circuit Rule 30(a) and (b) are included in the appendix.

November 14, 2025

s/Paul D. Clement
Paul D. Clement

**CERTIFICATE OF SERVICE**

I hereby certify that, on November 14, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Paul D. Clement
Paul D. Clement

**No. 25-2349**

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

—————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

ANNE PRAMAGGIORE,

*Defendant-Appellant*.

—————————

On Appeal from the United States District Court
for the Northern District of Illinois,
No. 20-cr-00812-2

—————————

## SHORT APPENDIX OF DEFENDANT-APPELLANT
## ANNE PRAMAGGIORE

—————————

Oral Argument Requested

—————————

| | |
|---|---|
| SCOTT R. LASSAR | PAUL D. CLEMENT |
| DANIEL C. CRAIG | *Counsel of Record* |
| JENNIFER M. WHEELER | ANDREW C. LAWRENCE |
| EMILY R. WOODRING | KEVIN WYNOSKY |
| JOAN E. JACOBSON | JULIA GRANT* |
| SIDLEY AUSTIN LLP | CLEMENT & MURPHY, PLLC |
| One South Dearborn | 706 Duke Street |
| Chicago, IL 60603 | Alexandria, VA 22314 |
| | (202) 742-8900 |
| | paul.clement@clementmurphy.com |

*Supervised by principals of the firm who are
members of the Virginia bar

*Counsel for Defendant-Appellant Anne Pramaggiore*

# TABLE OF CONTENTS

Judgment in a Criminal Case (July 21, 2025) (R.467) ........................................SA.1

Memorandum Opinion and Order (Jan. 4, 2024) (R.357) ...................................SA.9

Transcript of Proceedings – Motion to Reconsider (Mar. 3, 2025) (R.398)... SA.103

Transcript of Proceedings - Motion to Reconsider (May 28, 2025) (R.419) . SA.128

Excerpt of Transcript of Proceedings – Sentencing of Anne Pramaggiore
(July 21, 2025) (R.478) ............................................................................... SA.141

## CERTIFICATE OF COMPLIANCE WITH RULE 30

I hereby certify that the Short Appendix herein includes all of the materials required by Circuit Rule 30(a) and (b).

November 14, 2025                                             s/ *Paul D. Clement*
                                                             Paul D. Clement

# UNITED STATES DISTRICT COURT
Northern District of Illinois

| | |
|---|---|
| UNITED STATES OF AMERICA<br>**v.**<br>ANNE PRAMAGGIORE | **JUDGMENT IN A CRIMINAL CASE**<br><br>Case Number:    1:20-CR-00812(2)<br>USM Number:    19672-509<br><br>Scott R. Lassar<br>Defendant's Attorney |

**THE DEFENDANT:**

☐ pleaded guilty to count(s)

☐ pleaded nolo contendere to count(s)         which was accepted by the court.

☒ was found guilty on Counts 1, 3, 4, 7, and 9 of the Indictment after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section / Nature of Offense | Offense Ended | Count |
|---|---|---|
| 18:371.F Conspiracy To Defraud The United States | 05/01/2019 | 1 |
| 15:78F.M Securities Exchange Penalties | 05/01/2019 | 3 |
| 15:78F.M Securities Exchange Penalties | 05/01/2019 | 4 |
| 15:78F.M Securities Exchange Penalties | 05/01/2019 | 7 |
| 15:78F.M Securities Exchange Penalties | 05/01/2019 | 9 |

The defendant is sentenced as provided in pages 2 through 8 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☒ Counts 2, 5, 6, and 8 of the Indictment are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States Attorney for this District within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States Attorney of material changes in economic circumstances.

July 21, 2025
Date of Imposition of Judgment

Signature of Judge
Manish S. Shah, United States District Judge

Name and Title of Judge

July 21, 2025
Date

SA1

SA2

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 2 – Imprisonment                                                                                    Judgment – Page 2 of 8

DEFENDANT:  ANNE PRAMAGGIORE
CASE NUMBER:  1:20-CR-00812(2)

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:
24 months as to Counts 1, 3, 4, 7, and 9 of the Indictment.  Terms to run concurrently.

☒　　The court makes the following recommendations to the Bureau of Prisons: Defendant be designated to FCI Mariana Satellite Camp.

☐　　The defendant is remanded to the custody of the United States Marshal.

☐　　The defendant shall surrender to the United States Marshal for this district:

　　☐　　at　　　on

　　☐　　as notified by the United States Marshal.

☒　　The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

　　☒　　before 2:00 pm on December 1, 2025.

　　☒　　as notified by the United States Marshal.

　　☐　　as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows: _____

_____

_____

Defendant delivered on _____ to _____ at_____, with a certified copy of this judgment.

　　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　UNITED STATES MARSHAL

　　　　　　　　　　　　　　　　　　By　_____
　　　　　　　　　　　　　　　　　　　　　　DEPUTY UNITED STATES MARSHAL

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 3 – Supervised Release

Judgment – Page 3 of 8

DEFENDANT:  ANNE PRAMAGGIORE
CASE NUMBER:  1:20-CR-00812(2)

# MANDATORY CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C § 3583(d)

Upon release from imprisonment, you shall be on supervised release for a term of:
6 months as to Counts 1, 3, 4, 7 and 9 of the Indictment.  Terms to run concurrently.

The court imposes those conditions identified by checkmarks below:

**During the period of supervised release:**
- ☒ (1)  you shall not commit another Federal, State, or local crime.
- ☒ (2)  you shall not unlawfully possess a controlled substance.
- ☐ (3)  you shall attend a public, private, or private nonprofit offender rehabilitation program that has been approved by the court, if an approved program is readily available within a 50-mile radius of your legal residence.  [Use for a first conviction of a domestic violence crime, as defined in **§ 3561(b)**.]
- ☐ (4)  you shall register and comply with all requirements of the Sex Offender Registration and Notification Act **(42 U.S.C. § 16913)**.
- ☒ (5)  you shall cooperate in the collection of a DNA sample if the collection of such a sample is required by law.
- ☒ (6)  you shall refrain from any unlawful use of a controlled substance AND submit to one drug test within 15 days of release on supervised release and at least two periodic tests thereafter, up to 104 periodic tests for use of a controlled substance during each year of supervised release.  [This mandatory condition may be ameliorated or suspended by the court for any defendant if reliable sentencing information indicates a low risk of future substance abuse by the defendant.]

# DISCRETIONARY CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C § 3563(b) AND 18 U.S.C § 3583(d)

**Discretionary Conditions** — The court orders that you abide by the following conditions during the term of supervised release because such conditions are reasonably related to the factors set forth in **§ 3553(a)(1)** and **(a)(2)(B), (C), and (D);** such conditions involve only such deprivations of liberty or property as are reasonably necessary for the purposes indicated in **§ 3553 (a)(2) (B), (C), and (D);** and such conditions are consistent with any pertinent policy statement issued by the Sentencing Commission pursuant to **28 U.S.C. 994a**. The court imposes those conditions identified by checkmarks below:

**During the period of supervised release:**
- ☐ (1)  you shall provide financial support to any dependents if you are financially able to do so.
- ☐ (2)  you shall make restitution to a victim of the offense under **§ 3556** (but not subject to the limitation of **§ 3663(a)** or **§ 3663A(c)(1)(A)**).
- ☐ (3)   you shall give to the victims of the offense notice pursuant to the provisions of **§ 3555**, as follows:  ☐
- ☐ (4)  you shall seek, and work conscientiously at, lawful employment or, if you are not gainfully employed, you shall pursue conscientiously a course of study or vocational training that will equip you for employment.
- ☐ (5)  you shall refrain from engaging in the following occupation, business, or profession bearing a reasonably direct relationship to the conduct constituting the offense, or engage in the following specified occupation, business, or profession only to a stated degree or under stated circumstances; (if checked yes, please indicate restriction(s)) ☐ .
- ☒ (6)  you shall not knowingly meet or communicate with any person whom you know to be engaged, or planning to be engaged, in criminal activity and shall not:
    - ☐  visit the following type of places: ☐ .
    - ☒  knowingly meet or communicate with the following persons: **John Hooker, Michael McClain, and Jay Doherty.**
- ☒ (7)  you shall refrain from ☐ any or ☒ excessive use of alcohol (defined as ☒ having a blood alcohol concentration greater than 0.08; or ☐         ), and from any use of a narcotic drug or other controlled substance, as defined in **§ 102** of the Controlled Substances Act (**21 U.S.C. § 802**), without a prescription by a licensed medical practitioner.
- ☒ (8)  you shall not possess a firearm, destructive device, or other dangerous weapon.
- ☐ (9)  ☐  you shall participate, at the direction of a probation officer, in a substance abuse treatment program, which may include urine testing up to a maximum of 104 tests per year.
    - ☐  you shall participate, at the direction of a probation officer, in a mental health treatment program, and shall take any medications prescribed by the mental health treatment provider.
    - ☐  you shall participate, at the direction of a probation officer, in medical care; (if checked yes, please specify:

SA3

Case: 25-2349     Document: 30     Filed: 11/14/2025     Pages: 233
Case: 1:20-cr-00812 Document #: 467 Filed: 07/21/25 Page 4 of 8 PageID #:12343
ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 3 – Supervised Release                                                           Judgment – Page 4 of 8

DEFENDANT:  ANNE PRAMAGGIORE
CASE NUMBER:  1:20-CR-00812(2)

.)

☐ (10)    (intermittent confinement): you shall remain in the custody of the Bureau of Prisons during nights, weekends, or other intervals of time, totaling ⬜ [no more than the lesser of one year or the term of imprisonment authorized for the offense], during the first year of the term of supervised release (provided, however, that a condition set forth in **§3563(b)(10)** shall be imposed only for a violation of a condition of supervised release in accordance with **§ 3583(e)(2)** and only when facilities are available) for the following period ⬜.

☐ (11)    (community confinement): you shall reside at, or participate in the program of a community corrections facility (including a facility maintained or under contract to the Bureau of Prisons) for all or part of the term of supervised release, for a period of ⬜ months.

☐ (12)    you shall work in community service for ⬜ hours as directed by a probation officer.

☐ (13)    you shall reside in the following place or area: ⬜, or refrain from residing in a specified place or area: ⬜.

☒ (14)    you shall not knowingly leave from the federal judicial district where you are being supervised, unless granted permission to leave by the court or a probation officer. The geographic area of the Northern District of Illinois currently consists of the Illinois counties of Cook, DuPage, Grundy, Kane, Kendall, Lake, LaSalle, Will, Boone, Carroll, DeKalb, Jo Daviess, Lee, McHenry, Ogle, Stephenson, Whiteside, and Winnebago.

☒ (15)    you shall report to the probation office in the federal judicial district to which you are released within 72 hours of your release from imprisonment.  You shall thereafter report to a probation officer at reasonable times as directed by the court or a probation officer.

☒ (16)    ☒     you shall permit a probation officer to visit you ☐ at any reasonable time or ☐ as specified: ,
                  ☒ at home          ☒ at work          ☐ at school          ☒ at a community service location
                  ☒ other reasonable location specified by a probation officer
          ☒     you shall permit confiscation of any contraband observed in plain view of the probation officer.

☒ (17)    you shall notify a probation officer within 72 hours, after becoming aware of any change in residence, employer, or workplace and, absent constitutional or other legal privilege, answer inquiries by a probation officer. You shall answer truthfully any inquiries by a probation officer, subject to any constitutional or other legal privilege.

☒ (18)    you shall notify a probation officer within 72 hours if arrested, charged with a crime, or questioned by a law enforcement officer.

☐ (19) (home confinement)
          ☐     (a)(i) (home incarceration) for a period of __ months, you are restricted to your residence at all times except for medical necessities and court appearances or other activities specifically approved by the court.
          ☐     (a)(ii) (home detention) for a period of __ months, you are restricted to your residence at all times except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities pre-approved by the probation officer.
          ☐     (a)(iii) (curfew) for a period of __ months, you are restricted to your residence every day.
          ☐     from the times directed by the probation officer; or ☐ from __ to __.
          ☐     (b) your compliance with this condition, as well as other court-imposed conditions of supervision, shall be monitored by a form of location monitoring technology selected at the discretion of the probation officer, and you shall abide by all technology requirements.
          ☐     (c) you shall pay all or part of the cost of the location monitoring, at the daily contractual rate, if you are financially able to do so.

☐ (20)    you shall comply with the terms of any court order or order of an administrative process pursuant to the law of a State, the District of Columbia, or any other possession or territory of the United States, requiring payments by you for the support and maintenance of a child or of a child and the parent with whom the child is living.

☐ (21)    (deportation): you shall be surrendered to a duly authorized official of the Homeland Security Department for a determination on the issue of deportability by the appropriate authority in accordance with the laws under the Immigration and Nationality Act and the established implementing regulations.  If ordered deported, you shall not remain in or enter the United States without obtaining, in advance, the express written consent of the United States Attorney General or the United States Secretary of the Department of Homeland Security.

☒ (22)    you shall satisfy such other special conditions as ordered below.

☐ (23)    You shall submit your person, property, house, residence, vehicle, papers [computers (as defined in 18 U.S.C. 1030(e)(1)), other electronic communications or data storage devices or media,] or office, to a search conducted by a United States Probation Officer(s). Failure to submit to a search may be grounds for revocation of release.  You shall warn any other occupants that the premises may be subject to searches pursuant to this condition. An officer(s) may conduct a search pursuant to this condition only when reasonable suspicion exists that you have violated a condition of your supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner.

☐ (24)    Other:

SA4

DEFENDANT:  ANNE PRAMAGGIORE
CASE NUMBER:  1:20-CR-00812(2)

## SPECIAL CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C. 3563(b)(22) and 3583(d)

The court imposes those conditions identified by checkmarks below:

**During the term of supervised release:**

☐ (1)  if you have not obtained a high school diploma or equivalent, you shall participate in a General Educational Development (GED) preparation course and seek to obtain a GED within the first year of supervision.

☐ (2)  you shall participate in an approved job skill-training program at the direction of a probation officer within the first 60 days of placement on supervision.

☐ (3)  you shall, if unemployed after the first 60 days of supervision, or if unemployed for 60 days after termination or lay-off from employment, perform at least _____ hours of community service per week at the direction of the probation office until gainfully employed. The total amount of community service required over your term of service shall not exceed _____ hours.

☐ (4)  you shall not maintain employment where you have access to other individual's personal information, including, but not limited to, Social Security numbers and credit card numbers (or money) unless approved by a probation officer.

☒ (5)  you shall not incur new credit charges or open additional lines of credit without the approval of a probation officer unless you are in compliance with the financial obligations imposed by this judgment.

☒ (6)  you shall provide a probation officer with access to any requested financial information requested by the probation officer to monitor compliance with conditions of supervised release.

☒ (7)  within 72 hours of any significant change in your economic circumstances that might affect your ability to pay restitution, fines, or special assessments, you must notify the probation officer of the change.

☒ (8)  you shall file accurate income tax returns and pay all taxes, interest, and penalties as required by law.

☐ (9)  you shall participate in a sex offender treatment program.  The specific program and provider will be determined by a probation officer. You shall comply with all recommended treatment which may include psychological and physiological testing. You shall maintain use of all prescribed medications.

    ☐  You shall comply with the requirements of the Computer and Internet Monitoring Program as administered by the United States Probation Office. You shall consent to the installation of computer monitoring software on all identified computers to which you have access and to which the probation officer has legitimate access by right or consent.  The software may restrict and/or record any and all activity on the computer, including the capture of keystrokes, application information, Internet use history, email correspondence, and chat conversations.  A notice will be placed on the computer at the time of installation to warn others of the existence of the monitoring software. You shall not remove, tamper with, reverse engineer, or in any way circumvent the software.

    ☐  The cost of the monitoring shall be paid by you at the monthly contractual rate, if you are financially able, subject to satisfaction of other financial obligations imposed by this judgment.

    ☐  You shall not possess or use at any location (including your place of employment), any computer, external storage device, or any device with access to the Internet or any online computer service without the prior approval of a probation officer. This includes any Internet service provider, bulletin board system, or any other public or private network or email system

    ☐  You shall not possess any device that could be used for covert photography without the prior approval of a probation officer.

    You shall not view or possess child pornography. If the treatment provider determines that exposure to other

    sexually stimulating material may be detrimental to the treatment process, or that additional conditions are likely to assist the treatment process, such proposed conditions shall be promptly presented to the court, for a determination, pursuant to **18 U.S.C. § 3583(e)(2),** regarding whether to enlarge or otherwise modify the conditions of supervision to include conditions consistent with the recommendations of the treatment provider.

    You shall not, without the approval of a probation officer and treatment provider, engage in activities that will put

    you in unsupervised private contact with any person under the age of 18, and you shall not knowingly visit locations where persons under the age of 18 regularly congregate, including parks, schools, school bus stops, playgrounds, and childcare facilities. This condition does not apply to contact in the course of normal commercial business or unintentional incidental contact

    ☐  This condition does not apply to your family members: _____ [Names]

    ☐  Your employment shall be restricted to the judicial district and division where you reside or are supervised, unless approval is granted by a probation officer.  Prior to accepting any form of employment, you shall seek the approval of a probation officer, in order to allow the probation officer the opportunity to assess the level of risk to the community you will pose if employed in a particular capacity.  You shall not participate in any volunteer

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 3 – Supervised Release                                                                    Judgment – Page 6 of 8

DEFENDANT:  ANNE PRAMAGGIORE
CASE NUMBER:  1:20-CR-00812(2)

activity that may cause you to come into direct contact with children except under circumstances approved in advance by a probation officer and treatment provider.

☐ You shall provide the probation officer with copies of your telephone bills, all credit card statements/receipts, and any other financial information requested.

☐ You shall comply with all state and local laws pertaining to convicted sex offenders, including such laws that impose restrictions beyond those set forth in this order.

☒ (10) you shall pay to the Clerk of the Court any financial obligation ordered herein that remains unpaid at the commencement of the term of supervised release, at a rate of not less than 10% of the total of your gross earnings minus federal and state income tax withholdings.

☒ (11) you shall not enter into any agreement to act as an informer or special agent of a law enforcement agency without the prior permission of the court.

☐ (12) you shall pay to the Clerk of the Court $_____ as repayment to the United States of government funds you received during the investigation of this offense. (The Clerk of the Court shall remit the funds to _____ (list both Agency and Address.)

☐ (13) if the probation officer determines that you pose a risk to another person (including an organization or members of the community), the probation officer may require you to tell the person about the risk, and you must comply with that instruction. Such notification could include advising the person about your record of arrests and convictions and substance use. The probation officer may contact the person and confirm that you have told the person about the risk.

☐ (14) You shall observe one Reentry Court session, as instructed by your probation officer.

☐ (15) Other:_____

SA6

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 5 – Criminal Monetary Penalties                                                Judgment – Page 7 of 8

DEFENDANT:  ANNE PRAMAGGIORE
CASE NUMBER:  1:20-CR-00812(2)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| TOTALS | $500.00 | $.00 | $750,000.00 | $.00 | $.00 |

☐  The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to **18 U.S.C. § 3664(i)**, all nonfederal victims must be paid before the United States is paid.

☐  Restitution amount ordered pursuant to plea agreement $

☒  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant **to 18 U.S.C. § 3612(f)**.  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to **18 U.S.C. § 3612(g)**.

☐  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐  the interest requirement is waived for the _____ .

☐  the interest requirement for the _____ is modified as follows:

☒  The defendant's non-exempt assets, if any, are subject to immediate execution to satisfy any outstanding restitution or fine obligations.

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

SA7

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 6 – Schedule of Payments                                                                                    Judgment – Page 8 of 8

DEFENDANT:  ANNE PRAMAGGIORE
CASE NUMBER:  1:20-CR-00812(2)

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**  ☒  Lump sum payment of $750,500.00 due immediately.

       ☐  balance due not later than          , or

       ☒  balance due in accordance with ☐ C, ☐ D, ☐ E, or ☒ F below; or

**B**  ☐  Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

**C**  ☐  Payment in equal          (*e.g. weekly, monthly, quarterly*) installments of $          over a period of          (*e.g., months or years*), to commence          (*e.g., 30 or 60 days*) after the date of this judgment; or

**D**  ☐  Payment in equal          (*e.g. weekly, monthly, quarterly*) installments of $          over a period of          (*e.g., months or years*), to commence          (*e.g., 30 or 60 days*) after release from imprisonment to a term of supervision; or

**E**  ☐  Payment during the term of supervised release will commence within          (*e.g., 30 or 60 days*) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  ☒  Special instructions regarding the payment of criminal monetary penalties:
you shall pay to the Clerk of the Court any financial obligation ordered herein that remains unpaid at the commencement of the term of supervised release, at a rate of not less than 10% of the total of your gross earnings minus federal and state income tax withholdings.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>(including defendant number) | Total Amount | Joint and Several<br>Amount | Corresponding Payee, if<br>Appropriate |
|---|---|---|---|

**See above for Defendant and Co-Defendant Names and Case Numbers (*including defendant number*), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.**

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 20 CR 812** |
| **MICHAEL McCLAIN, ANNE PRAMAGGIORE, JOHN HOOKER, And JAY DOHERTY,** | **Judge Harry D. Leinenweber** |
| **Defendants.** | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Defendants move pursuant to Federal Rule of Criminal Procedure 29(c) for judgements of acquittal and Rule 33 for a New Trial in the alternative.

## I.     BACKGROUND

In this case, the Government brought charges against four defendants for activity related to the Speaker of the Illinois House of Representatives Michael J. Madigan and Commonwealth Edison Company ("ComEd"). The four Defendants are former ComEd external lobbyist Michael McClain ("McClain"), former ComEd CEO Anne Pramaggiore ("Pramaggiore"), former ComEd Vice President of Legislative and External Affairs and ComEd external lobbyist John Hooker ("Hooker"), and former ComEd external consultant Jay Doherty ("Doherty"). ComEd, a company headquartered in Chicago, delivered electricity to customers across northern Illinois. ComEd was a subsidiary of Exelon

Corporation ("Exelon"), a utility services holding company that provided energy to customers in multiple states.

## A. Indictment

In the indictment (Dkt. No. 1), Count One charged the defendants with participating in a conspiracy between 2011 and 2019 to confer a stream of benefits on Speaker Madigan, intending to corruptly influence and reward Madigan's efforts to assist ComEd with respect to legislation affecting ComEd's business, and seeking to conceal this illegal activity by falsifying books and records to disguise the true nature of benefits provided to Madigan.

Counts Two, Five, Six, and Eight of the indictment charged the defendants with corruptly offering and agreeing to give things of value, with the intent to influence and reward Michael Madigan in connection with state business, in violation of Title 18, United States Code, Sections 666(a)(2) and 2.

Counts Three, Four, Seven, and Nine charged the defendants with falsifying or causing to be falsified the books and records of ComEd and Exelon, in violation of the Foreign Corrupt Practices Act of 1977, Title 15, United States Code, Sections 78m(b)(5) and 78ff(a) (the "FCPA") and Title 18, United States Code, Section 2. The charges are summarized in the table below.

| Count | Defendants | Violations | Description |
|---|---|---|---|
| 1 | McClain Pramaggiore Hooker Doherty | 18 U.S.C. §§ 371, 2 | Conspiracy to commit an offense against the United States<br>• Object 1: Violation of 18 U.S.C. § 666(a)(1)(b)<br>• Object 2: Violation of 18 U.S.C. § 666(a)(2)<br>• Objects 3 and 4: Violation of 15 U.S.C. §§ 78m(b)(5), 78ff(a) |
| 2 | McClain Pramaggiore | 18 U.S.C. §§ 666(a)(2), 2 | Corruptly offering a thing of value, related to the ComEd contract with Reyes Kurson |
| 3 | McClain Pramaggiore Hooker Doherty | 15 U.S.C. §§ 78m(b)(5), 78ff(a) and 18 U.S.C. § 2 | Falsification of records in connection with the 2017 JDDA contract |
| 4 | McClain Pramaggiore Hooker Doherty | 15 U.S.C. §§ 78m(b)(5), 78ff(a) and 18 U.S.C. § 2 | Falsification of records in connection with the January to March 2018 JDDA contract |
| 5 | McClain Pramaggiore | 18 U.S.C. §§ 666(a)(2), 2 | Corruptly offering a thing of value, related to ComEd's Board position for Ochoa |
| 6 | McClain Pramaggiore | 18 U.S.C.§§ 666(a)(2), 2 | Corruptly offering a thing of value, related to the 2018 amendment of the JDDA contract<br>(payment of Michael Zalewski) |
| 7 | McClain Pramaggiore Hooker Doherty | 15 U.S.C. §§ 78m(b)(5), 78ff(a) and 18 U.S.C. § 2 | Falsification of records in connection with the 2018 amendment of the JDDA contract |
| 8 | McClain Pramaggiore Hooker Doherty | 18 U.S.C. §§ 666(a)(2), 2 | Corruptly offering a thing of value, related to the 2019 renewal of the JDDA contract |
| 9 | McClain Pramaggiore Hooker Doherty | 15 U.S.C. §§ 78m(b)(5), 78ff(a) and 18 U.S.C. § 2 | Falsification of records in connection with the 2019 JDDA contract |

## B. Trial

At trial, the Government's case, spanning roughly six weeks, did not contain the proverbial smoking gun in evidence, but it did include: emails and business records; recorded phone conversations; video surveillance surreptitiously gathered by Government cooperator; photographs taken by FBI agents in the homes of Defendants and their alleged co-conspirators; and testimony of law enforcement officers corroborating the surveillance.

This evidence showed that ComEd had business before the legislature frequently throughout the eight-year period of the alleged conspiracy. (*See* Tr. at 2343:7-9.)  For example, in 2011, the Illinois General Assembly passed the Energy Infrastructure and Modernization Act ("EIMA"), and in 2016, the General Assembly passed the Future Energy Jobs Act ("FEJA").  It also showed that over the course of approximately eight years, ComEd paid, indirectly through intermediaries such as Jay D. Doherty & Associates (JDDA), $1.3 million dollars to former Speaker Michael Madigan's political allies, namely former Alderman Frank Olivo ("Olivo"), precinct captain Ray Nice ("Nice"), precinct captain Ed Moody ("Moody"), former Alderman Mike Zalewski ("Zalewski"), and former legislator Eddie Acevedo ("Acevedo"), who did little to no work to work for ComEd. (*See* Government Exhibit ("GX") GX876.)

On April 11, 2023, once the Government expressed its intention to rest shortly thereafter, defendants filed Rule 29(a) motions for judgment of acquittal. (Dkt. Nos. 213, 214, 215, 218, 220, 238, 240; Transcript ("Tr.") 5127:16-19.) The Court denied the motions. (Dkt. No. 222; Tr. 3884:24-3887:15; 5127:20-25.)

- 4 -

The Defense case contained witnesses, documents, and even testimony from Defendants Pramaggiore and Hooker, who took the stand. The Court denied Doherty's motion to bring an expert to testify about common lobbying procedures but allowed Defendants to bring character testimony limited to honesty, truthfulness, and integrity.

On May 2, 2023, the jury returned a verdict of guilty against all Defendants on all counts with which they were charged, specifically against all Defendants for Counts One, Three, Four, Seven, Eight, and Nine, and against Defendants McClain and Pramaggiore for Counts Two, Five, and Six.

Each Defendant filed separate post-trial motions, seeking judgments of acquittal on various counts and a new trial on other grounds of claimed error. (Dkt. Nos. 262–266; 270–271.) For the reasons discussed below, the Motions are denied.

## II.    <u>MOTIONS FOR ACQUITTAL</u>

Faced with a motion for a judgment of acquittal, a federal district court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." FED. R. CRIM. P. 29; *United States v. Garcia,* 919 F.3d 489, 496 (7th Cir. 2019). Affording "great deference" to the jury's verdict, the Court thus views the evidence in the light most favorable to the conviction, asking "whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt." *United States v. Love,* 706 F.3d 832, 837 (7th Cir. 2013) (citing *Jackson v. Virginia,* 443 U.S. 307, 318–19 (1979)). While this is a high hurdle for defendants to clear, the "height of the hurdle depends directly on the strength of the government's evidence," and a properly instructed jury may occasionally convict even when no rational trier of fact could

- 5 -

SA13

find guilt beyond a reasonable doubt. *United States v. Snyder,* 71 F.4th 555, 571 (7th Cir. 2023) (citations omitted).

A motion for judgment of acquittal calls on the court to distinguish between reasonable and speculative inferences, and the line between the two "is by no means a sharp one." *United States v. Jones,* 713 F.3d 336, 346–347 (7th Cir. 2013). An ambiguous statement paired with only little support, for example, is speculation. *See Jones,* 713 F.3d at 350 (citing *Piaskowski v. Bett,* 256 F.3d 687 (7th Cir.2001)). Evidentiary gaps cannot reasonably be filled with mere "gut feelings and suspicions." *Garcia,* 919 F.3d 499. Likewise, a jury cannot find guilt by mere association. *Jones,* 713 F.3d 336. However, a juror may, indeed must, use its common sense. *See, e.g., United States v. Chester,* 2017 WL 3394746, at *28 (N.D. Ill., Aug. 8, 2017).

### A.  Conspiracy Count

To sustain a conviction of conspiracy, the Government must prove three elements beyond a reasonable doubt: (1) the conspiracy as charged in Count One existed; (2) the defendant knowingly became a member of the conspiracy with an intent to advance the conspiracy; and (3) one of the conspirators committed an overt act in an effort to advance a goal of the conspiracy within five years of the indictment. (Jury Instructions ("Instr.") 1; Dkt. No. 249.) Here, that was five years from November 18, 2015. (*See* Dkt. No. 1.)

As to the third element, there was evidence of payments made from ComEd to intermediaries, arrangements between the intermediaries and the recipients, and relationships between these recipients and Madigan that Madigan valued. Each of these occurred within five years of the indictment. These receipts, even if obscuring details,

- 6 -

were straightforward insofar as they were payments from ComEd to intermediaries, so a jury could easily find these receipts met the threshold of an overt act whereby Madigan's people received payment from ComEd to appease him.

The first and second elements are not as plain, yet the jury still found support for these over the seven-week trial. The Government has summarized its Count One conspiracy charge (consistent with the Indictment, *see* Dkt. No. 1) as follows: the defendants conspired: "(1) to corruptly influence and reward Michael Madigan in connection with his official duties as the Speaker of the Illinois House of Representatives, in order to assist ComEd with respect to the passage of legislation favorable to ComEd and its business and to defeat of [sic] legislation unfavorable to ComEd and its business; (2) to create false contracts, invoices, and other books and records to disguise the true nature of benefits paid to Madigan's associates; and (3) to circumvent internal controls." (Resp. by USA ("Resp.") at 8 (Dkt. No. 325).) Because this evidence came through various parts of the trial and connected to other counts, the Court refers to the rest of this opinion in reaching its conclusion that a reasonable jury could find the existence of the conspiracy. For evidence of the first object of the conspiracy, see discussion of Counts Two, Five, Six, and Eight, and for evidence of the second and third objects, see discussion of Counts Three, Four, Seven, and Nine. Additional evidence that a conspiracy existed, not discussed elsewhere in this opinion, includes that when Moody became Cook County Recorder of Deeds, it was Madigan who made the decision to halt ComEd's payments to Moody because, at that point, State Representative John Bradley was paying Moody on behalf of ComEd. (GX109.) McClain delivered the news to Bradley, suggesting that

- 7 -

Bradley characterize the final payment Bradley made to Moody as a holiday "bonus." (GX111; (*see also* Tr. 3762:1-12.))

There was plenty of evidence of the value of these subcontractors to Madigan, particularly to his political operation. For example, McClain told Marquez, "Ray Nice, he's, um, one of, um, he's one of the top three precinct captains, and he also trains, uh, people how to go to door to door." (GX23.) Ed Moody testified that Madigan ranked him and his twin brother, Fred, first among all precinct captains and workers. (*See, e.g.,* Tr. 3648:21-3651:6.) Moody explained that Madigan rewarded him for his political efforts by arranging for him to receive payments from ComEd lobbyists — first McClain, then Doherty, then Shaw Decremer, and finally John Bradley — even though he performed little or no work. Tr. 3617:13-3618:16. Ed Moody testified that he understood the purpose of the payments from McClain was "to stay active in my politics." (Tr. 3680:22-3682:12, 3689:25-3692:16.4.)

Evidence as to the second element can be adduced through the various counts. While referring to those counts, the Court will briefly discuss additional evidence as to each defendant that could have guided the jury in finding that the defendant knowingly became a member of the conspiracy with an intent to advance the conspiracy.

McClain acted as the conduit to convey Madigan's direction to those within ComEd who could facilitate them, ensured that Madigan's demands were complied with, monitored the payment of the Madigan associates, and oversaw contract adjustments. For example, he facilitated the hiring of former Alderman Michael Zalewski, a beneficiary of the Madigan conspiracy. See Count Six *infra* II.B.3.i.

- 8 -

During the April 24, 2018 call, when McClain told Hooker that Madigan had asked for Zalewski to "work under Jay Doherty," Hooker remarked, "that has paid off for us in the past," then described the arrangement as being "off the beaten path" because there's "just no flow through there." (GX12.) Hooker acknowledged, "it took me and you to think of that." (*Id.*) McClain remarked, "He's just used to asking and then the other people figure it out and uh, it's, it, it's done perfectly. Doherty's been uh, uh, wonderful doing it . . . he doesn't even blink about it." (*Id.*) In another call, McClain and Hooker discussed that they were "creative" in the arrangement they had set up with the Madigan subcontractors. (GX17.)

In January 2019, when Marquez wore a wire to lunch with Hooker and brought up the subcontractor arrangement, Hooker told Marquez that "me and McClain was [sic], I was the one that created it." (GX118); (Tr. 2001:1-11.) Hooker suggested to McClain that he explain the subcontractors to Pramaggiore's successor as ComEd CEO, Dominguez, because "with the Jay Doherty stuff . . . [McClain's] got a little leg up." (GX148.) The context allows for a reasonable inference that this comment references the advantage ComEd gained with its legislative agenda by vice of the payments to Madigan allies. Hooker added: "that which is understood need not be mentioned." (*Id.*) One can reasonably infer that Hooker was promoting the concealment of the subcontractor arrangement.

On February 18, 2019, after she had been promoted to CEO of Exelon Utilities, a position that gave her oversight authority over ComEd's operations (Tr. 1990:9-16,

- 9 -

4635:7-14), Pramaggiore instructed Marquez to wait to change Doherty's contract (including payments to the ghost payrollers) until the legislative session ended. (GX131.)

Evidence of Doherty's knowledge of joining this conspiracy with an intent to advance is not as clear. As President of the City Club of Chicago, he facilitated connections and built a network, and he indeed demonstrated skill in making meaningful connections in the community. Several witnesses mentioned his role in Special Olympics and other volunteer work that does not pay yet presumably added value to his lobbying clients because he was garnering goodwill across the community.

That said, the record contains enough evidence to render a finding of Doherty's knowledge and corrupt intent. Moody testified that while he was receiving ComEd paychecks via Doherty, the only work he did was knocking door-to-door for Madigan's political organization. (Tr. 3699:8-13; 3714:15-21.) Doherty knew this. On February 13, 2019, When Marquez asked Doherty about the work the subcontractors performed, Doherty responded, "[T]hey keep their mouth shut . . . [D]o they do anything for me on a day-to-day basis? No." (GX129.) And he communicated his understanding of the link between the subcontractor payments to ComEd's legislative success: When Marquez asked Doherty if the subcontracts should be renewed even though the subcontractors did not work, Doherty replied, "Your money comes from Springfield, right?" He followed up: "[I]f it ain't broke, don't fix it with those guys." (GX129.)

\* \* \*

Because the evidence was sufficient for a reasonable jury to convict on the conspiracy count, the Court will not overturn the verdict as to Count One.

- 10 -

\* \* \*

These conspiracy convictions open pathways to conviction on the other counts, namely pursuant to *Pinkerton v. United States,* 328 U.S. 640, 647 (1946). *See United States v. Ailsworth,* 867 F.Supp. 980, 987 (D. Kan. 1994) (A defendant in a case charging a conspiracy may be liable for each of the substantive counts charged in an indictment under any of three separate theories: (1) Actual commission of the crime; (2) Participation in the crime as an aider or abettor; and (3) Liability under a *Pinkerton* theory.) Under *Pinkeron*, a defendant can be held vicariously liable for a substantive offense committed by another member of a conspiracy if: (1) the defendant was a party to the conspiracy; (2) the offense was "within the scope of the unlawful project"; (3) the offense was committed in furtherance of the conspiracy; and (4) the defendant could have reasonable foreseen the offense as a "necessary or natural consequence of the unlawful agreement." 328 U.S. 647.

## B. Corruption Counts

Counts Two, Five, Six, and Eight charge Defendants with corruption in violation of 18 U.S.C. § 666 as to contracts between ComEd and various actors connected to Madigan. Count Two of the Indictment charged Defendants Pramaggiore and McClain with violating Section 666 by causing ComEd and Exelon to contract with the Reyes Kurson law firm "with intent to influence and reward [Madigan] . . . in connection with . . . legislation affecting ComEd and its business." Count Five of the Indictment charged Defendants Pramaggiore and McClain with violating Section 666 by causing ComEd and Exelon to offer "a position on the ComEd board of directors and monetary payments associated

- 11 -

with that position [to Juan Ochoa] . . . with intent to influence and reward [Mr. Madigan] . . . in connection with . . . legislation affecting ComEd and its business." (Indictment at 46 ¶ 2.) Count Six of the Indictment charged Defendants Pramaggiore and McClain with violating Section 666 by 2018 amendment to JDDA contract to include payment to Madigan associate and former Alderman Michael Zalewski. Count Eight of the Indictment charged all Defendants with violating Section 666 by the 2019 renewal of the JDDA contract.

Under 18 U.S.C. § 666(a)(2), it is criminal to offer, give, or agree to give things of value to another person, where the giver acts "corruptly, with the intent to influence or reward" an agent of a State or local government agency in connection with some business, transaction, or series of transactions of the government agency. Thus, to convict Defendants of bribery, or aiding and abetting bribery, the Government needed to prove two elements beyond a reasonable doubt: (i) that the alleged things of value were given or offered to influence or reward Madigan "in connection with . . . legislation affecting ComEd and its business," and (ii) that Defendants possessed corrupt intent. *See* 18 U.S.C. § 666(a). (*See also* Indictment at 43 ¶ 2, 46 ¶ 2, 47 ¶ 2, 49 ¶ 2.)

Defendants individually raise several challenges to the corruption convictions together and separately. Specifically, they have argued: the Government was required to show quid pro quo and it did not; the Government was required to prove the payments did not fall under the 18 U.S.C. § 666(c) safe harbor, *i.e.,* were not bona fide in the usual course of business, and it did not; and ultimately even if the jobs were subject to 18

- 12 -

U.S.C. § 666, no reasonable jury could have found that Defendants had corrupt intent or that the contracts were in connection with legislation.

The Court will first address Defendants' arguments about the requirement of quid pro quo and the applicability of the safe harbor provision to this case. Then, the Court will address the Defendants' arguments about sufficiency of evidence in proving the elements of these counts.

### 1. Quid Pro Quo

The Seventh Circuit has held that a quid pro quo is not required for a conviction under 18 U.S.C. § 666. *See United States v. Snyder,* 71 F.4th 555, 579 (7th Cir. 2023) *cert. granted,* 2023 WL 8605740 (2023) (reaffirming the Seventh Circuit's "refus[al] to import an additional, specific quid pro quo requirement into the elements of § 666," and explaining (cleaned up), ("[a] bribe requires a quid pro quo — an agreement to exchange this for that, to exchange money or something else of value for influence *in the future.* A gratuity is paid as a reward for actions the payee has already taken or is already committed to take . . .  The statutory language 'influenced or rewarded' easily reaches both bribes and gratuities.") (emphasis in original).

Pramaggiore, joined by all Defendants, argues that because the Government explicitly accused Pramaggiore of *bribery*, it took on the burden of showing a quid pro quo. The Court is not convinced because the Government case was consistent with gratuities, and the record contained sufficient evidence of a "this" (rewards named in the indictment) for "that" (multiple legislative activities).

- 13 -

First, the Government's case was consistent with gratuities. Although the Government repeated the term "bribe" and derivatives thereof during trial more frequently than "gratuity," (*see* Pramaggiore's Mot. for Acquittal ("Pramaggiore Mot.") (1) Appxs. A, B, Dkt. Nos. 264-1, 264-2 (recording Government's language during trial)), the jury was not misled, and Defendants were on notice. The activities the jury condemned might be understood as "bribery" in regular parlance because although the terms' legal meanings differ, *see Snyder,* 71 F.4th 579 (explaining that bribes involve something "in the future" and a gratuity rewards past acts), the words are somewhat synonymous in ordinary understanding, *see Snyder,* 71 F.4th at 579-80, 579 n.6 (holding that that although "[t]he title of the codified § 666 refers to '[t]heft or bribery concerning programs receiving Federal funds,' without mentioning gratuities," the text of the statute clearly applies to gratuities). The lawyers here are aware of the general guidance to address juries using common parlance, and the Court takes judicial notice that "bribe" is far more commonly used than "gratuity."[1] The corruption counts of the indictment contains statutory language rather than specifying either "bribery" or "gratuity" in the charges. (Indict. ¶ 1) The jury had a redacted version of the indictment when deliberating.

In any event, the jury may have reasonably found that an earlier event, *e.g.,* the 2011 passage of EIMA, was the act for which Defendants were granting a gratuity. Defendants acknowledge that EIMA was passed before the first payment to Olivo in

---

[1] *See* GOOGLE NGRAM VIEWER, https://books.google.com/ngrams/ (last visited Dec. 28, 2023) (searching "bribe,gratuity" in American English, non-case-sensitive, reveals that of all the unigram words contained in its 2019 corpus of books the term "bribe" (.0002176%) was used nearly nine times more frequency than "gratuity" (.0000265%)).

August 2011. (Pramaggiore Mot. at 12); (*see also* Tr. at 887:6-8.) Defendants do not dispute that this was a viable "business, transaction, or series of transactions of the [Illinois government]" as required by 18 U.S.C. § 666(a)(1)(B), (a)(2). *See e.g.*, Pramaggiore Mot. at 10 ("The Government's evidence at trial revealed only one possible 'business, transaction, or series of transactions' of the State of Illinois that could form the basis of the Section 666 charges: legislation impacting ComEd.") At trial, Illinois legislators testified that Madigan played an influential role in bringing EIMA to a vote, and people who worked with ComEd at the time testified about the importance of this legislation for the company's revenue generation (and in turn for the compensation of ComEd executives). (Tr. 791:3-12; 817:16-16 1459:18-23.)

Indeed, EIMA was but one of many legislative activities the Government argued was of interest to ComEd. For example, FEJA was passed in 2016, and in 2019 ComEd sought, unsuccessfully, Madigan's support in bringing to a vote a standalone formula rate extension bill. (*See* Tr. at 4067:15-4069:8.) That more legislative activity followed EIMA does not necessarily negate EIMA's significance, and any such legislative activity could have formed the "quo" for bribery and remains consistent with a stream of benefits theory. Several legislative actions occurred during the same relatively short time period in which the defendants gave jobs to Madigan people. "A rational juror could conclude from the activities of these defendants that there was an implicit agreement to exchange things of value for official acts." *United States v. Menendez,* 291 F.Supp. 3d 606, 616 (D.N.J. 2018) (citing *McDonnell v. United States,* 579 U.S. 550, 572 (2016) ("The

agreement need not be explicit, and the public official need not specify the means that he will use to perform his end of the bargain.").

### 2. § 666(c) Safe Harbor

Defendants argue that there was insufficient evidence that the corruption counts survive the 666(c) safe harbor provision. Subsection (c) states that § 666 "does not apply to bona fide salary, wages, fees, or other compensation paid . . . in the usual course of business."

Similarly, at the motion to dismiss stage, Defendants argued that the corruption counts could not stand because the Government failed to allege in the indictment that payments were not bona fide in the ordinary course of business. *See United States v. McClain,* WL 488944, at *2 (N.D. Ill., Feb. 17, 2022). The Court rejected the argument that negating the safe harbor was an element of the offense burdening the Government at the charging stage, and instead treated it as an affirmative defense, which the Defendants were entitled to invoke at trial. *Id.*; *see also United States v. Burke,* WL 1970189, at *30 (N.D. Ill., June 6, 2022). Defendants did indeed invoke this argument at trial, and the jury was instructed according to the Seventh Circuit pattern. The jury just did not buy it. In accordance with Rule 29, this Court must determine whether that was reasonable.

The Court finds this conclusion reasonable. Even if the Government does not bear the burden to negate an affirmative defense, a conviction cannot stand if the evidence would not support a conviction beyond a reasonable doubt. And while acknowledging that "[w]hether wages are bona fide and earned in the usual course of business is a

- 16 -

question of fact for the jury to decide," *United States v. Lupton,* 620 F.3d 790 (7th Cir. 2010), the Court heeds precedent and guidance about the scope of this inquiry as a matter of law, this time evaluating the record rather than merely the indictment.

Defendants point to *United States v. Blagojevich,* 794 F.3d 729, 736 (7th Cir. 2015), for its language, "Compensation for a job by someone other than a ghost worker is a bona fide salary," and then to evidence in the record showing that multiple recipients of the funds at issue did some work, and therefore could not be ghost workers, and thus those counts should be eliminated by § 666(c).

*Blagojevich* classified non-ghost workers as bona fide, but the opinion leaves no doubt that the 666(c) inquiry must consider the "usual course of business." *Id*. Indeed, the Court would not expect the jury to adopt a ghost worker theory as to the Reyes Kurson law firm (Count Two) or Juan Ochoa (Count Five). There was plenty of evidence, discussed *supra*, that they worked. The Government offered no evidence that the Reyes Kurson firm did not do the work they were assigned or that Juan Ochoa did not perform his duties for the board. But the evidence presented – when looking at the evidence the prosecution brought, the lack of evidence the defense brought, or as a whole – can reasonably lead to a conclusion that the hires were not in the "usual course of business," as our case law understands it.

*Blagojevich* promulgated that logrolling *among public figures* is a usual course of business in politics. 794 F.3d 734–736 ("[T]he 'usual course of business' in politics includes logrolling," which the Court described as "the swap of one official act for another" and including "a proposal to trade one public act for another."). It explicitly distinguished

potential exchanges involving only public offices from potential exchanges also involving a private payment. *Blagojevich,* 794 F.3d at 734 ("[Logrolling] is fundamentally unlike the swap of an official act for a private payment.").

It is clear to the Court that the transactions here constituted private payments rather than public acts. ComEd is a private company, and the intermediaries received personal income from this private company. Perhaps ComEd, with its monopoly over public utilities in northern Illinois, was effectively acting as a public officeholder by pursuing the customers' interests through legislation that would purportedly improve public access to reliable energy, embrace the efficiencies of technology, and champion environmental sustainability. But Defendants understandably did not argue that the payments were public acts, and still a jury might have believed that advocacy for good policy could be honest.

Other courts assessing the bounds of § 666(c) regarding employment related compensation emphasized various facts, including an underlying corrupt intent for the job, the actions and behavior of the defendant, how the money was spent, and whether the defendant was entitled to the money. *See United States v. Whiteagle,* 759 F.3d 734, 755–56 (7th Cir. 2014) (affirming a conviction under 18 U.S.C. § 666(b) for a corrupt solicitation of a job for a legislator's cousin, explaining that although "more than one witness testified [the cousin] was a good employee, . . . the jury nonetheless reasonably could have construed the employment request as yet another bribe solicitation"); *Lupton*, 620 F.3d 801–02 (affirming that a payment did not fall within the § 666(c) exception because the defendant's "unusual maneuvering . . . reveal[ed] that this was not to be

- 18 -

a payment in the ordinary course of business," and that additionally, evidence showed the defendant misled others regarding its use); *United States v. Bravo-Fernandez,* 913 F.3d 244, 247 (1st Cir. 2019) (holding "[t]hat the payments were made for a legitimate purpose . . . does not render them bona fide under the statute if they were intentionally misapplied, as they were here via sham contracts that skirted conflict of interest rules"; and describing § 666(c) exception as support for contention that "not all federal funds constitute 'benefits' under the statute."); *United States v. Williams,* 507 F.3d 905, 908 (5th Cir. 2007) (collecting cases where legitimate employees received payments that were not covered by § 666(c)); *United States v. Walsh,* 156 F.Supp. 3d 374, 385 (E.D.N.Y. 2016) (explaining § 666(c)'s safe harbor only protects "fixed compensation for services obtained without fraud or deceit and in the normal routine of a business"); *United States v. Bryant,* 556 F.Supp. 2d 378, 427 (D.N.J. 2008) (holding payments are not bona fide paid in the usual course of business when "a public official sells his office for wages, even if some legitimate work is performed in exchange for those wages").

Doherty posits that he sought expert testimony from Lee Drutman to explain lobbying and that the Court erred in denying the motion to admit this testimony. (*See* Doherty Mot. for New Trial at 3, Dkt. No. 270; *see also* Dkt. 230-1.) Doherty explains that Drutman would have testified:

> [A]cross federal and state jurisdictions, politicians routinely recommend individuals who campaign for them or work on their staff. This is also done so that the politician has someone trusted on staff and can rely on what the information that person provides. Referrals from powerful politicians make a lobbyist more valuable. A lobbyist routinely engages in multiple activities with the purpose of making a politician happy. . . A typical lobbyist is paid $5,000 to

- 19 -

> $20,000 per month (the subcontractors were paid $5,000 or less).
> The retainer is not dependent on the volume of work (the
> subcontractors in this case did not preset reports of work activity
> with their invoices). Companies may hire lobbyists that go unused
> for long periods of time (the subcontractors in this case may have
> remained inactive for period of time). In addition, a lobbyist will be
> hired in order to prevent them from working for a competitor.
> Lobbyists do not perform consistent work, but at a time when a
> company needs a particular relationship that lobbyist becomes
> extraordinarily important. *Id.*

Doherty argues that the failure to admit Drutman's testimony "altered the outcome of the trial on a crucial element of the offense for Doherty, 18 U.S.C. § 666(c)." *Id*.

Such a perspective about standard lobbying practices could support the § 666(c) defense that these actions were bona fide in the usual course of lobbying business, but this testimony did not need to come from an expert. (*See* Tr. 3887:21-23); *see also United States v. Lundy*, 809 F.2d 392, 395 (7th Cir. 1987) ("Courts agree that it is improper to permit an expert to testify regarding facts that people of common understanding can easily comprehend."). The defendants elicited testimony from multiple Government witnesses concerning legitimate business lobbying. An ordinary lobbyist is well suited to tell the jury about the ordinary course of lobbying. Doherty's arguments did not pass muster for expert testimony. (*See* Dkt. 230-1; *see also* FED. R. EVID 702.) As stated, the Court's reasoning in denying this motion reflected its reasoning in granting Defendants' motion to prohibit the expert testimony of Professor Richard Simpson, whom the Government proffered to explain common corruption practices in Chicago (*see* Dkt. No. 144): the jury did not need an expert gloss on corroborating testimony. (*See* Dkt. No. 159.)

- 20 -

SA28

The jury did need jury instructions explaining the 666(c) defense, and it received them. (*See* Instr. 24, 30, 36). The Court also rejects Doherty's argument that the Court erred in rejecting his proposed amended jury instruction to specify that the Government carried the burden to prove beyond a reasonable doubt that the jobs were not bona fide and in the normal course of business. The Court adopted the Seventh Circuit pattern, which did not direct such a message. Doherty cites *United States v. Johnson*, 605 F.2d 1025, 1026 (7th Cir. 1979), which urges courts to instruct the jury that the Government bears the burden in "close cases." Even if this were a close case, the jury was instructed that the "burden of proof stays with the Government throughout the case" (*See* Instr. 3), and the Court appropriately declined to give repetitive instructions so as not to add clutter that would dilute the rest.

For these reasons, the Court will not acquit as a matter of law or fact pursuant to § 666(c).

The Court will now address Defendants' arguments for acquittal based on the elements of the corruption charges.

### 3. Elements

#### i. Corrupt Intent Evidence

A conviction under § 666 for gratuities requires a reward be transmitted "'corruptly,' i.e., with the knowledge that giving or receiving the reward is forbidden." *Snyder*, 71 F.4th 555, 580 (7th Cir. 2023). In other words, a defendant must understand "that the payment given is a bribe, reward, or gratuity." *Id.*; *see also* Fed. Crim. Jury Instr. 7th Cir. 666(a)(2) (2022 ed.) (quoting *United States v. Bonito,* 57 F.3d 167, 171

- 21 -

SA29

(2nd Cir. 1995)) ("person acts corruptly, for example, when he gives or offers to give something of value intending to influence or reward a Government agent in connection with his official duties").

Co-conspirator turned cooperator Marquez testified that he understood his actions as intending to influence or reward Madigan. (Tr. 1903:18-1904:13); *see infra* Section II.B.1. Defendants argue that Marquez's state of mind cannot be reasonably transferred to a co-conspirator without speculation. In the same briefings, they also say that no reasonable jury could find corrupt intent when other people involved testified to lacking it. For example, attorneys with backgrounds in white collar criminal law did not think their behavior was wrong. The Court agrees that the testimony of similarly situated people as to their intent is relevant, but it is not in and of itself conclusive one way or the other, and admissibility depends on the context. *See infra* Sections II.B.1.

Even if each piece of evidence were too weak to outshine a shadow of reasonable doubt, collectively, they can do so. The Court will address each Defendant's arguments separately as to each count.

*Count 2 (Kurson)*

*Pramaggiore*

The evidence shows that Reyes Kurson was paid only for work it completed, and its guaranteed hours were cut, rather than increased as McClain requested. (Tr. at 1377:9-17, 1380:20-23, 1411:10-16, 1413:15- 1414:4.) Pramaggiore argues that the evidence was insufficient to establish corrupt intent because former ComEd General Counsel Tom O'Neill testified that Pramaggiore had nothing to do with the decision to

- 22 -

retain the law firm and then talked openly about renewing the contract once informed of it, and still played an insignificant role in its renewal.

In an email dated January 2016 — nearly 11 months before FEJA ultimately passed — concerning Reyes Kurson's contract, McClain wrote that non-action on the "issue of 850 [hours] for his law firm per year" would "provoke a reaction from our Friend." (GX318.) McClain directly wrote to Pramaggiore, "I know the drill and so do you." *Id.* Pramaggiore quickly replied, "Sorry. No one informed me. I am on this." (GX320.) She then forwarded this email to Marquez (GX318), who testified that he understood she took "action to avoid provoking problems with Speaker Madigan." (Tr. at 1205:18-20.)

Pramaggiore argues, that the "contractual negotiation between ComEd and Reyes Kurson took months" further undermines the possibility that it was a bribe, and "[i]t is nonsensical that a reduction in hours would constitute a bribe." But a compromise could, of course, include a thing of value: a contract with fewer than requested hours could still appease Madigan, if absent the Madigan connection there would have been no contract at all (*see* Resp. at 17 (citing testimony from Nicole Nocera, Pramaggiore's chief of staff, that she did not like Reyes Kurson's work)); (*but see* Tr. at 1377:9-17 (O'Neill's testimony that he approved of the firm's work product)). Her argument that it took a while may not have resonated with a jury informed by their own experience that little happens immediately in multi-layered organizations and that subtlety could suggest an intention to conceal true motives.

Pramaggiore tells McClain in an email that she and Marquez will discuss the renewal because O'Neill moved into a new role. (GX393.) O'Neill, who was copied on the

- 23 -

email, replies that he would help with the renewal, and he testified that he was the ultimate decisionmaker in the renewal of the contract. (*Id.*); (Tr. at 1259:12-16.) Defendants argue that evidence shows that O'Neill "handled" the 2017 renewal of the Reyes Kurson contract, and only through speculation could a jury conclude otherwise. However, that O'Neill ultimately "handled" it does not foreclose the involvement of others, namely his boss Pramaggiore who was party to email correspondence with McClain and assured him that she would make it a priority.

<em>McClain</em>

The corrupt intent is even clearer for McClain. McClain, while not a ComEd employee, was making demands on its executives. His email warning that Pramaggiore's failure to get involved "will provoke an action from our friend" could be reasonably understood as pressuring ComEd to appease Madigan. (GX318.)

<em>Count 5 (Ochoa)</em>

Defendants Pramaggiore and McClain argue that the evidence was overwhelming that Juan Ochoa was qualified, met expectations of the position, and performed required work as a member of ComEd's Board. Specifically, former ComEd General Counsel O'Neill testified that both Madigan and former Mayor of Chicago Rahm Emanuel recommended Ochoa for a "Hispanic board seat," and that Ochoa had served as the head of the Latino Chamber of Commerce. (*See* Pramaggiore Mot. at 18, citing Tr. at 1381:18-25, 1382:9-21.) Ochoa himself testified about his qualifications for the position, including having made deep connections in the Latino community and having been appointed to many other boards for reasons unconnected to Madigan. (Tr. at 3565:24-3571:24.) Ochoa

- 24 -

also described his close connection to two influential Latino politicians in Illinois—Congressman Jesús "Chuy" García and then-Congressman Luis Gutiérrez. (*Id.* at 3526:4-23.) Pramaggiore's successor as CEO of ComEd, Joe Dominguez, "liked [Ochoa] a lot" and was "impressed" by Ochoa's qualifications, including that he had a "lot of business acumen" and "seemed to know a lot about the Latino community." (*Id.* at 4195:1-11.)

The Government argues that regardless of Ochoa's qualification and work, the appointment of Ochoa was not a typical hiring decision; the evidence reflected there was internal resistance within ComEd to the appointment of Ochoa; the resistance was stiff enough that Pramaggiore offered to find another placement for Ochoa within the company that would pay Ochoa $78,000 a year — an offer she conveyed to Madigan through McClain. (GX15.) Despite the internal resistance and challenges to Ochoa's appointment, Madigan told McClain to "continue to support" and "go forward with" Ochoa's appointment to the Board, because he wanted to stay in good favor with Congressman Gutierrez, who had recommended Ochoa to Madigan. (GX15; GX21); (*see generally* Tr. 3531:15-3539-2.) McClain passed that message to Pramaggiore, who confirmed she would "keep pressing" to get Ochoa appointed to the Board, as Madigan requested. (GX22); *See United States v. Whiteagle*, 759 F.3d 734, 755 (7th Cir. 2014) (affirming a conviction for a corrupt solicitation of a job for a legislator's qualified cousin under 18 U.S.C. § 666(b)).

*Pramaggiore*

Pramaggiore argues no reasonable jury could have found corrupt intent amidst plenty of evidence of a clear conscience. Specifically, she argues that the fact that she

- 25 -

spoke openly about Madigan's interest in having Ochoa on the Board indicates an understanding that it was acceptable. The Government produced evidence that McClain relayed to Pramaggiore Madigan's direction to "keep pressing" for Ochoa (after she offered to secure some other position that paid the same amount of $78,000 per year). (GX22; GX15.) Pramaggiore said she would do so, indeed did, and took credit for the push to appoint Ochoa and overcoming the resistance she experienced: "I got that done" (GX22; Gx550; GX551; GX554; GX65). Pramaggiore knew that Madigan sought to deliver Ochoa the news once his appointment was confirmed and notified McClain when time was right for Madigan to share the news. (GX64; *see also* GX3; GX548; GX63; GX128.) When McClain thanked her for her efforts, Pramaggiore responded: "[Yo]u take good care of me and, and so does our friend and I will do the best that I can to, to take care of you." (GX90.)

It is possible that a different jury might have found that the evidence showed Pramaggiore was merely acting diligently as CEO to promote ComEd's interests, which include a prominent figure in Chicago's Latino community on its board and a rapport with powerful Illinois politicians replete with innocuous mutual favors. And that it was proper that Madigan's recommendation was but one factor in ComEd's pursuit of Ochoa for a board position it sounded like it might have sought to fill in the ordinary course of business. When Pramaggiore only promised to "do the best I can" to take care of McClain and Madigan, this caveat may have sincerely meant "within the law."

However, the record reflected that Pramaggiore "didn't want" a record of her efforts "in writing." (GX90 ("I wanted to respond to your text on — " "Yes ma'am." "Juan

- 26 -

Ochoa . . . I didn't want to put it in writing.")); (*see also* GX148-T (Hooker: "which is understood need not be mentioned.")). Thus, there is enough evidence for a jury to reasonably reach the conclusion that this jury did, in fact, reach after five days of deliberation. (Dkt. Nos. 244-250.) The Court cannot overturn the conviction of Pramaggiore to Count Two.

<em>McClain</em>

McClain argues that there is insufficient evidence of corrupt intent because the evidence shows he made no effort to conceal the job recommendations in his calls and emails, people well-versed in criminal law accepted McClain's job recommendations from Madigan, and again that Moody, Ochoa, and Reyes were qualified and did meaningful work. For the reasons discussed regarding Pramaggiore, McClain's evidence of corrupt intent was sufficient, and surely stronger because the emails and recorded phone calls show he proactively facilitated the hire at Madigan's bequest. Like Pramaggiore, who had a colorable, though ultimately unpersuasive defense that she was merely acting in ComEd's best interest by hiring a qualified person for the job, McClain may have been legitimately lobbying for the interests of at least one of his clients, ComEd and/or Madigan, but again the jury did not buy it. *See also, infra,* Section II.C.2.

<em>Count 6 (Zalewski)</em>

<em>McClain</em>

The evidence shows that on May 16, 2018, Madigan instructed McClain to talk to Pramaggiore about adding former Zalewski as a ComEd subcontractor. (GX21.) That same day, following Madigan's direction, McClain asked Pramaggiore if she had given

- 27 -

SA35

more thought to adding Zalewski as a subcontractor. (GX22.) Pramaggiore confirmed that she had told Marquez to add Zalewski, *id.*, then, later that day, McClain told Marquez that ComEd would pay Zalewski "five," or $5,000, per month. (GX23.) That same afternoon, McClain called Madigan to confirm that Madigan — with Pramaggiore's blessing — would give Zalewski the good news. (GX25.) Ultimately, consistent with the pattern of the other subcontractors to ComEd connected to Madigan, Zalewski was engaged as a subcontractor under the Doherty contract, (Tr. 1953:25- 1955:13), with no record of performing work for ComEd. (Tr. 1954:25-1956:4.)

*Pramaggiore*

When McClain asked Pramaggiore if she had given more thought to adding Zalewski as a subcontractor, Pramaggiore confirmed that she had told Marquez to add Zalewski: "Yeah, I told Fidel [Marquez] to hire him. To get it done." (GX22.) She gave her blessing to McClain that Madigan would give Zalewski the good news. (*See* GX25.)

To justify the mid-year addition of former Zalewski to Doherty's payroll in 2018 that would increase payment by $5,000 per month to $37,500 per month, Pramaggiore signed a contract amendment stated that JDDA was retained for June 1, 2018 to January 13, 2019 to provide "Government and Public Affairs Professional Services for the following: City Council, Department heads and Mayor's Office, plus expanded role with Cook County Board President's office and Cook County Commissioners Department Heads." (GX544; *see also* GX546.) The internal documentation in ComEd's books and records said nothing about Zalewski. (*Id.*) To the jury, this omission may have seemed

- 28 -

SA36

material to evince her corrupt intent. Moreover, the jury had no evidence that Zalewski contributed to the initiatives Pramaggiore claimed justified the increase.

For these reasons, there was reasonable evidence of corrupt intent as to Count 6.

### Count 8 (JDDA 2019 Renewal)

The Government's proffered evidence of corrupt intent surrounding ComEd's renewal of the JDDA contract in 2019 includes occurrences many years earlier. Pramaggiore wrote to Doherty in an October 11, 2014 email, "It has been a long path with each of [Speaker Madigan and Governor Quinn] and relationships always require care. Thanks for your help in creating an understanding with both of those gentlemen." (GX268.) That this communication occurred years before Count 8 does not render the connection merely speculative because the people involved were the same, and the means for creating this understanding of which they spoke could understandably continue for many years; indeed, the charged conspiracy spans these years.

Defendants argue that Doherty's organization, the City Club, was a key forum for communicating issues of importance to ComEd to key community stakeholders, including politicians. (Tr. 1306:14–1307:10, 2405:15-2406:8, 4543:2-9.) They also argue that the Government's argument that she was speaking in code about the subcontractors is further undercut by the absence of any suggestion that ComEd was bribing former Governor Quinn via subcontractors paid through JDDA. The jury was appropriately instructed not to speculate on why certain people were not charged. Their obedience with this instruction could not make their reasoning speculative.

*ii.  "In Connection With" Evidence*

Defendants insist the link between the ComEd contracts and legislation is too speculative. Specifically, Pramaggiore argues that there is no evidence showing her actions with regards to hiring were "in connection with" legislation. In light of Defendants' arguments at trial that the professional responsibilities of Pramaggiore and the other Defendants included pursuing optimal legislation, it is reasonable to infer that the CEO of a state-regulated utility company sees a connection between the Speaker of that state legislature and legislation. In an email to Doherty in October 2014, Pramaggiore wrote, "Thanks for your help in creating an understanding." (GX268.) While a "thank you" is not an "ask," and this one was not explicit, it does lend support for the connection. Moreover, on a February 20, 2019 phone call, McClain, Hooker, and Pramaggiore, discuss ComEd's legislative strategy. (GX136.)  Defendants argue that the contents of the call constitute legal lobbying. Nevertheless, legal lobbying connects to legislation.

Defendants' point that no evidence shows an explicit ask on the part of ComEd to Madigan for help with their legislative agenda is of no matter. *See United States v. Curescu,* 674 F.3d 735, 740 (7th Cir. 2012) (explaining that parties involved in bribery do not explicitly describe their conduct with these words and "instead use words that the other party to the conversation understands to refer to bribes"). The evidence reflected Pramaggiore's practices of writing thank you notes and of recognizing others' contributions to ComEd. (Tr. 3401:4-12, 4562:24-4563:14.) Obviously, neither appreciation nor "nice relationship[s]" could on their own support a corruption conviction beyond a reasonable doubt, *see Garcia*, 919 F.3d at 503 (".  .  . inferences focused on a

- 30 -

SA38

defendant's presence or association with criminals or their criminal activity—will fail to carry the government's burden."), but they do support this element of the corruption charges, alongside other evidence, discussed herein.

Defendants also argue that the alleged "things of value" did not personally support Madigan. However, they concede that Madigan wanted to hoard power, and a jury could reasonably find based on evidence of the importance of precinct captains, as well as plenty of Madigan's own remarks on wiretaps indicating his interest in what ComEd provided, that Madigan valued the jobs. It is "not necessary for the government to prove [that the targeted public official] actually received the bribes." *United States v. Whiteagle,* 759 F.3d 734, 753 (7th Cir. 2014).

The Court now explains the established connection with legislation of the specific counts.

*Count 2 (Reyes Kurson)*

In 2016, FEJA was passed and the pre-existing Reyes Kurson contract was renewed. For one, Reyes Kurson was engaged on favorable terms because Victor Reyes was one of Madigan's top fundraisers. (Tr. 1180:1-12; 1182:11-19.) ComEd first engaged Reyes Kurson in 2011, at a time when defendants sought to influence and reward Madigan in connection with the EIMA legislation. (Tr. 1180:23-11:82-10.) When the contract came up for renewal in 2014, Pramaggiore told General Counsel Tom O'Neill to go forward, despite O'Neill telling her that "there is not a ton of work" for them to do. (Tr. 1188:6-20.) And in 2016, when Tom O'Neill sought to reduce the number of hours that ComEd guaranteed Reyes Kurson, McClain looped Pramaggiore and Hooker into the

- 31 -

conversation to make sure the contract was negotiated on favorable terms — all while ComEd was working to get its Future Energy Jobs Act ("FEJA") legislation passed. (Tr. 1202:9-1205:20, 1141:13-1142:1) (discussing the multi-year effort to pass FEJA from later 2014/early 2015 to the end of 2016).

Pramaggiore points out that the Government conflated the 2014 renewal and the 2016 renewal of the Reyes Kurson contract to incorrectly imply that O'Neill testified that Pramaggiore directed him to renew the Reyes Kurson contract in 2016. (*See* Tr. at 1188:6-20.) Moreover, on cross examination, O'Neill admitted Pramaggiore instructed him only to work with McClain, rather than explicitly to renew the contract. (*Id*. at 1378:7-1379:23.) The Court agrees that the strength of this particular evidence in connecting Kurson with FEJA would be greater if her instruction were explicit and in closer proximity to the passing of FEJA, but this is insignificant because the charge did not require a connection to FEJA's passage, and this was but one piece of evidence showing a connection.

Defendants argue that no evidence or testimony supports the conclusion that anyone expected that non-renewal of the contract would provoke an adverse action from Madigan affecting legislation. But the jury could draw the rational inference that a lobbyist known to speak for the Speaker of Illinois House of Representatives was communicating with ComEd employees using their ComEd email addresses about business regarding the two entities.

In an email dated January 2016, McClain raised to Pramaggiore and Hooker that ComEd was trying to cut Reyes' hours. He said to them: "I know the drill and so do you.

If you do not get involve[d] and resolve this issue of 850 hours for his law firm per year then he will go to our Friend. Our Friend will call me and then I will call you." (GX318.) McClain threatened that such a step would "provoke a reaction from our Friend," or Madigan. (*Id*.) This email vividly demonstrated what motivated McClain, Hooker, and Pramaggiore in contract negotiations with Reyes Kurson: influencing and rewarding Speaker Madigan, to avoid an adverse outcome in the General Assembly. *Id*. Pramaggiore apologized for the delay before responding, "I am on this." (GX320.) Ten days later, she reported back to McClain: "I asked Fidel [Marquez] and Tom [O'Neill] to address this." (GX321.) The project manager of FEJA, Marc Falcone, was enlisted to ensure that the law firm got what it wanted — even though Falcone was responsible for ensuring that nothing was an obstacle to the passage of FEJA and had nothing whatsoever to do with the retention of law firms by the company. (Tr. 1228:18-1230:15.) As promised, ComEd renewed the contract with Reyes Kurson in 2016. (Tr. 1252:7-12.) ComEd did the same for 2017, after Pramaggiore again stepped in to ensure the renewal. (Tr. 1257:11-13; GX393.)

### Counts 5 (Ochoa) and 6 (Zalewski)

The facts that then-Speaker Madigan gave the news of both Zalewski (GX25) and Ochoa (GX 64; *see also* GX3; GX548; GX63; GX128) of their positions at ComEd permits a reasonable inference that the hires were in connection with legislation.

### Count 8 (JDDA 2019 Renewal)

The connection between the JDDA contract renewal in 2019 and legislation is also straightforward. For example, in a recorded phone call with Marquez, Pramaggiore

- 33 -

explained that Doherty's contract should be renewed for 2019 because, otherwise, the company would be "forced" to give someone a five-year contract "in the middle of needing to get something done in Springfield." (GX 131.) Marquez confirmed that, at the time of this call, ComEd was working to pass the "Skinny Bill" rate legislation. (Tr. 2024:2-7.) Marquez expressly testified that the purpose of ComEd's payments to Doherty's subcontractors was to influence Madigan so he could help ComEd's legislative agenda. (*See, e.g.,* Tr. 1904:10-1905:14.) Additionally, on February 13, 2019, when Marquez asked Doherty if the subcontracts should be renewed even though the subcontractors did not work, Doherty expressly linked the subcontractor payments to ComEd's legislative success: "Your money comes from Springfield, right?" He followed up: "[I]f it ain't broke, don't fix it with those guys." (GX129.)

\* \* \*

Viewing the evidence in the light most favorable to the jury's decision, the Court affirms that a reasonable jury could have weighed the evidence in favor of the corruption convictions. The Court cannot then overturn the verdict.

### C.   FCPA Counts

Counts Three, Four, Seven, and Nine charge defendants with falsification of records in connection with Jay Doherty and Associates ("JDDA") contracts, in violation of the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §§ 78m(b)(5), 78ff(a) and the federal aider and abettor statute, 18 U.S.C. § 2.

Section 78m(b)(5) of the FCPA makes it a crime to "knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify

- 34 -

any book, record, or account described in [the above] paragraph." 15 U.S.C. § 78m(b)(5).

Section 78ff(a) sets forth the penalties for violating the statute. *See id.* § 78ff(a).

Defendants challenge their direct liability, as well as their conviction on an aider

and abettor theory and a *Pinkerton* theory. Because the counts are for similar contracts

that recurred annually, the Court will discuss these counts together where proper. The

Court will first address why the evidence shows a crime was committed, and then will

address facts supporting liability for each Defendant.

### 1. False Documents

Defendants argue they are entitled to acquittal because the Government failed to

demonstrate that the JDDA contracts and single source justification ("SSJ") forms were

false. In support, they point to a laundry list of evidence presented which clearly

establishes that the records did not need to list the subcontractors. (*See, e.g.*, Tr. at

2357:13-2360:14, 3353:12-15, 3354:1-9; GX868.) They contend this evidence

conclusively shows that the contracts and SSJ forms themselves contained no falsehoods.

However, this both mischaracterizes the Government's theory and overlooks supporting

evidence.

The Government's theory was not limited to a technical deficiency; instead, the

Government's indictment alleged that Defendants "created and caused the creation of

false contracts, invoices and other books and records to disguise the true nature of certain

of the payments and to circumvent internal controls." (Indict. ¶ 3) Whether the contracts

or justification forms were mandated to list the subcontractors is relevant, but whether

the whole of the evidence rendered the documents false was a question for the jury.

- 35 -

To that point, the Government introduced plenty of evidence upon which a jury could reasonably conclude that the contracts did contain falsehoods. This included Pramiaggore's approval of the 2017 Doherty contract, which specified that all payments made under the contract were "as consideration for the monthly services" to Doherty for advising ComEd on legislative issues relating to its business. (GX868.) The SSJ forms the Government introduced justified ComEd's retainment of Doherty because of his "unique insight and perspective to promote ComEd and its business matters." Subsequent contracts and justification forms "expanded [his] role". (*Id.*; Tr. 1929:11-19.)

ComEd used SSJ forms when the company engaged the services of a vendor outside of its typical competitive bidding process. (Tr. 1928:12-13.) Marquez testified that this usually occurs when goods or services are uniquely provided by a specific firm or company. (Tr. 1928:19-20.) Carrie Bourque, employed as a principal category manager at Exelon, was involved in the preparation of the ComEd contracts. Bourque testified that it is "really important" that the justification forms are "really accurate" because they are auditable, they help maintain public trust, and they typically identify the individuals that are contracted so that background checks can be performed and confidentiality can be maintained. (Tr. 3297:4-3305:15.) Therefore, the documents at issue were at least incomplete, in part, because no subcontractors were mentioned on the two justification forms signed and approved by Defendant Pramaggiore. (*See, e.g.,* GX868, GX484.) The forms also conveyed that Doherty provided expertise as a consultant that could not be obtained elsewhere, but there was little evidence that his team contributed any expertise, let alone unique expertise. (*Id.*)

- 36 -

SA44

To the contrary, the Government introduced evidence that Doherty and the subcontractors did not do any work.  At trial, Marquez testified that he "didn't expect for [the subcontractors] to be doing work for ComEd" because he "knew they were brought on as a favor to Michael Madigan." (Tr. 1903:18-1904:13.) Marquez further testified that it was his understanding that Pramaggiore did not expect the subcontractors "to be doing anything" because the payments were made so that Madigan "could perhaps be helpful in [ComEd's] legislative agenda" with no expectation of working at all.  (Tr. 1959:2-13, 1904:10-1905:14, 1925:25-1926:2.) Thus, what appeared distinctive about Doherty's team was not its expertise but its connection to Madigan.

This testimony alone is sufficient for a jury to reasonably conclude that the contracts were false because they failed to disclose the intent guiding the payments; that is, the payments were not for professional expertise but instead for something else. The jury also heard a recorded conversation where Doherty told Marquez that ComEd's motivation for paying these individuals was not so that they could assist Doherty, but instead to corruptly influence Madigan. (GX129) (Doherty: "And, uh, [the subcontractors] keep their mouth shut, and you know, so. But, do they, do they do anything for me on a day to day basis? No."). The is substantially more than a "mere modicum" of evidence that defendants falsely represented the reasons for retaining and paying the subcontractors on the Doherty contracts and associated justification forms. *Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *see United States v. Vorley,* 2021 WL 1057903, at \*4 (N.D. Ill., Mar. 18, 2021) (holding that testimonial evidence "standing alone" could

- 37 -

SA45

sufficiently support jury's conclusion that the defendants' technically accurate contracts were lies).

Defendants also accuse the Government of eschewing specificity and changing their theory throughout the case. They argue that the Government failed to articulate a consistent theory supporting the books-and-records charges "refusing to identify which documents it believed were false. And when [the Government] was compelled by the Court to provide information about these charges, it adopted a kitchen-sink approach, claiming that nearly every document associated with the JDDA contract was false," permitting Government to offer "shifting theories" throughout trial in violation of the Fifth Amendment. (Pramaggiore Mot. at 21).

The Fifth Amendment bars prosecutors from presenting different and incomplete sets of facts in support of different theories of culpability for the same crime. *See Stumpf v. Robinson,* 722 F.3d 739, 749 (6th Cir. 2013) (citing *Thompson v. Calderon,* 120 F.3d 1045, 1056 (9th Cir. 1997) (en banc) (plurality op.), *vacated on other grounds,* 523 U.S. 538 (1998)). On the other hand, prosecutors may introduce relevant evidence — including contracts, e-mails, and recorded calls that the Government relied on here — to substantiate their overall theory of liability. *See id*.

Here, the Government was not presenting different and incomplete theories of liability when it alleged that the documents were false, in part, for failing to disclose the subcontractors or the reason for hiring the subcontractors. Instead, Defendants' failure to disclose information on contracts were pieces of evidence that the Government introduced to illustrate how the documents — specifically the 2017 Doherty contract, its

- 38 -

renewal, and the documents otherwise associated with executing the payments under the contract — were full of lies, even where the documents might have been accurately procured. This, too, is no basis for acquittal. *See, e.g., Vorley,* 2021 WL 1057903, at *4 (finding no error in the Government's reliance on information and testimony other than the documents at issue to establish that technically accurate documents contained misrepresentations).

### 2. Knowing and Willful Intent

Defendants next contend that the Government introduced no evidence to find the requisite mens rea. As noted, the Government must prove that the defendants acted with knowing and willful intent. A defendant acts knowingly if the defendant "realized what he was doing and was aware of the nature of his conduct, and did not act through ignorance, mistake or accident." Pattern Crim. Fed. Jury Instructions for the Seventh Circuit 4.06 (*see* Instr. No. 41) "A person acts willfully if he or she acts knowingly and with the intent to do something he or she knows is against the law." *Id.* 409 (Instr. 42.) This intent need not be to falsify records but can be the intent to join a conspiracy to do as much. *Pinkerton v. United States,* 328 U.S. 640, 647 (1946). Viewing the evidence in the light most favorable to the verdict, the Court must deny Defendants' motions, as explained herein for each argument Defendants raised.

### Doherty

Doherty argues the Government's evidence does not sufficiently show a willful and knowing intent. He believes the Government's showing was insufficient as it only showed Doherty's "mere" suspicion that "something was amiss." (Doherty Mot. at 17).

- 39 -

In essence, Doherty disagrees with the jury's interpretation of the evidence: Doherty, a long-time businessman in a position to understand that falsely describing the nature of payments would — and ultimately did — cause the creation of false entries, provided false justifications to ComEd in his invoices and in the contract requisition process. Doherty's contract was under Anne Pramaggiore's (ComEd CEO) budget, which meant that from time to time, Pramaggiore was required to sign the single source justification forms explaining why it was necessary to pay for Doherty's services at the rate invoiced. Doherty was aware that he was asked to provide accurate information so there could be an internal justification as to why the payments under the contract were being increased. (*See, e.g.,* Tr. 2887:17-2889:21; 2890:9-2891:8.) Yet the signed justification forms explained that Doherty was being paid hundreds of thousands of dollars each year on account of his expertise and omitted the detail that a portion of the payments were destined for the subcontractors who were Madigan associates. (*See* GX484; GX868.)

The Government's evidence showed other efforts by Defendants directly associated with Doherty to ostensibly conceal the subcontractors. Janet Gallegos (Doherty's administrative assistant) and Elizabeth Lynch (Director of Corporate Accounting at Exelon) testified that Doherty's invoices said nothing about subcontractors. (*See, e.g.,* Tr. 2811:18-20; 2853:2-6; 3489:20-3489:23.) Gallegos and Carrie Bourque (principal category manager for Exelon, who created and executed contracts for ComEd consultants) likewise testified that the contracts between Doherty and ComEd said nothing about the subcontractors. (*See, e.g.,* Tr. 2889:16-18; 3295:19-3298:20; 3304:6-

- 40 -

SA48

19; 3309:25-3310:10.) Lynch further testified that ComEd's internal accounting records also said nothing about the subcontractors, and instead stated that the payments to the intermediaries were for categories such as "legislative services," without any mention of the fact that a substantial portion would be passed on to Madigan associates. (*See, e.g.,* Tr. 3503:4-7; 3505:10-12; 3507:3-10; 3509:5-8; 3511:4-13.)

The Seventh Circuit has recognized that inconsistent assertions put in books and records suggests willfulness. *U.S v. Mansfield*, 381 F.3d 961, 965 (7th Cir. 1967) (citing *Spies v. United States*, 317 U.S. 492 (1943)); *see also U.S. v. Mullins*, 355 F.2d 838, 886 (finding endorsement of fraudulent checks demonstrates willful conduct). In *Mansfield*, for instance, the defendant, a doctor, failed to fully disclose his income to IRS agents. When visiting the Internal Revenue Office, he made no mention of his personal injury patients, who were the "most lucrative" aspects of his practice. 381 F.3d at 964. The Court reasoned that withholding these records were inconsistent with his assertions that he put his books and records at the agents' disposal, thereby having the effect to conceal or mislead, suggesting willful intent. *Id*.

The Court cannot repeat the entire record, but the above showing made by the Government already mirrors *Mansfield*. As there, a jury here could reasonably infer that Doherty's failure to disclose was an effort to conceal and mislead, thereby suggesting willful intent. Therefore, the Court cannot acquit on this basis.

### *Pramaggiore*

Pramaggiore also challenges the sufficiency of the evidence of her intent to falsify documents. (Pramaggiore Mot. at 25-27.) First, she argues that the Government cannot

- 41 -

prove she intended to falsify the Doherty contracts for 2017 and 2018 (Counts Three and Four), because she did not personally sign these contracts, and the 2019 contract amendment (Count Nine), because she had already left ComEd CEO. (Dkt. No. 264 at 26.)  This argument fails for several reasons.

As discussed above, Pramaggiore did sign false single source justifications for the Doherty contract in 2017 and 2018. (GX868; GX484.)  Although the forms did not require mention of subcontractors, they did require truthful justifications of the payments. As with Doherty, a jury can reasonably infer that Pramaggiore's omissions were an effort to conceal and mislead, suggesting willfulness to hide the true reason why the Doherty payments were so high (to pay Madigan associates for no work). *See Mansfield,* 381 F.3d at 964.

Moreover, as Elizabeth Lynch (Director of Corporate Accounting at Exelon) testified, Pramaggiore was responsible not just for signing the single source justifications, but for approving payments under the contract on an ongoing basis. (*See, e.g.*, GX702; Tr. 3497:4-3499:12.) Accordingly, each payment under the contract enerated a false entry in the general ledger of the company for which Pramaggiore was directly responsible. And while Pramaggiore did not personally sign each contract with Doherty, a reasonable jury could conclude that she caused their creation and authorized their scope, as demonstrated by, for example, her direction to Marquez to hire Zalewski, (*see* GX22), or her involvement in pushing for the contracts continued into 2019, even when she had moved to Exelon, (*see* GX131). Such evidence established her liability as an aider and abettor (*see infra* Section II.B.1.iv). In addition, as discussed further below in

- 42 -

SA50

response to the arguments presented by Hooker, a reasonable jury could have found Pramaggiore guilty under a *Pinkerton* theory ofliability as to the books-and-records charges.

*Hooker*

Hooker argues that he cannot be held liable (directly or otherwise) for violating the book-and-records provisions of the FCPA because he had retired as a full-time employee from the company. (John Hooker's Mot. for Judgment of Acquittal ("Hooker Mot.") at 7). But Hooker claimed that he created the illegal payment arrangement in 2011 and set it in motion when he was head of the company's legislative affairs department. (*See* GX126 (Hooker: "We came up with this plan"); GX118 ("me and McClain was — I was the one that created it")); (Tr. 2001:1-11 (Marquez explaining that Hooker meant that Hooker and McClain had "created the mechanism or process by which the subcontractors were added")). In one call, Hooker described the arrangement as being "off the beaten path" and, in another call, McClain and Hooker joked that they were "creative" in the arrangement they had set up with the Madigan subcontractors. (GX17.)

The Government introduced plenty of evidence showing that Hooker, in his post-retirement role as a consultant for ComEd, continued to play a role in the contracts. For example, he continued to monitor the subcontractors throughout the existence of the conspiracy. (*See* GX129 (Doherty stated that Hooker would call to check on the subcontractors and report back to Madigan).) Additionally, he continued to provide co-conspirator McClain advice about how to have the contract renewed in 2019 when

- 43 -

SA51

Dominguez became ComEd's CEO. (*See* GX126; GX148.) In sum, a reasonable jury could find that he knowingly and willfully caused false records to be created.

*McClain*

McClain also contends that there was no evidence that he knowingly or willingly falsified a book or record, because he did not have responsibility or access to internal ComEd documents, did not have any role in creating, signing, approving, or reviewing JDDA contracts or single source justification forms, and was not aware of ComEd's internal accounting practices. (Michael McClain Motion for Acquittal ("McClain Mot."), Dkt. No. 265). But, as discussed herein (Section II.B.4), McClain's liability does not depend on his personal signature where he played an integral part in the conspiracy as the conduit between ComEd and Madigan and caused the creation of false documents. In addition to his calls with Hooker discussed above, McClain enlisted Shaw Decremer and John Bradley to act as intermediaries for payments to individuals such as Ed Moody. (Tr. 1911:1-1913:4; 1934:11-1938:6.) Invoices, as well as associated payment records, sent by both individuals to ComEd made it appear that the payments were for legitimate lobbying services, when the payments were instead made to corruptly influence Madigan for no work. (Tr. 3490:14-3491:22; 3492:7-3494:3.) A jury could reasonably infer that McClain knew that he was causing false documentation to be created as part of ComEd's books and records because they affirmatively mispresented why payments were being made to Doherty. *Mansfield,* 381 F.3d 961, 965.

### 3. Circumvention of Internal Controls

Defendants Hooker and Pramaggiore take further issue with their convictions under 78(m)(b)(5) for willfully and knowingly circumventing internal accounting controls. They argue that the only internal control the Government presented was Exelon's Corporate Code of Business Conduct, which, she asserts, are not internal accounting controls for the purposes of 15 U.S.C. §§ 78m(b)(5) and 78ff(a) (Pramaggiore Mot. at 39).

This argument fails for two reasons. First, Exelon's Code was not the only internal control the Government presented. For instance, the previously discussed testimony from Fidel Marquez, Elizabeth Lynch. and Carrie Bourque also detailed how the Defendants' failure to disclose the true nature of the payments required the Defendants to circumvent multiple ComEd and Exelon accounting procedures. These internal controls included requiring the submission of invoices before payment, the requirement that invoices be approved by someone "familiar with the charges," and the requirement that payments be for services actually rendered. (Tr. 3513:20-3514:19.)

But even if the Code were the only control Defendants were alleged to have violated, Exelon's Code directly concerns the organization's internal accounting practices. The Seventh Circuit has clarified that internal controls for §§ 78m(b)(5) purposes include "manual or automated review of records to check for completeness, accuracy and authenticity; a method to record transactions completely and accurately; and reconciliation of accounting entries to detect errors." *McConville v. SEC,* 465 F.3d 780, 790 (7th Cir. 2006). Here, the 2015 and 2016 Code of Business Conduct describes internal

- 45 -

controls related to ComEd's accounting systems, including mandates to: (i) "Never make an entry in any record that intentionally misrepresents, conceals or disguises the true nature of any transaction, event or condition," and (ii) "Record all business transactions, events and conditions accurately, completely, and in a timely fashion." (GX739.) This makes the Code, as well as the procedural testimony, characteristic §§ 78m(b)(5) and 78ff(a) accounting procedures, as they (among other things) ensure accuracy and authenticity. There was more than sufficient evidence that Pramaggiore approved transactions that did not comply with these standards in order to circumvent these internal safeguards—namely, by misrepresenting or concealing the true nature of the Doherty transactions and creating inaccurate records to do so. This was enough to convict her on a direct liability theory. And the following section illustrates how there was more than sufficient evidence to convict Hooker on a *Pinkerton* theory of liability.

### 4. § 2, Pinkerton Liability

McClain, along with Doherty, challenge their convictions under 18 U.S.C § 2 and *Pinkerton*. The Court affirms each count in turn.

For § 2 aider and abettor liability, the Government must prove that the defendant: (1) took an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission. *Montana v. Cross,* 829 F.3d 775, 780 (7th Cir. 2016) (citing *Rosemond v. U.S.*, 572 U.S. 65, 71 (2014)). Once it has been established that an aider and abettor had knowledge of an underlying crime, it "does not take much to satisfy the facilitation requirement." *United States v. Woods,* 148 F.3d 843, 848 (7th Cir. 1998) (citation omitted). Secondary liability charged via 18 U.S.C. § 2 generally applies

- 46 -

regardless of whether the defendant himself is capable of committing the substantive offense. *See Salinas v. United States,* 522 U.S. 52 (1997); *Ocasio v. United States*, 578 U.S. 282 (2016) ("A conspirator need not agree to commit the substantive offense — or even be capable of committing it — in order to be convicted.") Of course, a crime must have taken place.

The Court already concluded in greater detail above that the Government presented sufficient evidence for a jury to reasonably conclude each Defendant had knowing and willful intent. The Court also concluded that a jury could reasonably find that Doherty and McClain took several affirmative acts in furtherance of the conspiracy to corruptly influence Madigan; for his part, Doherty provided dishonest justifications for the payments he received and concealed subcontractors on invoices, and McClain played an integral part in this "creative" arrangement as the conduit between ComEd and Madigan. (GX17.) A reasonable jury could therefore conclude they aided and abetted the underlying conspiracy.

The same reasoning applies in force to Hooker's challenge to his circumvention of internal controls conviction: a reasonable jury could therefore conclude he aided and abetted the underlying conspiracy to pay off Madigan associates when he took credit for creating the mechanism to circumvent ComEd and Exelon's internal controls to pay the subcontractors illicitly (*see supra,* Section II.B.2).

Under the *Pinkerton* theory of liability, one conspirator can be held liable for the crimes of another if committed in furtherance of the conspiracy. *United States v. Manzella,* 791 F.2d 1263, 1267 (7th Cir. 1986) (citing *Pinkerton v. United States,* 328 U.S. 640, 666

- 47 -

(1946)). To convict under *Pinkerton,* the Government must prove that: 1) "the offense defined in the substantive count was committed pursuant to the conspiracy," and 2) "that the defendant was a member of the conspiracy at the time the substantive offense was committed," *Id.* at 1268, and that 3) the offense was committed in furtherance of and as a foreseeable consequence of the conspiracy. *See United States v. Benabe,* 654 F.3d 753, 777 (9th Cir. 2011).

Here, Defendants challenge the foreseeability that their actions would result in the creation of false documents and the circumvention of internal accounting procedures. Doherty and McClain (and Hooker) were long-time professionals in positions to understand that falsely describing the nature of payments would cause the creation of false entries in the books and records of a company. Given their experience, and their roles in creating the subcontractor arrangement and taking steps to conceal the true purpose of the arrangement (*see supra,* Section II.B. generally), it was reasonably foreseeable that their fellow conspirators would continue to falsify internal records over the years that followed.

Drawing all reasonable inferences in favor of the verdict, the Court cannot acquit Defendants on counts here either.

\* \* \*

Ultimately, the Court cannot acquit on any count. For the reasons discussed as to each conviction, the jury had sufficient evidence, and Defendants' arguments here amount to disagreeing with the strength with which the jury weighed it. The Court now turns to Defendants' arguments that the Court erred in ways that demand a new trial.

- 48 -

### III.   NEW TRIAL

"[T]he court may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). The Court should grant a new trial "if there is a reasonable possibility that a trial error had a prejudicial effect upon the jury's verdict." *United States v. Van Eyl,* 468 F.3d 428, 436, 438 (7th Cir. 2006) (affirming district court's grant of new trial). The Court has broad discretion in making this determination because it "heard all the evidence, watched both the witnesses and the jury," and is in the best position to determine whether any improper evidence "tipped the scale against" a defendant. *Id.* at 438. Additionally, if the Court "believes there is a serious danger that a miscarriage of justice has occurred — that is, that an innocent person has been convicted — [it] has the power to set the verdict aside, even if he does not think that he made any erroneous rulings at the trial." *United States v. Morales,* 902 F.2d 604, 606 (7th Cir. 1990) (citation omitted). To be sure, "[a] jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly." *United States v. Santos,* 20 F.3d 280, 285 (7th Cir. 1994) (quotation marks and citation omitted).

#### A.   Jury Instructions

#### 1.   *Quid Pro Quo*

For reasons explained *supra* in Section II.B.1, the Court's instruction was proper.

#### 2.   *666(c) Instructions*

For reasons explained *supra* in Section II.B.2, the instructions were proper.

### 3. Pinkerton

Pramaggiore contends that the *Pinkerton* instruction impermissibly confused the jury by inserting "gratuitous . . . complexity." (Pramaggiore Mot. at 51). She points to jury deliberations, where the jury asked "[i]f on instructions pg 43 (Instruction #39) [the books-and-records instruction] you don't believe the Government proved 'beyond reasonable doubt, can pg 48 of the instructions [the Pinkerton instruction] still be applied? Yes or No . . . P.S. This includes the burden of proof by the Government." (Tr. 5516:17-22.) After some deliberation, the Court instructed the jury to, "Please reread Instruction No. 39 carefully and then reread Instruction No. 44. This should answer your question," without objection. (Tr. 5526:19-25.)

Pramaggiore argues that this question indicates the jury's inability to find Pramaggiore and/or her co-defendants guilty for an FCPA count as either a principal or an aider and abettor and thus their only avenue for conviction was via *Pinkerton*.

Pramaggiore points to the Seventh Circuit's ruling in *United States v. Manzella,* where a panel of judges found the trial court's version of a *Pinkerton* instruction "drastically compressed" the standard such that it failed to present the *Pinkerton* doctrine in an intelligible form to the jury. 791 F.2d 1263, 1268 (7th Cir. 1986). There is no similar concern here because the Court's instruction mapped precisely with the Seventh Circuit's pattern instruction. *Compare* Pattern Crim. Fed. Jury Instructions for the Seventh Circuit 5.09 *with* Pattern Instruction 48 (Dkt. No. 249). Pramaggiore further mischaracterizes *Manzella* by asserting that the Seventh Circuit "generally discourage[s]" a *Pinkerton* instruction. (Pramaggiore Mot. at 50). The *Manzella* court expressly did not consider

- 50 -

whether a *Pinkerton* is an added complication to criminal trials, and nowhere did the court indicate that its instruction is discouraged. *Id.* at 1267 ("whether it really adds anything besides complication, given the possibility of basing liability on aiding and abetting—are not questions open to us to reexamine.")

Moreover, as the Government notes, Pramaggiore's objection is misplaced as her counsel consented to Court's clarification of the *Pinkerton* instruction during trial. (*See* Tr. 5526:22-5527:1 (all counsel affirmatively agree with Court's chosen clarification)). Under Federal Rule of Criminal Procedure 30(d), when a party disagrees with a jury instruction it "must inform the court of the specific objection and the grounds for the objection . . . ." Because no defendant objected to the court's answer to the jury's question at trial, the objection was forfeited, so the standard of review is plain error. *United States v. Ye,* 588 F.3d 411, 414 (7th Cir. 2009). Rule 30(d). "An error is plain if it was (1) clear and uncontroverted at the time of appeal and (2) affected substantial rights, which means the error affected the outcome of the district court proceedings." *United States v. Wheeler,* 540 F.3d 683, 689 (7th Cir. 2008) (quotations and citations omitted). Obtaining reversal on these grounds is an "uphill battle," and unlike *Manzella,* Pramaggiore does not and cannot contend that the instructions here were intelligible, being drawn directly from regularly used language endorsed by the Seventh Circuit.

The only evidence of error Pramaggiore offers is the jury's question regarding the defendants' liability. In response, the Government argues that the question does not suggest gratuitous confusion, but that the jury was asking for clarification on the applicability of *Pinkerton* as an alternative theory of liability on the books-and-records

- 51 -

counts; the jury did not have to find a particular defendant committed all elements beyond a reasonable doubt specified in the books-and-records counts, provided that the jury found the Government proved all elements beyond a reasonable doubt set forth under *Pinkerton*, precisely as the question implies. (Resp. at 93.) The Court agrees with the Government. But even if the Court's instruction was impermissibly confusing to the jury, Pramaggiore still fails to bear her burden of persuasion with respect to prejudice, making no effort to articulate how this confusion affected her substantial rights or affected the case's outcome beyond conclusory assertions that she otherwise would not have been convicted. *Wheeler,* 540 F.3d at 690 ("plain error analysis 'calls for the same inquiry as 'harmless error' analysis, except that here the defendant bears the burden of persuasion with respect to prejudice.")

Since the Court finds no error — and no miscarriage of justice—in its *Pinkerton* instruction, the Court cannot grant Defendants a new trial on this basis.

### 4. Goodwill and Good Faith (Defs' proposed 30.2)

Pramaggiore also finds err in the Court's refusal to adopt Defendants' proposed § 666 instruction that: "It is not a crime to give a thing of value to a public official to build a reservoir of goodwill that might ultimately affect one or more of a multitude of unspecified acts, now and in the future." As before, the Court finds the instruction redundant.

"Although a defendant may have the jury consider any theory of defense that is supported by law and fact, a defendant is not automatically entitled to a particular jury instruction. Rather, to warrant a specific theory of defense instruction, the defendant

- 52 -

must demonstrate: (1) the instruction is a correct statement of the law; (2) the evidence in the case supports the theory of defense; (3) the theory is not already part of the charge; and (4) the failure to provide the instruction would deny the defendant a fair trial." *United States v. Choiniere,* 517 F.3d 967 (7th Cir. 2008) (*citing United States v. James,* 464 F.3d 699, 707 (7th Cir.2006)).

The Court previously rejected Defendants' proposed instruction, and instead instructed the jury that it must find a defendant acted with knowing and willful intent that something of value is given or offered to reward or influence an agent of State Government in connection with the agent's official duties. (Dkt. No. 249 at 37.) The Seventh Circuit has repeatedly clarified that "an action taken in good faith is on the other side of an action taken *knowingly.*" *United States v. Lunn,* 860 F.3d 574, 580 (7th Cir. 2017) (emphasis added). Here, it was not possible for the jury to find that the Defendants had the mens rea to conspire knowingly and willfully without finding that the Defendants did not wish to merely build a reservoir of goodwill. One necessarily negates the other, making the Defendants' goodwill theory of defense a redundant element of the Government's charge. *Id.* (affirming denial of theory-of-defense instruction that would have stated that defendant lacked the intent to defraud if he acted in good faith and honestly believed the accuracy of financial statements, because the instruction was "at best redundant" of the intent instruction given by the court); *see also United States v. Chanu,* 40 F.4th 528, 543 (7th Cir. 2022); *United States v. Johnson,* 874 F.3d 990, 1002 (7th Cir. 2017).  The same rationale applies to Pramaggiore's contention that the Court erred when it denied a Good Faith defense instruction offered by Defendants for the

- 53 -

books-and-records counts (Defs' proposed 35.1), which similarly required the jury to find knowing and willful intent of the underlying crime. *See* Instr. 34-35.

The Court has a duty to omit redundancies to mitigate dilution and confusion. *Brown v. Packaging Corp. of America,* 338 F. 3d 586, 595 (6th Cir. 2003) (Clay, J., concurring) ("Ordinarily, a district court should give a requested jury instruction when such instruction offers a correct statement of the law and **is not** irrelevant, redundant, or confusing.") (emphasis added); *see United States v. Collins,* 223 F.3d 502, 507-08 (finding district court's *inaccurate* conspiracy instructions "not so misleading that the jury would likely be confused or misled by the district's error" because overall thrust of trial and instruction mitigated any effect of potential jury confusion); *see also Reinig v. RBS Citizens, N.A.,* 2019 WL 11273201, at *3 (finding inclusion of jury instruction would "only confuse the jury" when denying the proposed instruction). Since the Court, in following its duty, did not err in rejecting either instruction, the Court cannot order a new trial on this basis.

### 5. *"Official duty" Instruction*

Doherty takes issue with the Court's refusal to advise the jury that the Government carried the burden to prove beyond a reasonable doubt that the jobs held by Madigan associates were not "bona fide" and in the normal course of business. The analysis here is much the same as directly above; it was not possible for the jury to find that "something of value [was] given or offered to reward or influence an agent of State Government in connection with the agent's official duties" *without* also finding that the jobs were not legitimate. The jobs given to Madigan associates were a key element of the conspiracy.

- 54 -

The instruction would have been redundant, and the Court is satisfied that its omission of redundant instructions did not prejudice Defendants. (*See supra,* Section II.B.2.)

### 6. *Vicarious Liability in the Corporate Context (Defs' proposed 20.2)*

Pramaggiore, again joined by her co-Defendants, challenges the Courts decision to give Pattern Instruction 5.02:

> A person who acts on behalf of a corporation also is personally responsible for what he does or causes someone else to do. However, a person is not responsible for the conduct of others performed on behalf of a corporation merely because that person is an officer, employee, or other agent of the corporation.

Pramaggiore's proposal, which the Court rejected, omitted the first sentence and concluded with another one, to read:

> A person is not responsible for the conduct of others performed on behalf of a corporation merely because that person is an officer, employee, or other agent of a corporation. You may not convict a person on the basis that he or she should have known that he or she was participating in wrongdoing, rather than on the basis of his or her actual knowledge.

Pramaggiore argues that the Court's addition of the first sentence and the omission of her last permitted the jury to believe that a person who acted on behalf of a corporation could be convicted if she was negligent in causing someone else's actions that violated the law, "even if she herself did not have the corrupt intent necessary to violate the law." (Pramaggiore Mot. 49.)

Pramaggiore confuses the pinpoint of potential confusion here; as the Government notes, without the first sentence, the Court's instruction reads as if a person cannot be responsible for actions their subordinates completed — for example, at that person's direction — and therefore would have risked confusing the jury. At trial, Defendants noted

- 55 -

the confusion when they dubiously claimed that their modification from the pattern "dropped language suggesting that a person cannot hide behind a corporation, cannot say, 'I'm not guilty because I'm part of a corporation.'" (Tr. 4990:11-14.) This is precisely the language that Defendants kept as part of their proposed instruction.

More critically, jury instructions are considered as a whole, not in piecemeal fashion. *United States v. Andres,* 216 F.3d 645 (7th Cir. 2000) (finding that the jury instructions as given adequately covered the possible, "more argumentative" defense theory.); *see Brown v. Jess,* 521 F.Supp. 3d 801 (W.D. Wisc. 2021) (finding court's jury instruction error harmless in criminal conviction, considering both" the jury instructions that were, and were not, provided in this case."). The jury received a separate instruction requiring that it find corrupt intent. (*See, e.g.,* Instr. Nos.  30, 31, 33.) Thus, there was no risk the pattern instruction reduced the mens rea to a negligence standard, as Pramaggiore suggests. Thus, any failure to provide the proposed instruction could not have possibly denied Defendants a fair trial. *Choiniere,* 517 F.3d at 971.

Since the Court properly instructed the jury on vicarious liability, the Court must deny Defendants plea for a new trial on this basis.

### 7. Terms "Madigan" and "Legislation" for 18 U.S.C. § 666 Instructions

Invoking the Fifth Amendment, Defendants argue that the jury instructions for 18 U.S.C. § 666 should have used the terms in the Indictment, "Michael Madigan" or "Mr. Madigan" and limited "things of value" to "Legislation." Defendants further assert that inserting Madigan's name was important to prevent the jury from convicting defendants for influencing or rewarding a person who was not Madigan.

- 56 -

Trial covered the involvement of multiple public officials along the chain but specifying that "Madigan" was the object of the Defendants' conspiracy was unnecessary. It was clear throughout the weeks of trial that Madigan was the public official. (*See, e.g.,* Tr. 587:19 ("You didn't vote for Mr. Madigan as Speaker either, did you?"), 1097:24-25 ("What was your understanding as to why David Ellis, Speaker Madigan's chief legal counsel, was involved in this process?"), 1098:14-16 ("During the course of these meetings, did you form an understanding as to whether Madigan was aware of the EIMA legislation"), 3048:23-24 ("his connection to Speaker Madigan is highly relevant in this case"), 4459:14-16 ("Did you tell him that, as CEO of ComEd, that he couldn't' fire anybody who had been hired at the request of Speaker Madigan?")). Even in closing, both Government and defense made clear that Madigan was the individual in question. (*See, e.g.,* Tr. 5132:13-15 ("The system of corruptly influencing Michael Madigan through a stream of benefits and rewards had been up and running for years."))

Pramaggiore also suggests the Government constructively amended the Indictment, challenging the use of the term "legislative activity" as opposed to "legislation." R. 264 at 53. The Seventh Circuit's ruling in *United States v. Heon Seok Lee* is both instructive and controlling. 937 F.3d 797, 806 (7th Cir. 2019). Lee, the defendant, was charged and convicted with executing a scheme to defraud local governments by falsely representing that his company manufactured its turbo blowers in the United States. *Id.* at 801. On appeal, Lee argued that the government constructively amended the indictment by presenting evidence of misrepresentations beyond specific certifications identified in the indictment. *Id.* He claimed that the indictment confined itself to the falsity

- 57 -

of the certifications, whereas the government's trial evidence focused on other lies, such as false statements to sales presentations, misrepresentations to sales representatives, and misleading emails to general contractors. *Id*.

In rejecting the defendant's challenge, the court reasoned that, "[e]ven if we accept as true Lee's interpretation of the indictment and his characterization of the trial evidence, it would not rise to the level of a constructive amendment. The government did not attempt to prove a crime different from the one alleged." *Id*.; *see United States v. Khilchenko,* 324 F.3d 917, 920 (7th Cir. 2003) ("To effect a constructive amendment, the evidence at trial must establish offenses different from or in addition to those charged by the grand jury."). Rather, the government in *Heon Seok Lee* "consistently maintained" its theory of defendant's fraud. 937 F.3d 806.

Likewise, Defendants here do not — and cannot — argue that the instruction was an offense different from or in addition to the counts charged in the indictment; the government remained consistently focused on the Defendants' efforts to falsify documents and to circumvent internal procedures in an effort to corruptly influence Public Official A. There is no confusion here who Public Official A is, much less a constructive amendment of the Indictment.

Moreover, Doherty argues that the statutory reference to "business, transaction and series of transactions" should have been limited to only EIMA, Senate Bill 9, and FEJA. Again, *Heon Seok Lee* is instructive, as the court approved of the government's reliance on evidence not expressly covered by the indictment's text because the evidence was "'part and parcel' of the same scheme described by the indictment." *Id*. at 807

- 58 -

SA66

(quoting *Nye & Nissen, Corp. v. United States,* 336 U.S. 613, 617 (1949 (no variance where indictment alleged a single scheme to defraud executed in various ways)). Again, the government in *Heon Seok Lee* relied on lies other than ones made on mere certifications, such as false statements during sales presentations, misrepresentations to sales representatives, and misleading emails to general contractors. *Id.*

Here, Defendants' scheme was similarly executed in various ways: the jury heard evidence about other ComEd related legislation, including a House Resolution that Madigan sponsored and advocated for and that was favorable to Exelon in 2014 (HR 1146); a bill proposed by Lisa Madigan that ComEd successfully defeated in 2018 (HB 5626); an extension of the formula rate that ComEd supported in 2015 (HB 3975); and another proposed extension of the formula rate in 2019 (which has been referred to as the "Skinny Bill" or SB 2080). Moreover, witnesses testified that ComEd monitored thousands of bills in the General Assembly each year and took an interest in many that did not involve energy legislation. (Tr. 1818:9-22.)

Activities like committee assignments, for example, are part and parcel to the ultimate passage or defeat of bills in the legislature. "Additional evidence regarding technical details about how a defendant executed an alleged scheme does not constitute an impermissible variance." *Heon Seok Lee,* 937 F.3d at 807. As in *Heon Seok Lee,* Defendants here cannot demonstrate that their Fifth Amendment rights were violated because the Court's instruction concerned "the same elaborate scheme ... as was described in the indictment." *Id.* (quoting *United States v. Ratliff-White,* 493 F.3d 812 (7th Cir. 2007)).

Because the Court cannot find a Fifth Amendment violation in its instructions, the Court cannot grant a new trial on this basis.

### 8.  Listing Documents Alleged False

Again, invoking the Fifth Amendment, Pramaggiore insists the Court erred by failing to give Defendants' Proposed Instruction No. 31.1 which lists the particular documents the government alleged to be false. She contends that the instructions left open the possibility that the jury could find a defendant falsified or caused to be falsified "any" document, not just the ones charged. Hence, the Court's instructions were, according to Pramaggiore, "insufficiently tailored to [the government's] indictment — such that a jury is able to convict for an offense outside the indictment's scope." (Pramaggiore Mot. at 52.)

Beyond her conclusory statement that the jury might have accidentally convicted her for falsifying any document, Pramaggiore does not explain how the instruction allowed the government to prove a crime different from the one alleged. In *Stirone v. United States,* on which Pramaggiore relies, the indictment alleged that the defendant illegally interfered with interstate sand commerce, but the Court instructed the jury that it could convict the defendant for transporting steel. This instruction impermissibly broadened the indictment because the indictment could not "fairly be read as charging interference with movements of steel from Pennsylvania to other States." 361 U.S. 212, 217 (1960).

Here, Instruction No. 39 informed the jury that the government must prove "defendant falsified, or caused someone else to falsify the books, records, or accounts of

ComEd or Exelon as *specified in the particular count of the indictment.*" (emphasis added). The indictment, in turn, outlined various categories of such documents. (*See, e.g.,* Indict. ¶ 12 (documents "in connection with the renewal of JDDA's contract for 2018"); at 48 (Count Seven) (documents "in connection with the amendment of JDDA's contract for 2018"); at 50 (Count Nine) (documents "in connection with the renewal of JDDA's contract for 2019")). The government likewise identified the false documents by category during closing argument. (*See, e.g.,* Tr. 5222:7-12 (focusing on the Doherty invoices, the single-source justifications that Pramaggiore signed, the Exelon contracts that Doherty signed, and the Asset Suite records); Tr. 5222:13-16 (focusing on "[i]nvoices, the 2018 amendment [that] has to do with a change in the description of the services rendered, as well as the contracts and the Asset Suite records")). Even a brief overview of this Order — which has focused on evidence such as invoices, contracts, single source justification forms, and testimony concerning these documents — will show that there was no risk of the jury thinking that the Defendants could have been convicted on the books-and-records counts because they lied about their email on a young fellow's petition for city council outside of their local Trader Joe's, for instance. The Court here directly referred to the documents in the indictment, whereas the trial court in *Spirone* *added* a new object of liability.

The Court finds no error in its instruction.

### 9. Instruction Against Speculation

Doherty argues the Court erred by refusing instructions he contends guarded against improper speculation. Specifically, defendants proposed to add to Pattern

- 61 -

Instruction 2.02: "However, you may not rely on speculation, gut feelings, or a strong suspicion. Circumstantial evidence that leads only to a strong suspicion that someone is involved in criminal activity is not a substitute for guilt beyond a reasonable doubt." Regarding Pattern Instruction 2.03, Defendants' version would have deleted the sentence pertaining to direct versus circumstantial evidence that reads, "The law does not say that one is better than the other." Defendants also proposed adding, "However, any inferences that you make must be reasonable and logically connected to the evidence — you must not speculate or guess."

It is well established that "[c]ircumstantial evidence is not less probative than direct evidence and, in some cases is even more reliable." *United States v. Rodriguez,* 53 F.3d 1439, 1445 (7th Cir. 1995) (internal citations and quotations omitted). Indeed, circumstantial evidence standing alone may be sufficient to support a conviction for conspiracy. *See United States v. Conley,* 875 F.3d 391, 399 (7th Cir. 2017). Defendants' proposed instructions would have misled the jury by improperly conflating circumstantial evidence and mere "speculation," "gut feelings" and "suspicion." They likewise would have encouraged the jury to minimize the import of circumstantial evidence in their deliberations. There was no error in refusing these modifications to the jury instructions.

### 10.    *Special Verdict Forms*

Against Defendants' contentions, the Court is also satisfied that special verdict forms were unnecessary. The jury was not required to sift through every document, one by one, to find that each document was false or step in the auditing circumvented. The jury saw the documents (many signed by Defendants) and other associates and

- 62 -

employees testify regarding the contents and truthfulness of those documents. The jury was entitled to conclude that the documents highlighted by the Government were, in fact, representative of the documents charged in the indictment.

### B. Evidence

#### 1. Evidence to Negate Pramaggiore's Corrupt Intent

During Pramaggiore's case-in-chief, the Court denied her motions to introduce evidence to negate the element of her corrupt intent. She argues the Court erred by limiting the scope of her testimony so that the jury never heard this evidence – namely, (1) that she asked to investigate ComEd lobbyists while the alleged conspiracy was underway; (2) that she denied Madigan's request for polling questions; (3) her understanding of "bribery"; (4) testimony about intent from similarly-situated individuals.

#### i. Pramaggiore's efforts to investigate ComEd lobbyists in 2012

Pramaggiore sought to testify that in June 2012 she requested to have *all* ComEd lobbyists investigated. (Tr. at 4549:25-4550:7.) As this was during the time that Olivo and Nice were subs for Doherty, she argued this would show that she lacked knowledge of illegal activity, *id., i.e.,* that she had corrupt intent and was a member of the conspiracy. This testimony would been elicited alongside the introduction of Defense Exhibit 1135, an email chain in which Pramaggiore asked for an investigation into the activities of the company's lobbyists and that the results be shared with individuals who were not part of the alleged conspiracy. For example, she asked to bring Darryl Bradford — then Exelon's General Counsel, and another individual who was not part of the alleged conspiracy — "into the loop" and make sure he was "fully briefed." (DX1135.)

- 63 -

The Government explained that DX1135 discusses the *Chicago-Sun Times* reporting of an investigation of a connection between a ComEd lobbyist and a company whose owners had been convicted of fraud. The government argues this scandal had no connection to the charged conduct, and thus Pramaggiore's acts as to this matter constituted impermissible evidence of a prior good act under Rule 405(a). "Evidence that a defendant acted lawfully on other occasions is generally inadmissible to prove he acted lawfully on the occasion alleged in the indictment." *United States v. Reese,* 666 F.3d 1007, 1020 (7th Cir. 2012); *United States v. Heidecke,* 900 F.2d 1155, 1162 (7th Cir. 1990) (same); *United States v. Burke,* 781 F.2d 1234, 1243 (7th Cir. 1985)).

Pramaggiore contends that testimony about one email would have been simple. She also argues that the impact of this error was compounded by the fact that Marquez responded "no" (Tr. at 2025:1) when asked if Pramaggiore, upon learning about the subcontractors years later, "suggest[ed] that there ought to be some sort of investigation or something like that about how that might have happened under her watch?" (Tr. at 2024:23-25.) In other words, she says, "if the absence of the call for an investigation in 2019 can be evidence of corrupt intent, then conversely, the call for an investigation in 2012 is evidence [of the absence of] corrupt intent." (Pramaggiore Reply at 41, Dkt. No. 326.)

The Court excluded this testimony. While Pramaggiore makes a case that the timing of her request for an investigation could support her defense, the Court weighed the probative value against the prejudicial effect. Rule 403. As the Court explained, allowing this evidence would unnecessarily expand the scope of the trial by demanding

- 64 -

significant time on a narrow ancillary issue. (*See* Tr. 4551:22-4552:4); *see generally United States v. Carson,* 870 F.3d 584, 598 (7th Cir. 2017). The government would have presumably sought to argue that the email had to do with this other scandal, and sorting through another scandal could distract the jury. The government also argues that because Pramaggiore was addressing Marquez, her co-conspirator, while copying non-conspirators, she might have intended to conceal her true motives. A jury would have been appropriately charged with deciphering the email but given how much the jury was already hearing and the detour this evidence would cause for little probative value, the Court did not admit the evidence.

### ii. *Pramaggiore's denial of Madigan's polling request*

Pramaggiore challenges the Court's exclusion of testimony that Pramaggiore denied McClain's request that ComEd ask polling questions on his behalf and Defendants' Exhibit 1072. (*See* Tr. 4549:18-23.) She sought to introduce this example of a denial of a request from Madigan, to support her defense that she lacked corrupt intent, namely that she only agreed to hire Madigan recommendations when she thought it was appropriate — that is, when she thought the people would add value. The Court excluded this testimony as improper evidence of good acts pursuant to Federal Rule of Evidence 405(a).

To the government's argument that this evidence would have been irrelevant because "denying a request to issue polling questions for Madigan — a highly visible action that would have been susceptible to public scrutiny — has no bearing on her intent regarding the stream of benefits that ComEd covertly provided to Madigan over the

- 65 -

course of the eight-year conspiracy," (Resp. by USA at 110), Pramaggiore fairly points out that there is no evidence in the record that this polling would have been visible. Still, the Court agrees that it has little probative value to the specific counts charged.

To the government's argument that the evidence would have been redundant (citing other times on the record where ComEd declined to hire individuals affiliated with Madigan[2]), Pramaggiore fairly points out that those examples were ComEd decisions, and this evidence addressed *her* decision. However, the evidence showed that she played a role in several of these other denials. Because it was cumulative and tangential, any error in excluding this evidence was harmless. *See Tober v. Graco Childre"s Prod., Inc.,* 431 F.3d 572, 577 (7th Cir. 2005).

The Court notes the inconsistency in the government's objection to the introduction of this evidence and their arguments that "Madigan wanted, ComEd gave, and ComEd got," (Tr. at 5145:9-10) and "when Madigan said jump, these defendants said how high." (*Id.* at 5222:21-22.) Still, because the jury heard evidence of times when this is not the case, the jury could also have recognized this argument as an exaggeration. Because the evidence did not pass muster of Rules 405 and 403, the denial of this evidence was proper, otherwise harmless.

---

[2] *See, e.g.,* Tr. 1384:18-24 (Will Cousineau); Tr. 2190:18-2191:5 (Jim D'Amico); Tr. 2191:22-2194:3 (Elgie Sims); Tr. 2224:1-2226:6 (ComEd did not hire Ryan Aderman and Frank Glass); Tr. 2541:10-23 (Jordan Matyas); Tr. 2566:12-22 (ComEd did not hire some of the Speaker's recommendations).

- 66 -

### iii.  Defendant's own understanding of "bribery"

Pramaggiore argues that the Court erred by precluding her from explaining her subjective understanding of "bribery" during her testimony. The Court properly sustained the government's objection that counsel was attempting to elicit an impermissible legal conclusion.

As a threshold matter, mistake of law was no defense to the § 666 charges. *United States v. Blagojevich,* 794 F.3d 729, 738 (7th Cir. 2015). Accordingly, Pramaggiore's opinion of what bribery entails is irrelevant, and was properly excluded under Rule 401 and 403.

Moreover, "lay testimony offering a legal conclusion is inadmissible." *United States v. Noel,* 581 F.3d 490, 496 (7th Cir. 2009) (collecting cases). Legal conclusions offered by lay witnesses fail to meet the requirements of Federal Rule of Evidence 701, in that they are not helpful to the jury because "a witness's opinion that the facts in a case meet the elements of the charged crime will likely constitute unhelpful testimony because it merely tells the jury what result to reach." *United States v. Locke,* 643 F.3d 235, 241 (7th Cir. 2011). Based on this principle, courts have barred testimony concerning whether conduct was, or was believed to be, legal or illegal, legitimate or illegitimate, or proper or improper, or whether certain conduct satisfied an element at issue in the case. *See, e.g., United States v. Van Eyl,* 468 F.3d 428 (7th Cir. 2006) (affirming exclusion of testimony concerning "wrongfulness" of conduct as "there was no distinction between moral opinions and legal opinions."), *United States v. Baskes,* 649 F.2d 471, 478 (7th Cir. 1980) (affirming prohibition of cross-examination of co-conspirator witness regarding the

- 67 -

witness's views of whether he or the defendant "conspired" or otherwise engaged in conduct that was "unlawful" or "willful" — " terms that demand an understanding of the nature and scope of the criminal law").

The Court properly anticipated jury confusion when it prevented Pramaggiore from introducing her definition of bribery, which would effectively be a mistake-of-law argument. The denial of this evidence was proper, or otherwise harmless.

### iv. Testimony about intent from similarly-situated individuals

At trial, the Court limited testimony from fact witnesses who were present for, aware of, or participated in some of the events underlying the charges in this case. The testimony would have concerned the witnesses' perceptions of their own conduct and their own state of mind at the time of the relevant events. (Tr. 1050:19-21 ("the witnesses for ComEd that are attorneys will not be allowed to say that the actions were either legal or illegal.")) Instead, the Court allowed testimony as to "what they understood [the Defendants'] actions to be and be asked whether [the Defendants] did or not communicate any opinion or any advice as to those specific actions." (Tr. 1050:18-24.) Without much of an argument, Defendants claim the Court's ruling had the practical effect of preventing the Defendants from questioning ComEd attorneys about their own, personal intent, with prejudicial effect.

This fails for multiple reasons. First, as with Pramaggiore's bribery testimony, the testimony would have impermissibly offered a legal conclusion. *Noel,* 581 F.3d 490, 496. Except here, the witnesses were attorneys (not testifying as experts), and their testimony regarding the legality of conduct may improperly be given extra weight by the jury. The

- 68 -

sole objection Defendants point to, which the Court sustained, prevented a question concerning whether the witness had "corrupt intent to bribe Mr. Madigan." (Tr. 1409:11-15 ("Q. Okay. And so when you made the decision to go ahead and hire them did you have a corrupt intent to bribe Mr. Madigan by hiring Reyes Kurson? MS. STREICKER: Objection, Your Honor. THE COURT: Objection sustained.")). But that was among the essential questions of the case, the conclusion of which rested in the jury's deliberations, not the witness stand.

Second, testimony regarding the legality of a Defendant's conduct and testimony concerning a witness's intent do not operate in tandem such that limiting the former bars the latter. At trial, the Court itself clarified that Defendants could elicit testimony about "what they understood [a given] situation to be." (Tr. 1051:9-12.) This unsurprisingly elicited testimony on the witnesses' personal intent concerning particular actions. (*See, e.g.,* 1076:12 ("I understood it to mean that we had a good plan and a good strategy, and that John and I guess Mike felt that this time around, the company could be successful if we could pull together a good piece of legislation."); 1081:18-20 ("Did you understand that it was important to get Speaker Madiga"s buy-in to the concept of a formula rate?"); 1081:25-1082:4 ("[W]e wanted to move a piece of legislation in the General Assembly; and the Speaker is the leader of the House, and so as I came to understand in more detail, the Speaker controlled what bills were called in the House.")) The Court fails to observe the "practical effect" Defendants complain of.

Finally, the testimony here is irrelevant; "one person's state of mind is irrelevant to what another person actually believed." *United States v. Benalcazar,* 2011 WL 4553027

- 69 -

(N.D. Ill. 2011). *see also Kelley as Trustee of BMO Litigation Trust v. BMO Harris Bank N.A.,* 634 F.Supp. 3d 619, 633 (D. Minn. 2022) (excluding evidence of knowledge and state of mind of federal investigators as irrelevant to determine state of mind of other parties). To the extent that testimony concerning the Defendants' witnesses' states of mind would have informed the jury on what the Defendants intended, it was "at best minimal." *United States v. Kaplan,* 490 F.3d 110, 121 (7th Cir. 2007) (finding the erroneous admission of testimony concerning a witness's state of mind to be of "limited probative value" and "substantially outweighed by the risk of unfair prejudice.") The Court properly limited this irrelevant testimony and finds no other basis here on which to grant Defendants a new trial.

### 2. Campaign Contributions

Prior to trial, Defendants moved to exclude all evidence or argument regarding campaign contributions arguing that such evidence would be irrelevant, prejudicial, and confusing, *i.e.,* the jury may conflate legal campaign contributions with the bribery and gratuity charges. (Dkt. 131 at 21–23.) The Government responded that campaign contributions, while protected by the First Amendment, "serve to demonstrate the close and cozy relationship Madigan cultivated with ComEd." (Dkt. 147 at 55–56.) The Court denied Defendants' motion. (Dkt. 161 at 4.)

The Court will explain this decision, which remains unchanged. The Court weighed the probative value against prejdicial effect and found that the anticipated probative value far outweighed potential prejudice. FED. R. EVID. 303. In doing so, the Court heeded the First Amendment's reverence for campaign contributions. *See Fed. Election Comm'n*

*v. Cruz,* 142 S. Ct. 1638, 1653 (2022) ("the 'line between quid pro quo corruption and general influence may seem vague at times, but the distinction must be respected in order to safeguard basic First Amendment rights.' . . . And in drawing that line, 'the First Amendment requires us to err on the side of protecting political speech rather than suppressing it.'") (cleaned up); *Citizens United v. Fed. Election Comm'n,* 558 U.S. 310, 360 (2010); *McCormick v. United States,* 500 U.S. 257, 272–74 (1991) (The Supreme Court required the Government to prove an explicit quid pro quo to bring extortion charges based on campaign contributions because criminalizing campaign contributions "would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable. . . ."); *USA v. Martin,* 195 F.3d 961, 966 (7th Cir. 1999) ("the courts have made clear that criminal inducement of a legislator to take particular action cannot be inferred from the legislator's acceptance of campaign contributions from interests urging the action . . .") (collecting cases); *USA v. Allen,* 10 F.3d 405, 410-11 (7th Cir. 1993) ("Money fuels the American political machine. Campaigns are expensive, and candidates must constantly solicit funds. People vote for candidates and contribute to the candidates' campaigns because of those candidates' views, performance, and promises. It would be naive to suppose that contributors do not expect some benefit — support for favorable legislation, for example — for their contributions."); *United States v. Donagher,* 520 F.Supp. 3d 1034, 1043 (N.D. Ill. 2021).

Still, the right of free speech does not prohibit the Court from admitting free speech, including campaign contributions, as evidence. The Committee comment to the

- 71 -

revised Seventh Circuit Pattern Criminal Jury Instructions suggests, "In a case involving campaign contributions as the alleged thing of value, the parties and the court should consider whether to give an additional instruction explaining the lawfulness of contributions and distinguishing them from illegal bribes or illegal gratuities." Seventh Circuit Pattern Criminal Jury Instructions (updated 2022), Committee Comment to 18 U.S.C. § 666(a)(2) Paying a Bribe. The jury was instructed:

> You have heard evidence concerning campaign contributions made by ComEd and others to various public officials. This evidence was introduced to show relationships, not as evidence of a crime. There are no allegations that such campaign contributions were illegal or intended to bribe Michael Madigan.

(Instr. 38, Dkt. 249.) And, of course, evidence supporting elements of crimes can constitute lawful behavior. *See e.g., USA v. Palivos,* 486 F.3d 250, 258 (7th Cir. 2007).

Now, Pramaggiore, joined by her co-defendants, argues that at trial the Government's evidence of campaign contributions far exceeded what was necessary to show a relationship between ComEd and Madigan, and that by tying the campaign contributions to legislation at trial, the Government was effectively inviting the jury to convict on grounds of campaign contributions. In particular, during its direct examination of Marquez, the Government offered an August 2015 email chain discussing ComEd's campaign contributions to Madigan, then explicitly linked that discussion to legislation that was the supposed object of the conspiracy by asking, "[t]his is August of 2015. What's going on legislatively for the company right now," to which he answered, "[w]e're in the midst of negotiations for what would eventually become FEJA." (Tr. at 2233:10-

13.) Additionally, during the same direct examination, the Government offered an email into evidence in which McClain relayed a request from Madigan that ComEd and Exelon "raise close to [$]450,000" in campaign contributions. (*Id.* at 2253:25-2255:2; GX364.) The government asked Marquez, "[w]hat was the status of FEJA at this time when you received this – this request in August of 2016," to which he responded, "still in the process of trying to get FEJA passed." (Tr. at 2255:7-9.) Defendants objected to the government's questions tying of campaign contributions to legislative outcome as going beyond the allegations in the indictment. The Court overruled Defendants' objection (*id.* at 2255:20–2257:9), for the same reason it does today.

Notably, the Government did not charge Defendants with bribery where the thing of value was campaign contributions, *cf. Cruz,* 142 S. Ct. 1638, 1652–53 (2022) (citing *McCutcheon v. Fed. Election Comm'n,* 572 U.S. 185, 207 (2014); *Fed. Election Comm'n v. Nat'l Conservative Political Action Comm.,* 470 U.S. 480, 497 (1985)), and the jury was instructed specifically regarding things of value in the various counts (*see* Dkt. 249). Showing a connection between ComEd, Madigan, and legislation was an element for other counts, and this evidence was probative of their relationship. Additionally, Pramaggiore argued in her opening argument that Madigan wanted to distance himself from ComEd. Madigan's willingness to have a public connection to ComEd with these campaign contributions offers support to refute this argument.

Therefore, the Court maintains that its admission of evidence of campaign contributions was proper.

### 3. Improper Questioning

In a recorded call introduced by the Government at trial, Pramaggiore and Marquez discussed how to approach new ComEd CEO Joe Dominquez to reapprove the Doherty contracts. (GX131). Pramaggiore takes issue with several questions the Government asked her about the call during cross-examination, which she argues were facially improper and "designed to inflame and prejudice the jury against her." (Pramaggiore Mot. at 32.)

During cross examination, the Government asked Pramaggiore whether she recalled her February 2019 call with Marquez. Pramaggiore volunteered: "No. And I think I shared that with you when I came in for the interview." (Tr. 4627:10-12.) She then confirmed that the September 2019 interview occurred just four or five months after she was served a search warrant in May 2019, that she was represented by counsel for the interview, and that she prepared for the interview. (Tr. 4630:7-4631:4.) She testified that she told the government that she did not recall that Doherty employed subcontractors during the September 2019 interview. (Tr. 4631:5-21.) Pramaggiore then testified that she had forgotten the February 2019 recorded conversation with Marquez when she was interviewed in September 2019. (Tr. 4631:22-24); (4633:15-17).

Pramaggiore claims the entire line of questioning was improper and prejudicial because questions about the termination of Pramaggiore's proffer were "not probative of any fact at issue in the case." (Pramaggiore Mot. at 67.) But as the Government notes, the fact that she prepared for the September 2019 interview, was represented by counsel, and yet claimed during the interview that she forgot the February 2019 call about the

- 74 -

Madigan subcontractors – even though this call took place just four or five months after she learned about the government's investigation in May 2019 – was highly probative because it arguably demonstrated Pramaggiore's lack honesty regarding her memory and underlying credibility. (Tr. 4630:4-4631:24.)

> Towards the end of this line of questioning, the following exchange occurred:
>
> Q. So, Ms. Pramaggiore, after the February 18, 2019 call was played for you during the interview, very soon after that, the interview was terminated, correct?
> A. It was the end of the day, yes. The interview was over.
> Q. The interview concluded after the call, right?
> A. Yes.
>
> BY MS. STREICKER:
> Q. You and your counsel ended the interview, correct?
>
> MR. LASSAR: Objection, Your Honor.
>
> THE COURT: Objection sustained. She's answered the question.

(*Id.* 4640:5-15.)

On this end, Pramaggiore claims that juries "should not be permitted to draw" inferences from a defendant's decision not to voluntarily interview and answer questions. Pramaggiore Mot. 67. Although sometimes true, *Salinas v. Texas* made clear that a defendant might also fall silent "because [she] was trying to think of a good lie, because [she] was embarrassed, or because [she] was protecting someone else. Not every such possible explanation for silence is probative of guilt, but neither is every possible explanation protected by the Fifth Amendment." 570 U.S. 178, 179 (2013). In *Salinas,* the petitioner voluntarily answered some of a police officer's questions about a murder but fell silent when he was asked about whether ballistics testing would match his shotgun

to shell casings found at the scene of the crime, and, over his objection, the government used his reaction to the officer's question as evidence of his guilt. *Id.* at 178. The Supreme Court explained that,

> [t]he critical question is whether, under the 'circumstances' of this case, petitioner was deprived of the ability to voluntarily invoke the Fifth Amendment. He was not. We have before us no allegation that petitioner's failure to assert the privilege was involuntary, and it would have been a simple matter for him to say that he was not answering the officer's question on Fifth Amendment grounds. Because he failed to do so, the prosecution's use of his noncustodial silence did not violate the Fifth Amendment. *Id.*

*Salinas* controls: the interview here was voluntary, and the mere fact that Pramaggiore decided to terminate (or, in other words, remain silent during) the interview after listening to her recorded call does not violate her Fifth Amendment rights. And unlike the *Salinas* petitioner, Pramaggiore was interviewed with counsel with months of notice. Moreover, her efforts to conceal her knowledge of the Doherty subcontractors was highly probative evidence of her attempt to cover up her crimes and her consciousness of guilt. As a statement of a party opponent, the Government was entitled to elicit this evidence.

She also claims that the question was a misstatement of fact because the question suggests Pramaggiore and her counsel decided to end the interview when, instead, she claims that the parties mutually decided to conclude the interview. (Pramaggiore Mot. at 68.) Pushing aside the fact that this argument further undermines any notion that Pramaggiore intended to invoke the Fifth here, at trial, her counsel admitted that to the Court that "as her attorney, we decided to terminate the interview" once the call was played. To the extent that the decision was, in fact, a collective effort with the

- 76 -

government, the Court will not blame the Government for relying on the Defendants' representation of the facts during trial.

The Court properly sustained Defendant's objection to the Government asking, "you [didn't] want to come in for the interview with the government, did you?" (Tr. 4633:6-7.) Whether the Government had a good or bad faith basis, the Court does not believe this one question — against the myriad of evidence otherwise introduced — had *any* effect, much less an "extraordinarily prejudicial" one. Defendants have not identified any cases where a *single* question which the court struck required a new trial, and the Court is not aware any exists.

Finally, Pramggiore newly objects to the government's questions about Pramaggiore's actions following the 2019 call about additional steps she should have taken to report the fact that certain subcontractors were not working after the February 2019 call with Marquez. Defense counsel did not object to any of these questions and has therefore forfeited any objection. (Tr. 4635:15-4636:20); *Ye*, 588 F.3d at 414.

In any event, the Government's questions were highly probative. Pramaggiore's state of mind was the key issue in dispute at trial, and the jury was charged with assessing Pramaggiore's credibility. The Government was entitled to explore whether Pramaggiore was truly "taken aback" when she learned there were no-work subcontractors on ComEd's payroll by inquiring about her subsequent actions. (Tr. 4634:16-18.) Had she really been "taken aback," as she claimed, it was appropriate to point out that she did absolutely nothing to address her purported discovery of ghost payrollers. She admitted that she

did none of those things, which was probative evidence that she was not being truthful. (Tr. 4635:15-4620.)

### 4. Expert

The Court properly denied Doherty's motion to bring an expert because he failed to establish a need for an expert consistent with the Federal Rules of Evidence standards, in the Court's view. (*See supra,* Section II.B.2, discussion regarding 666(c); Tr. 3887:21-23.)

### 5. Hearsay in Emails

Hooker argues that email Government Exhibits 627 and 217 contained inadmissible hearsay, *i.e.,* "that Gallegos told Takagi what Doherty told Gallegos that Hooker told Doherty." (Hooker Mot. at 31, Dkt. No. 262.) And while Hooker is correct that emails are not per se admissible as business records, the statements at issue here were properly admitted in accordance with the Federal Rules of Evidence.

Government Exhibit 627 is an email dated December 14, 2012, between Doherty's assistant Janet Gallegos and then ComEd employee Mamie Takagi, and Defendant Doherty is copied on the email. GX627. In that email, Gallegos (Doherty's agent per Rule 801(d)(2)(D)) states: "Yes, Jay spoke to John Hooker and he approved the $31,000 per month Contract for the entire 2013." Id. Government Exhibit 630 builds on the same email exchange contained in Government Exhibit 627. In Government Exhibit 630, Doherty responds to Gallegos's email saying, "Confirmed." GX630. By this statement, Doherty adopted Gallegos's statement that "Jay spoke to John Hooker and he approved the $31,000 per month Contract for the entire 2013." FED. RULE OF EVID. 801(d)(2)(B).

Government Exhibit 217 is an email string dated December 17, 2012. Here, Gallegos tells Doherty that she spoke to Takagi and Takagi told her that "she did speak to John Hooker regarding extending the $31,000 contract amount through 2013. She said she still has to get Anne Pramaggiore's approval too." (*See* Tr. 2835:10-13.) Hooker cites *Thakore v. Universal Mach. Co. of Pottstown*, Inc., 670 F.Supp. 2d 705, 726 (N.D. Ill., 2009) (Cole, M.J.) for the fair proposition that hearsay – even if part of the regular course of business – remains inadmissible for the truth of the matter asserted "unless the recorded declarations of the third party were admissible for a nonhearsay purpose." Indeed, there were nonhearsay purposes here, including Doherty's awareness, which is relevant for his intent to participate in the conspiracy and further this end. Within six minutes of Gallegos's email, Doherty responded, "verrrrry important," to Gallegos. (GX217.) This statement is admissible against Doherty as a statement of a party opponent, which demonstrated that Doherty knew Gallegos was talking to Mamie Takagi regarding the subcontractor arrangement. FED. DKT. NO. EVID. 801(d)(2).

And because Doherty's intention behind these statements appears to have been to move things forward with subcontractors, the statements were made in furtherance of the conspiracy. Because Hooker was a coconspirator of Doherty's, Doherty's statements made during and in furtherance of the conspiracy is admissible against Hooker. See *Loscalzo,* 18 F.3d at 383 (". . . evidence of [a] defendant's acts or statements may be provided by the statements of co-conspirators."); *Lindemann,* 85 F.3d at 1238 (a coconspirator's statements are admissible against other coconspirators where "the

declarant and the defendant were involved in an existing conspiracy, and that the statement was made during and in furtherance of that conspiracy").

That said, the Government did suggest in its closing that Takagi's words could be considered for their truth in telling the jury, "it's reasonable to infer based on these e-mails that Takagi did indeed reach out to Hooker as the person with knowledge of the contract to determine whether, in his view, the contract should be renewed . . .. And why would Takagi lie about speaking with Hooker?" (Tr. at 5187:2-11.) Hooker argues this prejudiced him as it directly contradicted his testimony that he had no authority to approve contracts after he left ComEd in March 2012. Hooker correctly points out that although Gallegos testified during trial as a Government witness, Tagagi did not, and thus Hooker was not able to confront her. See U.S. Const. Amend. 6; *see Crawford v. Washington,* 541 U.S. 36 (2004).

The Government responds that Hooker was entitled to call Takagi and chose not to. Counsel for Hooker confronted Gallegos with Government Exhibit 627, and elicited both that Takagi never sent her a contract from Hooker, and that, after Hooker retired from ComEd in 2012, she needed someone employed by ComEd to approve the contract. (Tr. 2984:4-21.) Counsel for Hooker likewise confronted Gallegos with Government Exhibit 217, and Gallegos again confirmed that, per that email, an internal ComEd employee needed to authorize approval of the contract. (Tr. 2984:23-2985:25). The jury therefore heard that Hooker did not have ultimate authority to approve the Doherty contract, minimizing any possible error from the admission of these emails. Moreover,

- 80 -

SA88

even if Hooker ceased his participation following his retirement in 2012, that would not have insulated him from liability. *See Schiro,* 679 F.3d at 528-29.

Ultimately, the government argues that any error was harmless: the jury heard ample evidence that Hooker stayed intimately involved in ComEd contracts after his 2012 retirement, including through 2019. (*See, e.g.,* GX12; GX17; GX129; GX148.) The Court agrees that this was harmless. *See Jordan v. Binns,* 712 F.3d 1123, 1138 (7th Cir. 2013) ("As a general rule, errors in admitting evidence that is merely cumulative of properly admitted evidence are harmless."); *United States v. Johnson,* 127 F.3d 625, 631 (7th Cir. 1997) (holding that the erroneous admission of hearsay that is "cumulative to other testimony already presented" was harmless because of its "limited (or nonexistent) prejudicial effect on the defendant"); *United States v. Carter,* 720 F.2d 941, 948 (7th Cir. 1983) (erroneous admission of hearsay was "harmless error due to the cumulative nature of the testimony"). These were two emails out of hundreds of emails and recordings that implicating Hooker in the conspiracy.

### 6. Marquez and Rate Legislation

Doherty sought to strike Marquez's statement in the following recording, in which Marquez qualifies Doherty's statement that ComEd makes its money from Springfield by narrowing the statement to rate legislation.

> DOHERTY:    Here's how, here's how I might. Uh, number one, your money comes from Springfield. ComEd money, right? I mean, for the most part.
> MARQUEZ:    You mean, that's how we make our money.
>
> DOHERTY:    Yeah.
> MARQUEZ:    Yeah, yeah. Through our rates, yes, regulated.

DOHERTY:   And, you know, I would, if it were me, and again, Mike Madigan's not my best friend, but if I called him right now, he'd call or he'd say, "Jay," if I want to go see him, I'd go see him. But, my bottom line advice would be, 'if it ain't broke, don't fix it' with those guys-
MARQUEZ:   Okay.

The Court admitted the statement not for truth, but to show the effect on the listener. (Dkt. No. 183.) Doherty argues that he never adopted the statement, but he didn't disagree either, and Doherty's impression of this conversation was properly given to a jury to interpret. Doherty points out that such an adoption would be inconsistent with testimony from O'Neill and others that ComEd always had legislation pending which affects its bottom line — not just rate legislation. (*See e.g.*, Tr. at 1440). Again, the jury regularly hears conflicting testimony and is charged with sorting through it and determining credibility.

### 7.  Ray Nice Texts

Doherty moved to exclude a text messages Doherty sent to Ray Nice, saying, "Fabulous. Thank you so much, Ray. Now I know why The Speaker thinks so highly of you." (Dkt. No. 191; GX- 314.) At the time, Doherty was paying Nice, and Nice also worked as a public official at the Cook County Recorder of Deeds.  Doherty argues that "[t]he jury could have used this as a basis to convict under §666, even though no such conduct was charged."  (Doherty Mot. at 11.)

The probative value as to Doherty's knowledge of Nice's connection to Madigan outweighs any prejudice that one could glean about Doherty cozying up to a public official. The text constituted normal, kind words among colleagues. It's the part about Madigan that would be interesting to the jury, who heard from Doherty's counsel in

- 82 -

SA90

opening statements that Doherty "stayed in his lane" and focused on city politics, not Springfield politics (Tr. 403:1-7), and that the subcontractors (including Nice, the recipient of the text message) brought "value to ComEd" (*see* Tr. 406:4-10). Doherty's comment about Nice's connection to Madigan showed the jury that he was attuned to Springfield politics and knew of Nice's value to Speaker Madigan. Because Doherty's intent was a crucial issue in dispute, the Court properly admitted this evidence.

### C.    Other Errors

### 1.  *Heated Exchange Between Prosecutor and Witness*

Pramaggiore claims that the prosecutor threatened defense witness Joe Dominguez during cross examination, depriving her of testimony favorable to her case. (Pramaggiore Mot. at 79). This claim has no merit.

"Defense witnesses must be free to testify without fear of governmental retaliation." *United States v. Johnson,* 437 F.3d 665, 677 (7th Cir. 2006) (quoting *United States v. Burke*, 425 F.3d 400, 411 (7th Cir. 2005)). "Where . . . the substance of what the prosecutor communicates to the witness is a threat over and above what the record indicate[s] was timely, necessary, and appropriate, the inference that the prosecutor sought to coerce a witness into silence is strong." *Id*. at 847 (citation omitted).

We find no such threat. Dominguez took over as ComEd's CEO after Pramaggiore. During cross examination, the prosecutor questioned Dominguez about a conversation Dominguez had with cooperator Marquez in which he discussed the Doherty contracts. As the prosecutor asked about a statement Dominguez (who was himself a former federal

- 83 -

prosecutor) had made during that recorded conversation, Dominguez (the Defendant's witness) interrupted the prosecutor:

> Q: And then later in the call you said in the light of day, you know, things, you know, need to —
>
> A. Right. We discussed this. And you said, you said a lot of good things on this tape, didn't you? lot of good things on this tape, didn't you?

Tr. 4280:16-19.

As the Government explains, Dominguez asked the prosecutor a question in what appeared to an attempt to introduce the Assistant United States Attorney's opinion of how Dominguez behaved during the recorded conversation — in other words, to elicit the prosecutor's opinion about whether Dominguez had acted lawfully by implying the prosecutor thought Dominguez had "said a lot of good things on this tape." Dominguez even tried asking the prosecutor a question ("didn't you?") about the prosecutor's opinion from the witness stand.

Appearing to be confused, the prosecutor asked, "Sorry?" (Tr. 4280:20.) Dominquez, instead of responding to the question previously posed by the prosecutor (which sought to elicit what Dominguez had said during his recorded conversation with Marquez), continued to describe how the prosecutor allegedly viewed the recorded conversation and Dominguez's conduct as expressed during an earlier interview at the United States Attorney's Office: "The meeting I had with you in the office, you [meaning the prosecutor] portrayed this conversation slightly different." (Tr. 4280:21-22.)

- 84 -

The prosecutor responded by advising the witness not to make unsolicited comments about the prosecutor's opinion of Dominguez's conduct: "Wait a second. Wait a second. If you are going to start talking about what I said, you might want to not (sic) do that . . . because that might not work out well for you, okay." (Tr. 4280:23-4281:1.) Pramaggiore's counsel objected, and the prosecutor explained in response to a question from the Court on the objection that the Defendant's witness was trying to refer to comments the prosecutor had made at a prior meeting, and that "obviously whatever I say during a meeting is not admissible. That's not fair." (Tr. 4281:16-18.) There was no definitive ruling on the objection, nor was one sought.

The Court finds this interaction harmless. None of the cases Pramaggiore cites to support her contention that this interaction constituted a threat, much less deprived her of the right to defend herself. First, Dominiquez's response was not an out-of-court statement offered to show the effect on the listener state of mind and to establish the sequence of events; Dominiquez squarely interrupted the prosecutor to probe into the prosecutor's opinion of Dominguez's conduct, which was both irrelevant, outside the scope of cross examination and an attempt to use the prosecutor's supposed impression of the conversation to provide the impression to the jury that the phone call was proper (*i.e.,* inadmissible hearsay). This differs from *Sizelove v. Madison-Grant United State School Corporation,* on which Pramaggiore relies in part, where the court admitted testimony in a civil case to establish how the witness had learned of a fact and how that knowledge led to a sequence of events. 597 F.Supp. 1246, 1263 (S.D. Ind. 2022) (admitting testimony that the witness learned from his son's brother-in-law that a

- 85 -

SA93

proposal was being considered again to prove knowledge of the proposal — and not that the proposal itself was actually being considered — , establishing subsequent conduct).

Pramaggiore also misreads *United States v. Johnson,* which challenged the effect of a letter in which the government announced that it changed its position to the defendant (not the witness), "a rather inefficient medium for conveying threats to a witness," suggesting that the letter was probably not intended to deter the witness from testifying. 437 F.3d 665, 678. Importantly, the dispute was whether the government threatened the witness to deter the witness from testifying *at all,* a concern that does not arise in this case because Dominguez — the Defendant's witness — testified. And in *United States v. Burke,* the defendant argued that the government's refusal to grant his mother immunity prevented her from providing important exculpatory testimony on his behalf, thus distorting the fact-finding process. 425 F.3d 400, 411 (7th Cir. 2005). Again, the Seventh Circuit found that the prosecutor did not abuse his discretion when he denied potentially exculpatory testimony. *Id.* at 412. Most critically, this has nothing to do with threatening witnesses *on the stand,* as Pramaggiore accuses occurred here.

*United States v. Jackson,* 935 F.2d 832, and *United States v. Linder,* 2012 WL 3264924, are similarly inapposite. The *Jackson* defendant took issue with a witness who did not to testify *at all* after prosecutors reminded the witness that his statements in court could be used against him in an ongoing, related investigation. 935 F. 2d at 846 (7th Cir. 1991). And *Linder* concerned indirect allegations against prosecutors because a U.S. Marshal actively assisted prosecutors while also commanding employees who reported directly to the Marshal not to speak with the defendant and his counsel. 2012 WL

3264924, at *16 (N.D. Ill., Aug. 9, 2012). Again, Pramaggiore's witness *did* testify. The Court cannot otherwise find any case where a prosecutor impermissibly threatened a witness whose testimony broached irrelevant, inadmissible subject matter by reminding them that it "might not work out well."  At worst, the statement was a curt reminder of potential consequences for misbehavior which obstructs the administration of justice. *Id.*; 18 U.S.C § 401(1).

The questioning continued without event. The Court finds no err here.

### 2.  *Mischaracterization during closing*

At closing, the Government mistakenly asserted that O'Neill testified that an email forwarded from Pramaggiore meant "it was simply word from the boss in stark terms, or lack thereof, get this done." Tr. 5196:2-3. "Misstatements of evidence during closing argument can be improper, but it is rarely reversible error." *United States v. Mullins,* 800 F.3d 866, 872 (7th Cir. 2015) To prevail on her motion, Pramaggiore must establish that the misstatement was improper and that it prejudiced her by "so infect[ing] the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Johnson,* 655 F.3d 594, 602 (7th Cir. 2011) (affirming denial of motion for new trial when prosecutor immediately corrected a single misstatement during opening). Factors the Court considers include whether (1) the judge offered curative instructions, (2) the defense could have rebutted the misstatement, and (3) the weight of the evidence. *Mullins,* 800 F.3d at 872.

Pramaggiore satisfies the first prong easily; the Court overruled Defense Counsel's objection, failing to provide an immediately curative instruction to the government's

- 87 -

misstatement. However, minutes after the misstatement, the Government corrected itself, saying:

> Let me go back for just a moment and talk about the Reyes Kurson contract and correct something that *I just said*. I had mentioned something that O'Neill said in his testimony about what he understood the no-message forwarding of the e-mail to him. *I don't believe he did testify about that*, at least in putting it into so many words. But you can take your own interpretation from the fact that Anne Pramaggiore did not include any words, nothing to soften or buffer what it is that she said, to understand that it was an immediate signal from her to O'Neill to get it done.

(Tr. 5204:24-5205:8) (emphasis added).

This was a clear, unequivocal correction, followed by argument as to what inferences the jury could reasonably draw based on the fact that Pramaggiore had forwarded the email without comment. And that argument was fully supported by the evidence; in an email on January 30, 2016, Pramaggiore made clear what she meant when she forwarded the email to O'Neill a few weeks' prior; she told McClain: "I asked Fidel and Tom [O'Neill] to address this." (GX321.) The great weight of evidence pointed toward guilt, and the government ameliorated any impact their misstatement might have had. *Nelson,* 958 F.3d at 671, *see also Mullins,* 800 F.3d at 872 (finding no error where the prosecutor later corrected the misstatement.) Any error was therefore harmless; a new trial is not warranted.

### 3. Closing Arguments

Finally, Pramaggiore accuses the government of shifting theories at closing when invoking a tollway analogy. "It is settled in this circuit that, in their summations to the jury, prosecutors are entitled to respond to arguments articulated by defense counsel."

- 88 -

*United States v. Taylor,* 728 F.2d 930, 936 (7th Cir. 1984). To be sure, government counsel cannot develop new arguments on rebuttal, being restricted to answering the arguments put forth by defense counsel and to statements that are reasonably deducible from the record. *Id.; accord United States v. Reagan,* 694 F.2d 1075, 1081 (7th Cir. 1982) ("We believe that the comment in rebuttal was reasonably deducible from the evidence of record . . . and constituted a fair response to defense counsel's closing statement") (cleaned up).

Here, multiple defendants argued that Madigan did not help ComEd, rather, ComEd's legislative success was the result of legitimate coalition building. (*See, e.g.,* Tr. 5296:20-24 (McClain's counsel, arguing that ComEd legislation passed "[n]ot because of some jobs spread over a decade, but because they worked their heads off, because they boxed him in, because they built coalitions, because they spent millions and millions of dollars."); Tr. 5312:11-20 (Pramaggiore's counsel, arguing that ComEd legislation passed because of strong coalitions, "[n]ot based on the fact that we're hiring people")). During rebuttal, the Government responded to these arguments by comparing the corruption scheme to a "corruption toll," in which a driver pays the toll. (Tr. 5442:20-5443.))

This tollway analogy was not a new theory at all but simply "[a]nother way to think about" the case, as the prosecutor observed. (Tr. 5442:20.) It was consistent with the government's remarks throughout the case. (*See, e.g.,* Tr. 290:3-8 (Government's opening, describing theory that "defendants conferred a stream of benefits on Madigan over a long period of time," intending to influence Madigan's actions regarding ComEd's

- 89 -

legislation); Tr. 5132:13-4 (Government's closing, arguing that "Michael McClain convened a meeting of the ComEd inner circle of corrupt influence and reward.")). Here, the analogy elucidated the "stream of benefits" scheme wherein Madigan exerted influence, and not sole control, over the passage of legislation (as the jury instructions provided). (Tr. 5466:16-21.) This was an appropriate subject of rebuttal argument because the "stream" or "toll" both concern the broad set of actions defendants took to corruptly influence Madigan, and the direction of the toll or stream all flowed to support the same conspiracy. This conspiracy is both deducible from the extensive record, and the tollway fairly responds to the defense's case that the broad set of actions were instead legal coalition building. *See Reagan,* 694 F.2d at 1081 ("The record, however, contains sufficient evidence from which a jury could reasonably infer that defendant's receipts understated the cash received from Link. It was therefore proper for the Government to rebut that inference in closing.").

Again, a new trial is unwarranted.

## IV.    <u>CONCLUSION</u>

For the reasons stated herein, the Defendants' Motions for Acquittal or, in the alternative, New Trial are DENIED.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated: 1/4/2024

- 90 -

SA98

**MEMORANDUM OPINION AND ORDER** ........................................ Error! Bookmark not defined.

I.    Background ...............................................................................................1

  A.    Indictment ........................................................................................2

  B.    Trial ...................................................................................................4

II.   Motions for Acquittal .............................................................................5

  A. Conspiracy Count ...............................................................................6

  B. Corruption Counts ...........................................................................11

    1.    Quid Pro Quo ..............................................................................13

    2.    § 666(c) Safe Harbor ...................................................................16

    3. Elements ........................................................................................21

      i. Corrupt Intent Evidence .............................................................21

      Count 2 (Kurson) .............................................................................22

      Count 5 (Ochoa) ..............................................................................24

      Count 6 (Zalewski) ..........................................................................27

      Count 8 (JDDA 2019 Renewal) ......................................................29

      ii. "In Connection With" Evidence ..................................................30

      Count 2 (Reyes Kurson) ..................................................................31

      Counts 5 (Ochoa) and 6 (Zalewski) ..............................................33

      Count 8 (JDDA 2019 Renewal) ......................................................33

  C. FCPA Counts ....................................................................................34

    2.   Knowing and Willful Intent ..........................................................39

      Doherty .............................................................................................39

      Pramaggiore ....................................................................................41

Hooker ........................................................................................................... 43

McClain ......................................................................................................... 44

3.    Circumvention of Internal Controls .......................................................... 45

4.    § 2, Pinkerton Liability ............................................................................. 46

III.  New Trial ....................................................................................................... 49

A.   Jury Instructions ......................................................................................... 49

1.    Quid Pro Quo ........................................................................................... 49

2.    666(c) Instructions ................................................................................... 49

3.    Pinkerton .................................................................................................. 50

4.    Goodwill and Good Faith (Defs' proposed 30.2) ..................................... 52

5.    "Official duty" Instruction ......................................................................... 54

6.    Vicarious Liability in the Corporate Context (Defs' proposed 20.2) .......... 55

7.    Terms "Madigan" and  "Legislation" for 18 U.S.C. § 666 Instructions ......... 56

8.    Listing Documents Alleged False .............................................................. 60

9.    Instruction Against Speculation ............................................................... 61

10.  Special Verdict Forms .............................................................................. 62

B. Evidence ....................................................................................................... 63

1. Evidence to Negate Pramaggiore's Corrupt Intent ................................... 63

(i)    Pramaggiore's efforts to investigate ComEd lobbyists in 2012 ............ 63

(ii)   Pramaggiore's denial of Madigan's polling request ............................. 65

(ii)   Defendant's own understanding of "bribery" ...................................... 67

(iii)  Testimony about intent from similarly-situated individuals ................. 68

2. Campaign Contributions ........................................................................... 70

- 93 -

SA101

3.    Improper Questioning ................................................................................ 74

4. Expert ............................................................................................................ 78

5. Hearsay in Emails ........................................................................................ 78

6. Marquez and Rate Legislation .................................................................... 81

7. Ray Nice Texts .............................................................................................. 82

C.    Other Errors ..................................................................................................... 83

1.    Heated Exchange Between Prosecutor and Witness ................................ 83

2.    Mischaracterization during closing ............................................................ 87

3.    Closing Arguments ...................................................................................... 88

IV.    Conclusion ............................................................................................................ 90

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA            )  Case No. 20 CR 812
                                    )
                                    )
        v                           )
                                    )
MICHAEL McCLAIN, ANNE PRAMAGGIORE,  )
JOHN HOOKER, and JAY DOHERTY,       )  Chicago, Illinois
                                    )  March 3, 2025
            Defendants.             )  10:30 o'clock a.m.


                TRANSCRIPT OF PROCEEDINGS - RULING
              BEFORE THE HONORABLE MANISH S. SHAH


APPEARANCES:

For the Government:       MR. MORRIS O. PASQUAL
                          Acting United States Attorney
                          219 South Dearborn Street, Suite 500
                          Chicago, Illinois  60604
                          BY:  MR. AMARJEET S. BHACHU
                               MS. DIANE MacARTHUR
                               MS. SARAH E. STREICKER
                               MS. JULIA K. SCHWARTZ


For Defendant McClain:    UB GREENSFELDER, L.L.P.
                          BY:  MR. PATRICK J. COTTER
                          200 West Madison Street, Suite 3300
                          Chicago, Illinois  63102


For Defendant Pramaggiore: SIDLEY AUSTIN, L.L.P.
                          BY:  MR. SCOTT R. LASSAR
                               MR. DANIEL C. CRAIG
                               MS. JENNIFER M. WHEELER
                               MS. EMILY R. WOODRING
                          One South Dearborn Street
                          Chicago, Illinois  60603

2

APPEARANCES (Continued):

For Defendant Hooker:        MONICO & SPEVACK
                             BY:  MS. JACQUELINE S. JACOBSON
                                  MS. HANNAH G. RUSSELL
                             20 South Clark Street, Suite 700
                             Chicago, Illinois  60603


                             LAW OFFICES OF SUSAN M. PAVLOW
                             BY:  MS. SUSAN M. PAVLOW
                             53 West Jackson Boulevard, #1215
                             Chicago, Illinois  60604

For Defendant Doherty:       MS. GABRIELLE R. SANSONETTI
                             120 North LaSalle Street, Suite 2000
                             Chicago, Illinois  60602

Court Reporter:              COLLEEN M. CONWAY, CSR, RMR, CRR
                             Official Court Reporter
                             219 S. Dearborn Street, Room 1918
                             Chicago, Illinois  60604
                             (312) 435-5594
                             *colleen_conway@ilnd.uscourts.gov*

                        * * * * *
              PROCEEDINGS REPORTED BY STENOTYPE
  TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

SA104

Case: 25-2349    Document: 30    Filed: 11/14/2025    Pages: 233
Case: 1:20-cr-00812 Document #: 398 Filed: 03/03/25 Page 3 of 25 PageID #:9416

3

(Defendants out.  Proceedings heard in open court:)

THE CLERK:  20 CR 812, U.S.A. versus Michael McClain, Ann Pramaggiore, John Hooker, Jay Doherty.

THE COURT:  Good morning, everyone.  We have your appearances noted.  No one needs to state their names for the record.

Why don't we start with the motion to stay.

Any change in the government's position since the email that had been attached to the motion?

MR. BHACHU:  No.

THE COURT:  A stay in this procedural moment of the case would not conserve party or judicial resources.  The motion for reconsideration is fully briefed and ready for ruling.  Depending on how that motion is decided, there may be more proceedings.  And if there are next steps, and if the government changes its position about prosecuting books-and-records or internal-accounting-controls charges, there might be a time when a stay would make sense, but for now, that's not this time.

Outside events over which the parties have had no control have affected this case, and it has been a long time for all concerned.  I do understand and appreciate that.

What tomorrow may bring, I don't know, but today there's no need to stay the case.  So the motion for a stay is denied.

Case: 25-2349    Document: 30        Filed: 11/14/2025    Pages: 233
Case: 1:20-cr-00812 Document #: 398 Filed: 03/03/25 Page 4 of 25 PageID #:9417

4

I can give you a ruling on the motion to reconsider now.

First, the government raises a timeliness objection.

The Supreme Court's decision in *Snyder* applies to this case, and that provides good reason for a district court to evaluate how it applies, even though the deadlines for Rule 29 and Rule 33 motions has passed.

In most cases, if defendants kept filing motions to reconsider Rule 29 and Rule 33 all the way up to sentencing, and after entry of judgment, those kinds of motions would be summarily denied. But given the acceptance of motions to reconsider in criminal practice, and given that we are not within the timing of a notice of appeal with concerns over finality of sentencing and judgment, I conclude that a district court does have authority to reconsider orders denying Rule 29 and Rule 33 motions when intervening binding appellate precedent occurs before sentencing.

It may be that whatever I have to say about how *Snyder* applies to this case is not helpful to the Court of Appeals, but it seems odd to me to proceed to sentencing without a district court addressing it in the first instance. And sending it to the Court of Appeals to do that in the first instance seems odd to me, especially when the case is in the district court when the Supreme Court issued its decision.

So I will entertain the motion to reconsider over the

Case: 25-2349    Document: 30    Filed: 11/14/2025    Pages: 233
Case: 1:20-cr-00812 Document #: 398 Filed: 03/03/25 Page 5 of 25 PageID #:9418

5

government's objection.  The government has objected, and that point is preserved.

I start with the books-and-records counts, Counts Three, Four, Seven, and Nine.

*Snyder* does not affect the convictions on those counts.  The falsity of the records did not depend on the legal definition of "bribery," but on whether, as a matter of fact, the records were true.  As Judge Leinenweber put it:  "The payments were not for professional expertise but for something else."  That something else did not need to fit a post-*Snyder* definition of 666 "bribery" for it to be a lie about what the payments were for.

Lying about what post-*Snyder* might be called "corrupt gratuities" that are not prohibited by 666, that is, corruptly giving things of value to reward a public official in connection with that official's exercise of governmental power, is still a lie and undermines the accuracy of the books and records at issue.

The jury was not required to find that 666 bribery occurred in order to convict the defendants of Counts Three, Four, Seven, and Nine, and I do agree with Judge Leinenweber's analysis as to each defendant's direct liability for the books-and-records counts.

Mr. Doherty's conviction on the books-and-records counts was not entirely dependent on *Pinkerton* liability, even

Case: 25-2349    Document: 30    Filed: 11/14/2025    Pages: 233
Case: 1:20-cr-00812 Document #: 398 Filed: 03/03/25 Page 6 of 25 PageID #:9419

6

with the clarification that he did perform work for ComEd.  A jury could conclude beyond a reasonable doubt that he knew the subcontractors didn't do work, and he knew the records as they related to the subcontractors were false.

The evidence also supports beyond a reasonable doubt an agreement by all defendants to knowingly and willfully falsify the books and records, and to circumvent the internal accounting controls.  Even if the true nature of the relationship with Mr. Madigan perhaps fortuitously did not amount to bribery under 666, the true nature of the payments was still concealed.  It was still a lie and manipulated the company's accounting system's ability to know and understand what the company was paying for.

The evidence that Judge Leinenweber pointed to as sufficient proof of direct liability and the requisite intent also sufficed to prove that each defendant agreed to hide what they were paying for from the company's book and records and to evade the company's internal accounting controls.

There was plenty of evidence that whether the defendants actually violated 666, they wanted to hide the truth of the jobs as influence with Mr. Madigan.  My conclusion is that that suffices to prove the books-and-records counts as well as a conspiracy to violate the FCPA.

Although Judge Leinenweber said that evidence of Mr. Doherty's knowledge of joining the conspiracy with an

Case: 25-2349    Document: 30    Filed: 11/14/2025    Pages: 233
Case: 1:20-cr-00812 Document #: 398 Filed: 03/03/25 Page 7 of 25 PageID #:9420

7

intent to advance it is not as clear, I agree with what he said right after that passage in his opinion, and more importantly his discussion of the FCPA counts. Mr. Doherty knew about the subcontractors not doing work and the link between the subcontractors and ComEd's legislative success, and that demonstrates, along with the other evidence, his intent and agreement to falsify the books and records.

There was no special verdict for the jury to announce its finding beyond a reasonable doubt that the books and records and internal accounting controls were proven objects of the conspiracy. My conclusion is that no jury on this record would have or could have concluded otherwise. All defendants knew and agreed that to hide the relationship with Mr. Madigan, the books would have to be falsified and the controls circumvented.

Again, I disagree with the defense premise that the relationship had to be a criminal violation of 666 for it to be a lie or something that the defendants wanted to conceal for there to be a willful violation of the FCPA. Any *Yates* error as it relates to the objects of the conspiracy was harmless beyond a reasonable doubt.

There was no prejudicial spillover of evidence that would be admissible only for 666 bribery onto the books-and-records charges. Mr. Madigan's relationship with and power over ComEd was relevant to explain the subcontractors,

Case: 25-2349    Document: 30    Filed: 11/14/2025    Pages: 233
Case: 1:20-cr-00812 Document #: 398 Filed: 03/03/25 Page 8 of 25 PageID #:9421

8

and the evidence was not so inflammatory that the jury could not understand or follow the instruction to consider each count separately.

The jury's note about the *Pinkerton* and the substantive FCPA instruction, and the court's response to reread the instructions carefully, tells me that the jury was conscientious.  Even though the jury asked about *Pinkerton*, along with my conclusion that there was no harmful error in finding the defendants guilty of the books-and-records charges, including conspiracy under 371, my review of the record as a whole, applying an objective, harmless beyond-a-reasonable-doubt standard, also leads me to conclude that the *Pinkerton* instruction as it relates to the FCPA count was harmless.

The motion to reconsider the denial of the Rule 29 and Rule 33 motion as to Counts One, Three, Four, Seven, and Nine is denied.

Turning to Counts Two, Five, Six, and Eight.

The case was tried and the jury instructed with a backdrop understanding on the part of the prosecution and the court that Section 666 did not require proof of a specific quid pro quo and that 666 applied to what lawyers and judges called corrupt gratuities.

*Snyder* teaches that 666 is not a gratuities statute. It is a bribery statute.  *Snyder* does not exculpate what our

court has called a stream of benefits, which is an intended exchange, just not one proven by a specific, precise one-for-one exchange.

Under *Snyder*, bribery requires an upfront understanding or intent that things of value are in exchange for influence over official acts. The stream-of-benefits approach is not a gratuity theory of corruption. It is bribery. That's why it violates honest-services fraud, which only criminalizes bribes and kickbacks.

See *United States v. Solomon*, 892 F.3d 273, 277 (7th Circuit 2018), and *Ryan v. United States*, 688 F.3d 845, 852 (7th Circuit 2012). A stream of benefits as bribery also fits how *Snyder* conceives of a criminal reward under 666, payment can come later based on an earlier understanding that official acts were for sale.

Another important point from *Snyder* is that bribes are inherently corrupt. *Snyder*, 603 U.S. at 5. So while our current pattern instruction definition of "corruptly" can seem circular or repetitive, it isn't, so long as what we are talking about is bribery. "Corruptly" doesn't need further definition than the intent to give things of value to influence official action.

Judge Leinenweber analyzed the Rule 29 motion under the then-prevailing and binding gratuity theory of 666. But, as he explained, and as my own review of the record confirms,

Case: 25-2349    Document: 30    Filed: 11/14/2025    Pages: 233
Case: 1:20-cr-00812 Document #: 398 Filed: 03/03/25 Page 10 of 25 PageID #:9423

10

there was evidence from which a jury could conclude beyond a reasonable doubt that there was a "this for that" exchange throughout, and that was the intent of the participants, both on the solicitation and acceptance public official/bribe-recipient end and on the offer and giving bribe-payor end.  For example, the Energy Infrastructure Modernization Act in 2011 fits a "beyond a reasonable doubt" inference of a corrupt solicitation and corrupt offer to hire the firm, the law firm and subcontractors before and in exchange for official action by Mr. Madigan to pass the legislation.

A jury could reasonably conclude that Mr. Madigan had his metaphorical hand out in advance of bending the machinery of the Illinois legislature to favor ComEd, intending to be influenced in that legislative activity; and that in offering and agreeing to give and giving things of value, the defendants intended to influence those legislative activities.  These are not the tokens of appreciation that worried the Supreme Court in *Snyder*.  By the time the defendants and Mr. Madigan are dealing with each other in 2016 and Count Two, the offer to give a thing of value here was a bribe under *Snyder*, or so a jury could conclude beyond a reasonable doubt.

Judge Leinenweber described the evidence as consistent with gratuities, but he did not say that the evidence was in equipoise as between bribery and gratuity.  And on this point

Case: 25-2349    Document: 30    Filed: 11/14/2025    Pages: 233
Case: 1:20-cr-00812 Document #: 398 Filed: 03/03/25 Page 11 of 25 PageID #:9424

11

of equipoise, see *United States v. Johnson*, 592 F.3d 749, 755 (7th Circuit 2010).  I read Judge Leinenweber's opinion as deciding the motion through the simplest approach under then-binding precedent.  His use of the word "consistent" was not the same as saying that the evidence was evenly balanced between criminal and noncriminal.  He was just applying the proof against the law as it was, without deciding any more than he had to.

My own review of the evidence persuades me that this isn't a situation where the evidence equally supports an inference of noncriminal conduct as it does bribery.  There was evidence of a quid pro quo, upfront understanding and intent between the parties, and then an exchange, through a stream of benefits where, as the metaphor goes, menu items come up over time, but everyone intends the legislative activity at issue to have been influenced by the solicitation or the offer of things of value.  The corrupt intent to exchange private benefits for concrete official acts is there, again, viewing the evidence in the light most favorable to the prosecution.

For example, Government Exhibit 136 and the line:  "If you want to pass this bill, this is what it requires," can certainly be understood as an intent to exchange things of value for official action in advance.

The desire for ComEd to influence the passage of FEJA and the timing of renewing the Reyes-Kurson contract supports

Case: 25-2349   Document: 30   Filed: 11/14/2025   Pages: 233
Case: 1:20-cr-00812 Document #: 398 Filed: 03/03/25 Page 12 of 25 PageID #:9425

12

an intent to exchange Mr. Madigan's influence over that legislation for the contract, even if the timing of the thing of value comes after the passage.

That the subcontractor arrangement had paid off in the past and gave ComEd a leg up in the future could be accepted as proof beyond a reasonable doubt of an intent to exchange Mr. Madigan's legislative influence for things of value.

The government's argument that it did not have to prove that Mr. Madigan did anything was not an argument for conviction on a gratuity theory or without proof of an intended exchange. The relevant perspective is from the bribe payor and whether the bribe payor intended that Mr. Madigan was trading his power for things of value, even if Mr. Madigan ultimately did not take the official action or would have taken the official action without the offer. That's still bribery.

I do agree with the defense that if all the evidence amounted to was a general intent to keep Mr. Madigan happy without influencing official acts, that would not be enough to prove bribery, but that's not what the evidence was, and that wasn't the import of the government's argument. There was specific legislative action that defendants pursued, and they wanted that action in return for giving things of value. That inherently corrupt bribery scheme was formed in 2011 with the creative subcontractor arrangement and evidenced by what was described as an understanding created with Mr. Madigan.

Case: 25-2349    Document: 30    Filed: 11/14/2025    Pages: 233
Case: 1:20-cr-00812 Document #: 398 Filed: 03/03/25 Page 13 of 25 PageID #:9426

13

The motion to reconsider the Rule 29 motion on Counts Two, Five, Six, and Eight is denied.

That analysis does not resolve the Rule 33 motion for a new trial based on instructional error.

From the jury's perspective, this case was a bribery case. That was the title of the jury instruction. That was the word used by everyone to describe the alleged conduct.

In closing argument, the defense never mentioned rewards and instead argued that there was no intent to influence, no bribery, no legislative action. The defense repeatedly argued that this was goodwill and lobbying, not bribery. The defense argued that, "Connection is the whole ball of wax," emphasizing to the jury that it, the jury, needed to find an exchange. The defense argument was that there were jobs given and favorable legislative action but no connection. The government did not affirmatively, or in rebuttal, argue that there doesn't need to be an intended exchange or that there doesn't need to be intended official action. The idea of a quid pro quo, an exchange, loomed throughout the closing arguments.

The other point of emphasis from the defense was that the jobs were just bona fide compensation paid in the usual course of business. The jury instructions accurately told the jury about that concept, and if the jury concluded that these were bona fide payments, that would be a definitional failure

Case: 25-2349    Document: 30    Filed: 11/14/2025    Pages: 233
Case: 1:20-cr-00812 Document #: 398 Filed: 03/03/25 Page 14 of 25 PageID #:9427

14

on the government's burden to prove a thing of value.  The jury instruction defining "lobbying" included the concept of goodwill, and equipped the defense to argue that defendants' conduct was not a crime at all.

As argued, the term "in connection with" was treated as an exchange.  And the jury was given a binary choice between bribery and acquittal.

I appreciate the point that in the government's lawyers' heads, they thought 666 does not require what they were calling a quid pro quo.  The government fought to keep that concept out of the instructions.  But no one told the jury that.  I've emphasized how the case was argued because that is a useful way to understand how the jury received its mission.  The jury instructions given did not say that no quid pro quo, no upfront intent to influence official acts or duties was necessary.  The jury instructions tracked the statutory language.

Since the Supreme Court tells us that bribery is inherently corrupt, it seems to me that calling conduct bribery, and giving a jury the statutory language, could be sufficient and error-free.  A jury likely doesn't need pages of instructions explaining what bribery is in a case where the evidence supports an exchange of benefits and actions over time with an early course of conduct demonstrating that both sides of the equation had an understanding that their relationship

Case: 25-2349    Document: 30    Filed: 11/14/2025    Pages: 233
Case: 1:20-cr-00812 Document #: 398 Filed: 03/03/25 Page 15 of 25 PageID #:9428

15

was "this for that," and without any express argument or instruction suggesting conviction for giving things of value as an after-the-fact thank-you.

Corruptly soliciting or agreeing to give things of value with intent to influence or reward an agent in connection with official transactions or business could, with those words alone, be readily understood by a jury to require proof of what *Snyder* calls inherently corrupt bribery, especially if bribery is what everyone is calling it.

Using the statutory language does not omit an element of the offense. Giving the jury the statutory language is not the same as what the trial court did in *United States v. Edwards*, when it deleted the word "corruptly" from the elements of that obstruction offense.

I am reminded of *United States v. Hill*, 252 F.3d 919, 922 to 23 (7th Circuit 2001): "It is best to keep the instructions concise and leave inferences to arguments of counsel. Unless it is necessary to give an instruction, it is necessary not to give it."

There's also the principle that failing to give an explanation beyond the reading of the statutory language itself is not the same as a misstatement of the law. See *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).

Another example that comes to mind is that in our circuit, we believe that the term "proof beyond a reasonable

Case: 25-2349    Document: 30    Filed: 11/14/2025    Pages: 233
Case: 1:20-cr-00812 Document #: 398 Filed: 03/03/25 Page 16 of 25 PageID #:9429

16

doubt" is understandable without any further definition, even though the Supreme Court has held that trial courts can instruct the jury on "reasonable doubt."  Some concepts don't need further explanation for jurors, and "bribery" might be one of them, especially when no one has suggested to the jury that "bribery" means something other than what American law has long understood to be inherently corrupt.

Past practice and precedent in our circuit, however, tells us that the language of 666 was thought by many to include corrupt rewards without an ex ante intent to exchange private benefits for official action.  So defendants' point that the statutory language alone includes noncriminal conduct unless given further explanation has some force.  See *United States v. Hamilton*, 46 F.4th 389, 399 (5th Circuit 2022).

More than that, the point has persuasive, perhaps binding support from *Snyder* itself.  On remand from the Supreme Court, the Court of Appeals said:  "The Supreme Court's opinion did not address jury instructions directly, but its opinion is best understood as having found the jury instructions were erroneous because they permitted the jury to convict on a gratuity theory."  United *States v. Snyder*, No. 21-2986, 2024 Westlaw 4834037, at *2 (7th Circuit, November 20, 2024).

The jury instructions here were basically the same as the ones the Court of Appeals says are best understood to be erroneous.  So my long digression about how tracking the

Case: 25-2349   Document: 30   Filed: 11/14/2025   Pages: 233
Case: 1:20-cr-00812 Document #: 398 Filed: 03/03/25 Page 17 of 25 PageID #:9430

17

statutory language might not be erroneous is, I conclude, just that, a digression. Our Court of Appeals says that the Supreme Court says the instructions were erroneous.

So the jury should have been given more detailed instructions to explain what "bribery" means. That error is subject to harmless error review. Here, that means that a reviewing court must conduct a thorough examination of the record. If, at the end of that examination, the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error -- for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding -- it should not find the error harmless. *Neder v. United States*, 527 U.S.1, 19 (1999).

The defense here offered quid pro quo instructions that were refused, and there was evidence from which a jury, weighing the evidence the way the defense argued it, could conclude that there wasn't a corrupt intended exchange.

So, for example, Mr. Marquez's inability to identify an exchange, and the evidence that things of value were motivated perhaps by an amorphous fear of negative reaction without a tie to actual exercise of legislative power, could support a conclusion that there was no intended official action to influence. Under *Neder*, that means the omission of supplemental instructions was not harmless beyond a reasonable

18

doubt.

The motion to reconsider the denial of the motion for a new trial on Counts Two, Five, Six, and Eight is granted.  I vacate the convictions on those counts, and they need to be retried.

There are a few final points to address about the indictment and the grand jury.

The prosecutor's description of a reward theory likely misstated the law, as we now understand it, but I see no improper instruction to the grand jury on the influence theory. The government understood "corrupt influence" to mean an agreed-upon exchange of a thing of value in return for an official act.  And the government's understanding of a stream-of-benefits theory of bribery is, I conclude, bribery under 666, so I conclude that the grand jury was not given bad legal advice about what "influence" or "in connection with" meant under 666.

The grand jury found probable cause for a legally valid theory of bribery, and the text of the indictment that it returned supports that.  The indictment sufficiently alleges things of value were given to influence Mr. Madigan, who, the indictment alleges, wielded substantial power over legislation affecting ComEd.  Alleging that jobs and contracts were intended to influence Mr. Madigan in connection with legislation affecting ComEd and its businesses is sufficient to

Case: 25-2349    Document: 30    Filed: 11/14/2025    Pages: 233
Case: 1:20-cr-00812 Document #: 398 Filed: 03/03/25 Page 19 of 25 PageID #:9432

19

plead a post-*Snyder* intended exchange.

The duration of the indicted conspiracy and the allegations of concealment also support an inference of bribery and the corrupt intent to bribe in every substantive count of offering a thing of value. A course of conduct can amount to proof of quid pro quo, and the stream-of-benefits theory is a quid pro quo theory, just not a one-and-done quid pro quo. The indictment puts the defense on notice of the bribery theory.

In sum, the motion to reconsider is granted in part, denied in part. The convictions on Counts One, Three, Four, Seven, and Nine stand, but the convictions on Counts Two, Five, Six, and Eight are vacated for a new trial.

Both sides -- or all sides may want to think about what next steps should be, but maybe you've already thought about this outcome and are ready with suggestions.

I'll ask the government first.

MR. BHACHU: Judge, I think the better course here would be for us to probably consult with our leadership before we make a decision. I suspect I know what the answer is going to be.

I do know with respect to the remaining counts that the guideline range for those is life or thereabouts for each defendant, effectively, and so that may factor largely into our decision about how to proceed. But I would like an opportunity to speak with our leadership team before getting back to the

Case: 25-2349   Document: 30      Filed: 11/14/2025   Pages: 233
Case: 1:20-cr-00812 Document #: 398 Filed: 03/03/25 Page 20 of 25 PageID #:9433

20

Court.

We can file something to indicate to the Court what our preference is. I suspect it will be to proceed to sentencing on the counts that have not been disturbed.

THE COURT: And are you saying you don't want to anticipate what the government's position is with the other counts? Not to put you on the spot with that.

MR. BHACHU: Judge, to be clear, I think -- again, I don't want to get in front of the front office here, but my sense is given the fact that the remaining counts, the ones that have been the motion for which has been denied, the FCPA counts and the conspiracy count, because they carry a guideline range of life, my sense is it's likely that we would not proceed to a new trial on the remaining counts because that would be somewhat fruitless. But I would like to confirm that.

THE COURT: Understood.

MR. BHACHU: There is, obviously, the aspect of us taking an appeal as well, which I would need to discuss. But, again, the same rationale would probably apply there as well.

THE COURT: Both sides have appellate options to think through.

MR. BHACHU: Might I suggest, Judge, that we just file something with the Court in a week's time?

And, frankly, at this point in time, what I would suggest doing, just to make things efficient, is just set

Case: 25-2349    Document: 30    Filed: 11/14/2025    Pages: 233
Case: 1:20-cr-00812 Document #: 398 Filed: 03/03/25 Page 21 of 25 PageID #:9434

21

sentencing dates.  And if anything should change, we will let the Court know in seven days.

THE COURT:  If we were to proceed to sentencing on the existing counts, does the government think we need to redo the PSRs?

MR. BHACHU:  No.

MS. SANSONETTI:  Judge, I think --

THE COURT:  It's been a while since the PSRs were prepared, so I am not so sure about that.

But let me ask the defense, first, whether you object to everyone taking a little time right now and then hearing from the government about what they intend to do.

(Defense counsel nod.)

THE COURT:  Everyone's nodding their heads.

Ms. Sansonetti was about to say something, so I will just ask Ms. Sansonetti to speak on behalf of everybody at the defense.

MS. SANSONETTI:  I don't have any objection, and I don't believe any of the other defendants likely do either.

THE COURT:  And what were you about to say?

MS. SANSONETTI:  I would like to revisit the PSR for Mr. Doherty.  There is a provision in the FCPA statute with respect to sentencing that I just would like the probation officer to direct his attention to.

THE COURT:  I think sentencing dates are also going to

Case: 25-2349    Document: 30    Filed: 11/14/2025    Pages: 233
Case: 1:20-cr-00812 Document #: 398 Filed: 03/03/25 Page 22 of 25 PageID #:9435

22

require a fair bit of calendar coordination that I am not in a position to do right now with respect to my own calendar.  So let's see what the government wants to do with the counts for which the convictions have been vacated and then we'll take it from there.

Is there any objection from the defense to excluding time under the Speedy Trial Act on those counts?

MR. LASSAR:  No, Your Honor.

THE COURT:  Thank you, Mr. Lassar.

MR. COTTER:  No objection on behalf of McClain, Your Honor, to excluding time.

And no objection on behalf of McClain to giving the government an opportunity to perhaps consult with whoever is at DOJ about how they're going to move forward with these FCPA matters.

THE COURT:  Any other defendants want to object to exclusion of time under the Speedy Trial Act?

(Defense counsel nod.)

THE COURT:  Heads are being --

MS. JACOBSON:  No objection on behalf of Mr. Hooker.

MS. SANSONETTI:  Or Doherty.

THE COURT:  I appreciate that.  Thank you, everyone.

The government shall file a status report stating its position on next steps by March 11th.

Given that there's a number of other events with

Case: 25-2349    Document: 30    Filed: 11/14/2025    Pages: 233
Case: 1:20-cr-00812 Document #: 398 Filed: 03/03/25 Page 23 of 25 PageID #:9436

23

respect to sentencing and possibly a PSR that are still up in the air, I am excluding time under the Speedy Trial Act through March 31st. This delay is necessary to give the parties time for effective preparation, which includes consideration of next steps following the ruling on the motion to reconsider, and consideration of whether a new trial is going to be held or not, and that delay outweighs the interests of the public and the defendants in a speedy trial and shall be excluded.

On behalf of the government, is there anything further you'd like to raise this morning?

MR. BHACHU: Not on behalf of the government. Thank you, Judge.

THE COURT: On behalf of any defendants, anything further?

MR. COTTER: Nothing on behalf of Defendant McClain, Your Honor.

MR. LASSAR: Judge, could we ask if the government is going to ask for a review of the FCPA counts by the Attorney General?

THE COURT: I suppose you can ask via me.

I'll ask, is there anything you can tell us about what's internally happening on that end?

MR. BHACHU: I really can't provide more than probably what you know from reading the paper.

But what I can say, and I want to be clear about this,

24

is that our office will comply with whatever instructions we receive from main justice as it concerns the application of Foreign Corrupt Practices Act.

There will be no daylight between our office and anybody in Washington, and we will follow whatever guidance we receive. And that's all I can say.

THE COURT: Is there anything any defendant would like me to address at this point?

(Defense counsel nod.)

THE COURT: Thank you. And thank you for your patience while the motion was under advisement. I appreciate that.

We're in recess.

MS. SANSONETTI: Thank you, Your Honor.

(Proceedings concluded.)

*        *        *        *        *

I, Colleen M. Conway, do hereby certify that the foregoing is a complete, true, and accurate transcript of the Ruling proceedings had in the above-entitled case before the HONORABLE MANISH S. SHAH, one of the Judges of said Court, at Chicago, Illinois, on March 3, 2025.

_/s/ Colleen M. Conway, CSR, RMR, CRR_          _03/03/2025_
             Official Court Reporter                                    Date
             United States District Court

SA126

Northern District of Illinois
Eastern Division

1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA              )  Case No. 20 CR 812
                                      )
                                      )
        v                             )
                                      )
MICHAEL McCLAIN, ANNE PRAMAGGIORE,    )
JOHN HOOKER, and JAY DOHERTY,         )  Chicago, Illinois
                                      )  May 28, 2025
        Defendants.                   )  10:11 o'clock a.m.


TRANSCRIPT OF PROCEEDINGS - MOTION HEARING/RULING
BEFORE THE HONORABLE MANISH S. SHAH


APPEARANCES:

For the Government:        HON. ANDREW S. BOUTROS
                           United States Attorney
                           219 S. Dearborn Street, Suite 500
                           Chicago, Illinois  60604
                           BY:  MS. SARAH E. STREICKER
                                MS. DIANE MacARTHUR
                                MS. JULIA K. SCHWARTZ


For Defendant Pramaggiore: SIDLEY AUSTIN, L.L.P.
                           BY:  MR. SCOTT R. LASSAR
                                MR. DANIEL C. CRAIG
                                MS. JENNIFER M. WHEELER
                                MS. EMILY R. WOODRING
                           One S. Dearborn Street
                           Chicago, Illinois  60603


For Defendant Hooker:      LAW OFFICES OF SUSAN M. PAVLOW
                           BY:  MS. SUSAN M. PAVLOW
                           53 W. Jackson Boulevard, #1215
                           Chicago, Illinois  60604

SA128

Case: 25-2349    Document: 30    Filed: 11/14/2025    Pages: 233
Case: 1:20-cr-00812 Document #: 419 Filed: 05/29/25 Page 2 of 13 PageID #:9550

2

APPEARANCES (Continued):

For Defendant Doherty:        MS. GABRIELLE R. SANSONETTI
                              120 N. LaSalle Street, Suite 2000
                              Chicago, Illinois  60602

Court Reporter:               COLLEEN M. CONWAY, CSR, RMR, CRR
                              Official Court Reporter
                              219 S. Dearborn Street, Room 1918
                              Chicago, Illinois  60604
                              (312) 435-5594
                              *colleen_conway@ilnd.uscourts.gov*

                    * * * * *
            PROCEEDINGS REPORTED BY STENOTYPE
  TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

Case: 25-2349  Document: 30  Filed: 11/14/2025  Pages: 233
Case: 1:20-cr-00812 Document #: 419 Filed: 05/29/25 Page 3 of 13 PageID #:9551

3

(Defendants out.  Proceedings heard in open court:)

THE CLERK:  20 CR 812, United States versus McClain, Pramaggiore, Hooker, Doherty.

MS. STREICKER:  Good morning, Your Honor.  Sarah Streicker and Julia Schwartz and Diane MacArthur on behalf of the United States.

THE COURT:  We have all of your appearances for the record, but why don't we go around the table for the record.

MR. LASSAR:  Scott Lassar for Anne Pramaggiore.

We're also representing Mr. McClain because Mr. Cotter could not be here today.

MR. CRAIG:  Daniel Craig for Ms. Pramaggiore.

MS. WHEELER:  Jennifer Wheeler for Ms. Pramaggiore.

MS. SANSONETTI:  Gabrielle Sansonetti, S-a-n-s-o-n-e-t-t-i, for Mr. Doherty.

MS. PAVLOW:  And Susan Pavlow on behalf of Mr. Hooker.

THE COURT:  Good morning, everyone.

I read the reply brief that was attached to the motion to file the reply.  So while it's styled as a motion for permission to file a reply, it's really more of a motion for forgiveness for filing a reply.

And with that preface, does the government have any objection to the filing of that reply?

MS. STREICKER:  Your Honor, yes, we do object to the filing of the reply, particularly in light of Your Honor's

Case: 25-2349   Document: 30   Filed: 11/14/2025   Pages: 233
Case: 1:20-cr-00812 Document #: 419 Filed: 05/29/25 Page 4 of 13 PageID #:9552

4

order at docket No. 414 that:  "No reply is permitted unless requested by the court."  And in this instance, it was not requested by the Court.  So we do object on that basis.

THE COURT:  The motion to file the reply is granted because I read it, and it's easier for me to put aside my disappointment in counsel for filing a brief that I didn't ask for than perhaps it is for me to put aside everything I read about it.

So I'll consider it.  And the motion to file the reply is granted.

You don't need to file it as a separate entry on the docket.  It's there.  And, as I mentioned, I have read it.

Unless there are any updates from the government or the defense about the FCPA counts, I can give you a ruling on the motion to reconsider now.

Are there any updates?

MS. STREICKER:  Your Honor, on that score, the defendants' appeal, which defendants raised at the last status hearing, has been denied, and the guidance we have received is to move forward with sentencing.

THE COURT:  Then I will give you the ruling on the pending motion to reconsider.

I imagine that framing this case now as an all-or-nothing battle about the internal accounting records of ComEd feels probably strange to those of you who were in the

Case: 25-2349   Document: 30   Filed: 11/14/2025   Pages: 233
Case: 1:20-cr-00812 Document #: 419 Filed: 05/29/25 Page 5 of 13 PageID #:9553

5

room trying the case, but here you are.

Thompson v. United States is, of course, binding on lower courts and in cases on direct review.  As I said about Snyder, it would make no sense to me to not consider a Supreme Court decision that has come down and applies, or at least to consider whether and how that decision applies, when the Court of Appeals will have to anyway.  So I will entertain the motion to reconsider and focus and limit it to the question of how Thompson applies.

In Thompson, the Supreme Court said that if "false" means anything, it means "not true."  A true statement is obviously not false.  And a statute that criminalizes false statements does not criminalize statements that are misleading but not false.

In considering the meaning of the word "false," the Court looked at, among other sources, the 12th Edition of Black's Law Dictionary.

Justice Alito's concurrence emphasized some points about the decision.  First, falsity must be judged in context. Second, "false" and "misleading" may overlap.  And third, it would be wrong to instruct a jury that it must acquit if it finds a statement is misleading.  On the jury instructions, Justice Jackson pointed out that the jury in that case had been properly instructed by using the word "false."

So how does Thompson apply to our case?

Case: 25-2349    Document: 30    Filed: 11/14/2025    Pages: 233
Case: 1:20-cr-00812 Document #: 419 Filed: 05/29/25 Page 6 of 13 PageID #:9554

6

Here, we have a statute that makes it a crime to knowingly circumvent a system of internal accounting controls or knowingly falsify any book, record, or account described earlier in the statute. 15, United States Code, Section 78m(b)(5).

*Thompson* addresses a distinction between a false statement and a misleading statement. Does that help us understand the meaning of the verb "falsify" in this case? Defendants say yes, that it is not falsifying a record if the act only makes the record misleading while still being literally true. In the defendants' view, only the act of making a document literally untrue is falsifying.

The 12th Edition of Black's Law Dictionary defines "falsify" as "to make deceptive; to counterfeit, forge, or misrepresent."

Merriam-Webster's Unabridged Dictionary includes among its definitions of "falsify" "to represent falsely: misrepresent, distort."

The OED, cited by defendants, defines "falsify" as: "to make false or incorrect," with a sub-definition of "to give a false account of; to misrepresent."

In my view, *Thompson* does not affect the meaning of the verb "falsify" in this statute; it has its ordinary meaning in law, which includes to make deceptive, to misrepresent.

The records at issue here look like ComEd was

purchasing lobbying or consulting services from entities like JDDA or Bradley & Decremer, but that wasn't what ComEd was buying, and that's not what the transactions were about, or so a jury could conclude beyond a reasonable doubt.  Contrary to what the books and records were representing, ComEd was paying benefits to Mr. Madigan.  Even if some of the money and contractual relationships were for actual services rendered, not all of it was, and defendants made the books and records deceptive by purporting to record payments and describe contracts for something else other than what the contracts, services, invoices, Sole Source Justifications, and ledger entries said they were.  These were misrepresentations and distortions, and the act of doing that to the books and records is falsifying.  The original analysis of these counts holds under an ordinary understanding of the word "falsify," and *Thompson* does not suggest otherwise.

As it has throughout the case, the defense is focused on the omission of the subcontractors and the absence of a specific requirement to identify subcontractors.  I don't agree that that makes concealment of the subcontractors a misleading omission but literally true.  These were acts of making the books and records a distortion of reality, a misrepresentation of what the company was really doing.  That's falsifying, and that fits within the statutory context.

Subparagraph (2)(A) requires that the books and

Case: 25-2349     Document: 30     Filed: 11/14/2025     Pages: 233
Case: 1:20-cr-00812 Document #: 419 Filed: 05/29/25 Page 8 of 13 PageID #:9556

8

records accurately and fairly reflect transactions.

"Falsify" in subparagraph (5) should be informed by the purpose of the books and records, to be accurate and fair reflections of the transactions. It does not make subparagraph (4) superfluous to make the knowing falsification of books and records criminal, where falsifying the records means to render the recorded transactions inaccurate or make them unfair reflections of transactions. There's no tension in reading "falsify" to include making something incorrect or distorting something and subparagraph (2)(A). Subparagraph (4) does the work of shielding negligent inaccuracies from criminal liability.

The jury instructions here used the term "falsify" straight out of the statute, without any further gloss, and *Thompson* confirms that there was no instructional error in going that route.

But even if "falsify" means only the partial definition that the defendants rely on from the OED, namely, to make false, full stop, the evidence here supports the convictions and there's no plain error justifying a new trial.

As *Thompson* teaches us, falsity depends on context.

A jury could find that the books and records here were literally false because the transactions they were documenting were not for services rendered by JDDA, for example. Viewed in the light most favorable to the government, these books and

Case: 25-2349    Document: 30    Filed: 11/14/2025    Pages: 233
Case: 1:20-cr-00812 Document #: 419 Filed: 05/29/25 Page 9 of 13 PageID #:9557

9

records were saying that all of the money and these contracts were for services rendered, and that was not true.

In *Thompson*, a statement that understated a loan amount might have been literally true. Of course, we don't know whether that is the case because the sufficiency of the evidence in *Thompson* hasn't been decided. It may be that even in *Thompson*, the context of the statement there made it false.

But even if understating something could be literally true, the books and records and ledger entries here were in a context of asserting that these contracts and invoices, et cetera, were for services rendered and those services rendered only. That's the point, the context, of all of these accounting controls, to give an accurate and fair accounting of what this issuer of securities is up to with its money. Unlike an arguably truthful but understated amount of a loan, these books and records weren't partial statements about the transactions. They were literally untrue in context.

For example, in our case, it's not a true statement to say that ComEd purchased JDDA's services when JDDA was, in part, a pass-through for a non-consulting, non-lobbying stream of benefits for Mr. Madigan.

That there were some services rendered does not compel a finding that the records were literally true. The defense argued to the jury that there were no false statements. The jury concluded otherwise, and that was a reasonable call for

Case: 25-2349    Document: 30    Filed: 11/14/2025    Pages: 233
Case: 1:20-cr-00812 Document #: 419 Filed: 05/29/25 Page 10 of 13 PageID #:9558

10

the jury to make.

I do understand the distinction between Mr. Doherty, the individual, and JDDA, the entity, but a jury could easily conclude from Mr. Marquez's testimony that JDDA did not have an expanded role necessitating a contract amendment, and that it was a lie to say that that was what the contract amendment was for. It was to pay Mr. Zalewski but not for services rendered through JDDA.

The defense may have a stronger argument about the -- for the literal truth of the Sole Source Justification forms, because those forms are explaining why there's no competitive bidding, but in the light most favorable to the government, it was not true that the consultant provided unique insight and perspective. The truth was that the consultant provided an opportunity or a pass-through for benefits to be conferred on Mr. Madigan.

The reason not to competitively bid the spending of this money wasn't because of JDDA's legitimate services. It was so that they could steer the money without disclosure. Saying that JDDA fell within the ordinary Sole Source Justification, when the entirety of the JDDA relationship did not, was a literal lie in context, or so a jury could conclude.

I don't agree with the defense that the ledger entries were literally true because they were only documenting dates, payment amounts, and remittance details without a field for

Case: 25-2349     Document: 30     Filed: 11/14/2025     Pages: 233
Case: 1:20-cr-00812 Document #: 419 Filed: 05/29/25 Page 11 of 13 PageID #:9559

11

"purpose" or "intent."  The ledger entries reported codes for professional services, consultant vouchers, legislative services, political expenses.  Those were not literally true because there were entries coded as professional services or lobbying that the jury could conclude beyond a reasonable doubt were not for professional services or lobbying.

The codes were lies, as were the invoices, in context, purporting to bill for services that were not what the bills were for.

Even a narrow construction of the verb "falsify," there was sufficient evidence to find falsification, and the original analysis of each defendant's liability holds.

And I'm still of the view that there was no need for a special verdict on the specific falsified documents because the evidence supports conviction for falsifying all of the charged documents.

I appreciate the point that circumventing the accounting controls was not a big part of the trial, but *Thompson* does not affect the analysis of that, that object.

The Code of Business Conduct was part of internal accounting controls, among other evidence of the accounting system, and the conspiracy knowingly and willfully evaded those controls.

Even if I concluded that defendants were right that there was literal truth in every document and record, there is

Case: 25-2349    Document: 30    Filed: 11/14/2025    Pages: 233
Case: 1:20-cr-00812 Document #: 419 Filed: 05/29/25 Page 12 of 13 PageID #:9560

12

still no doubt that there was a conspiracy to circumvent the accounting controls so that benefits to Mr. Madigan were concealed. There's no prejudicial spillover from the other alleged conspiratorial objects onto that object because all of the evidence relates to why the conspiracy circumvented the company's accounting controls. The conspirators did not want the transparency that the accounting controls demanded for money spent by this issuer of securities.

Hypothetically, I suppose in a post-*Snyder* world, if an issuer of securities wanted to reward a public official with no-show jobs, it could comply with its accounting controls, announce truthfully what it is doing and let the shareholders know. The accounting controls are designed so that the books and records truthfully reflect, for example, what transactions were for unique insight and lobbying and which transactions were steering benefits to a public official. This conspiracy willfully circumvented those controls.

It may not have taken a lot of time of the trial to prove, but the evidence was more than sufficient to prove that object of the conspiracy to circumvent the accounting controls. There was no need for a special verdict on the objects of the conspiracy because my view is that no jury could have concluded otherwise as to this object.

For those reasons, the motion to reconsider is denied.

And the schedule for sentencing will remain as we have

Case: 25-2349   Document: 30   Filed: 11/14/2025   Pages: 233
Case: 1:20-cr-00812 Document #: 419 Filed: 05/29/25 Page 13 of 13 PageID #:9561

13

it in place.

Is there anything further the parties would like me to address this morning?  On behalf of the government?

MS. STREICKER:  Not on behalf of the government. Thank you.

THE COURT:  On behalf of any of the defendants?

MR. LASSAR:  No, Your Honor.

THE COURT:  Thank you.

(Proceedings concluded at 10:28 a.m.)

*       *       *       *       *

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter.

*/s/ Colleen M. Conway, CSR, RMR, CRR*        *05/29/2025*

Official Court Reporter                Date
United States District Court
Northern District of Illinois
Eastern Division

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA       )   Case No. 20 CR 812-2
                               )
                               )
         v.                    )
                               )
ANNE PRAMAGGIORE,              )   Chicago, Illinois
                               )   July 21, 2025
              Defendant.       )   10:30 a.m.


TRANSCRIPT OF PROCEEDINGS - SENTENCING
BEFORE THE HONORABLE MANISH S. SHAH


APPEARANCES:

For the Government:           HON. ANDREW S. BOUTROS
                              UNITED STATES ATTORNEY
                              BY:  MS. SARAH E. STREICKER
                                   MS. JULIA K. SCHWARTZ
                                   MS. DIANE MacARTHUR
                              219 S. Dearborn Street, Suite 500
                              Chicago, Illinois  60604


For the Defendant:            SIDLEY AUSTIN, L.L.P.
                              BY:  MR. SCOTT R. LASSAR
                                   MR. DANIEL C. CRAIG
                                   MS. JENNIFER M. WHEELER
                              One S. Dearborn Street
                              Chicago, Illinois  60647


U.S. Probation:               MR. MICHAEL ALPER


Court Reporter:               COLLEEN M. CONWAY, CSR, RMR, CRR
                              Official Court Reporter
                              219 S. Dearborn Street, Room 1918
                              Chicago, Illinois  60604
                              (312) 435-5594
                              *colleen_conway@ilnd.uscourts.gov*

* * * * *
PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

SA141

8

THE COURT:  Okay.  So I'll give you a ruling on the "no knowledge" safe harbor.  And some of this will be repetitive of things I said in Mr. Hooker's case.

Title 15, United States Code, Section 78ff(a) says that:  "No person shall be subject to imprisonment under this section for the violation of any rule or regulation" -- and the statute is written with the male pronoun -- "if he proves that he had no knowledge of such rule or regulation."

The violation at issue here is the violation of Section 78m(b)(5), which says that:  "No person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account described in paragraph (2)," which is a reference to "books and records that accurately and fairly reflect the transactions and dispositions of the assets of the issuer."

There was no rule or regulation violation at issue in this case.  The defendants are not at risk of imprisonment for a violation of any rule or regulation.  Unlike in other cases where the underlying violation, even of a statutory violation, depended on a rule violation, Rule 10b-5 or 17 C.F.R. Section 240.13b2-1, that's not this case.  Ms. Pramaggiore is not facing imprisonment for a rule-based or regulatory crime.

In *Behrens*, the violation of an SEC rule, namely Rule 10b-5, was an element of a statutory offense.  And in *Reyes*, the underlying district court opinion discussed how the

SA142

9

indictment and verdict form in that case relied upon 17 C.F.R. Section 240.13b2-1 for the prohibition on the falsification of books and records. *United States v. Jensen*, 537 F.Supp.2d 1069, 1073 (Northern District of California 2008).

This case is different. The prohibition on falsifying books and records and evading internal controls were not violations of rules or regulations. Nothing in the jury instructions required the jury to find a rule or regulation violation. I conclude that the "no knowledge" safe harbor of 78ff(a) does not apply here.

That reading of the statutes makes sense to me because it makes sense for there to be an "imprisonment" safe harbor for rule or regulatory violations which usually don't carry the same force of law as in a criminal liberty-depriving setting. But facing imprisonment for a willful violation of a purely statutory offense is not the kind of case that it would make sense for Congress to carve out from the ordinary principles of criminal law and penalties that Congress set by statute.

But if the "no knowledge" provision could apply to this offense, and these offenses, I agree that *Behrens* and *Reyes* provide the correct formulation of the test. A defendant benefits from the safe harbor if they can establish that they did not know the substance of the SEC rule or regulation they allegedly violated regardless of whether they understood its particular application to their conduct. *United States v.*

SA143

*Behrens*, 713 F.3d 926, 930 (8ᵗʰ Circuit 2013).

This does not require that the person know that there is personal criminal liability. Whether Ms. Pramaggiore knew about the FCPA itself or its domestic application is not the question. The question is whether she knew the substance of the prohibition.

The potential surplusage problem is solved, I think, by understanding that the willfulness of the statutory violation does not require knowledge of illegality or the content of a specific rule or regulation. It requires -- willfulness, in that sense, I think means wrongfulness.

I find that Ms. Pramaggiore has not proven that she didn't know that the FCPA required truth in records and required a system of accounting controls that were not supposed to be intentionally evaded.

ComEd's code of conduct and training specifically told her that the FCPA required truthful accounting records. I find that that notice sufficiently implies that not maintaining accurate records and evading accounting controls is against the law and violates the law.

That the code of conduct doesn't -- or didn't warn of the sanction doesn't mean it didn't provide notice of the rule. On top of the code of conduct, Ms. Pramaggiore was a longstanding and high-ranking employee and officer of a publicly-traded company. She was a lawyer, former litigator,

antitrust specialist. The notion that an issuer of securities is not supposed to lie in its accounting records and evade its system of controls for accurately recording the disposition of its assets is not arcane or hyper-technical; certainly not for a person of Ms. Pramaggiore's background, education, sophistication and experience.

To suggest that she needed more notice beyond her legal education, in-house experience, and company ethics training to know that lying about the truthful disposition of the company's assets was prohibited by law is not plausible to me. The "no knowledge" safe harbor doesn't apply.

So I am going to move on to the sentencing guidelines now.

The government isn't advocating for consideration of bribery as relevant conduct when calculating the guidelines. And although I am not sure that that's a correct application of the relevant conduct guidelines, without party presentation on that point, I will accept that concession.

As I said, I believe in Mr. Hooker's sentencing, or at least intended to allude to, once courts start opting out of guideline provisions just because the parties -- or one party, the government, chooses to opt out of them, then the court isn't arriving at the genuine advice of the Sentencing Commission.

But, in any event, I will accept that concession and