**Nos. 25-2349 & 25-2350**

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

ANNE PRAMAGGIORE and MICHAEL MCCLAIN,

*Defendants-Appellants*.

———————————

On Appeal from the United States District Court
for the Northern District of Illinois,
No. 20-cr-00812-2

———————————

## REPLY BRIEF FOR DEFENDANT-APPELLANT ANNE PRAMAGGIORE

———————————

Oral Argument Requested

———————————

SCOTT R. LASSAR
DANIEL C. CRAIG
JENNIFER M. WHEELER
EMILY R. WOODRING
JOAN E. JACOBSON
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603

PAUL D. CLEMENT
  *Counsel of Record*
DANIELLE SASSOON
ANDREW C. LAWRENCE
KEVIN WYNOSKY
JULIA GRANT*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Supervised by principals of the firm who are
members of the Virginia bar

*Counsel for Defendant-Appellant Anne Pramaggiore*

January 20, 2026

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES......................................................................... ii

INTRODUCTION ................................................................................... 1

ARGUMENT ........................................................................................ 3

I.     *Snyder* Requires Vacating All Of Pramaggiore's Convictions ...................... 3

     A.    The Conspiracy Conviction May Have Rested on the Two Legally Flawed Bribery Objects of the Conspiracy ............................. 4

     B.    The FCPA Convictions Likely Resulted From an Improper Application of *Pinkerton*, and Those Convictions Fail on Their Own Terms in Any Event .......................................... 12

     C.    The Conspiracy Object of Circumventing Internal Accounting Controls Was Also Legally Flawed ................................. 14

II.    *Thompson* Independently Forecloses Pramaggiore's Remaining Convictions ..................................................................... 17

     A.    The District Court Should Have Acquitted Pramaggiore of All Remaining Charges in Light of *Thompson* ......................................... 17

     B.    At a Minimum, the District Court Should Have Ordered a New Trial on All Remaining Counts in Light of *Thompson* .............. 24

III.   The District Court Committed At Least Two Other Errors That Warrant Retrial Or Resentencing................................................................ 26

     A.    The District Court Improperly Excluded *Mens Rea* Evidence .......... 26

     B.    The District Court Improperly Imposed a Prison Sentence in Violation of the FCPA's No Knowledge Clause................................. 28

CONCLUSION ..................................................................................... 30

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Chapman v. California*,
386 U.S. 18 (1967)................................................................5

*Evans v. Jones*,
996 F.3d 766 (7th Cir. 2021).............................................25

*Flournoy v. City of Chicago*,
829 F.3d 869 (7th Cir. 2016)...............................................8

*Freeman v. Franzen*,
695 F.2d 485 (7th Cir. 1982)...............................................9

*Henson v. Santander Consumer USA Inc.*,
582 U.S. 79 (2017)..............................................................20

*In re FirstEnergy Corp. Sec. Litig.*,
149 F.4th 587 (6th Cir. 2025)............................................24

*Ingram v. Watson*,
67 F.4th 866 (7th Cir. 2023)..............................................29

*Jensen v. Clements*,
800 F.3d 892 (7th Cir. 2015)...............................................6

*Krulewitch v. United States*,
336 U.S. 440 (1949)............................................................12

*Level 3 Comm'cns, LLC v. Liebert Corp.*,
535 F.3d 1146 (10th Cir. 2008).........................................13

*McConville v. SEC*,
465 F.3d 780 (7th Cir. 2006)..............................................15

*McDonnell v. United States*,
579 U.S. 550 (2016)............................................................14

*MCI Telecomm. Corp v. AT&T Co.*,
512 U.S. 218 (1994)............................................................18

*Neder v. United States*,
    527 U.S. 1 (1999)..................................................................................6

*Rehaif v. United States*,
    588 U.S. 225 (2019)............................................................................27

*River Rd. Hotel Partners, LLC v. Amalgamated Bank*,
    651 F.3d 642 (7th Cir. 2011) ...........................................................16

*Skilling v. United States*,
    561 U.S. 358 (2010).............................................................................4

*Snyder v. United States*,
    603 U.S. 1 (2024)..............................................................................1, 4

*Stewart Org. v. Ricoh Corp.*,
    487 U.S. 22 (1988)............................................................................15

*Sullivan v. Louisiana*,
    508 U.S. 275 (1993).........................................................................5, 11

*Thompson v. United States*,
    604 U.S. 408 (2025)............................................................ 2, 17, 20, 21

*United States v. Behrens*,
    713 F.3d 926 (8th Cir. 2013).............................................................29

*United States v. Bohle*,
    445 F.2d 54 (7th Cir. 1971)...............................................................25

*United States v. Edwards*,
    869 F.3d 490 (7th Cir. 2017)............................................................14

*United States v. Erickson*,
    601 F.2d 296 (7th Cir. 1979).............................................................23

*United States v. Garner*,
    507 F.3d 399 (6th Cir. 2007)...............................................................9

*United States v. Hornsby*,
    666 F.3d 296 (4th Cir. 2012).............................................................13

*United States v. Leonard-Allen,*
739 F.3d 948 (7th Cir. 2013)............................................................27

*United States v. Norwood,*
982 F.3d 1032 (7th Cir. 2020)..........................................................26

*United States v. Oluwanisola,*
605 F.3d 124 (2d Cir. 2010).............................................................26

*United States v. Russell,*
221 F.3d 615 (4th Cir. 2000).............................................................9

*United States v. Sabaini,*
161 F.4th 1036 (7th Cir. 2025)................................................... 20, 25

*United States v. Santos,*
553 U.S. 507 (2008)...................................................................... 19

*United States v. Smith,*
223 F.3d 554 (7th Cir. 2000)............................................................12

*United States v. Walls,*
225 F.3d 858 (7th Cir. 2000)............................................................13

*United States v. Yates,*
16 F.4th 256 (9th Cir. 2021).............................................................11

*Whitehead v. Cowan,*
263 F.3d 708 (7th Cir. 2001)............................................................25

*Yates v. Evatt,*
500 U.S. 391 (1991).......................................................................5, 6

*Yates v. United States,*
354 U.S. 298 (1957)..........................................................................4

**Statutes**

15 U.S.C. §45b(b)(2)........................................................................18

15 U.S.C. §77g(b)(1)........................................................................18

15 U.S.C. §78ff(a)............................................................................28

15 U.S.C. §78m(b)(5) ............................................................................16

15 U.S.C. §78m(m)(1) ...........................................................................29

15 U.S.C. §78u-2(a)(1) ...........................................................................18

**Other Authorities**

Black's Law Dictionary (5th ed. 1979)....................................................18

Oxford English Dictionary (2d ed. 1989) ............................................... 18

Matthew A. Pauley, *The Pinkerton Doctrine and Murder*,
   4 Pierce L. Rev. 1 (2005) ..................................................................12

Scalia & Garner, *Reading Law* (2012).....................................................18

Webster's New World Dictionary (3d College ed. 1988) .........................18

**INTRODUCTION**

The government's submission confirms that Anne Pramaggiore is currently sitting in federal prison for no valid reason.  The government prosecuted this case based on its overarching theory that Pramaggiore engaged in a scheme to, in its words, "bribe" former Illinois House Speaker Michael Madigan.  That theory was subsequently discredited by *Snyder v. United States*, 603 U.S. 1 (2024), which admonished that mere gratuities are not "bribes" and that the government could not prove the latter with evidence of the former.  Although the district court correctly recognized Pramaggiore's substantive bribery convictions could not survive *Snyder*, it reached the baffling conclusion that Pramaggiore's remaining convictions for conspiracy and for FCPA books-and-records violations—which were all dependent on the alleged and now-discredited "bribery" scheme—could remain standing.

The government's attempt to defend this profoundly wrong and unjust result is a study in revisionist history that is tellingly relegated to the back of its brief.  The government speculates that the jury "could" have convicted Pramaggiore of conspiracy based solely on the strength of the evidence supporting the substantive FCPA counts.  That seems unlikely, but what a jury "could" have done drastically understates the government's burden on appeal.  Because instructional error indisputably infected the conspiracy count premised on the government's invalid bribery theory, this Court must ask whether it is clear beyond a reasonable doubt that

the *Snyder* error did not contribute to the verdict here. On this record, it is impossible to reach that conclusion. Not even the government seriously argues otherwise, instead retreating to an incorrect, and far more favorable, standard of review.

Indeed, the government conceded below—and the district court agreed—that the jury could have found Pramaggiore guilty of a bribery conspiracy and then convicted her on the substantive FCPA counts based entirely on a theory of *Pinkerton* liability for the substantive crimes of her supposed bribery coconspirators. That is particularly likely because—as the government's submission lays bare—the evidence of an FCPA scheme, and especially of Pramaggiore's knowledge of such a scheme, was remarkably paltry and largely dependent on the government's discredited "bribery" theory. Simply put, because it is certainly possible (indeed, probable) that the jury convicted Pramaggiore on the conspiracy count based on the legally invalid "bribery" theory that dominated the proceedings below and then convicted on the FCPA counts by applying *Pinkerton* in the absence of a legally valid conspiracy, Pramaggiore is entitled to a new trial.

In fact, the government's submission underscores that Pramaggiore is not only entitled to a new trial, but to outright acquittal, as the remaining convictions are also irreconcilable with the Supreme Court's decision in *Thompson v. United States*, 604 U.S. 408 (2025), which held that statutes criminalizing false statements do not extend to merely misleading statements. The government seeks to evade *Thompson*

2

on the ground that "knowingly make … *false*" (the language in *Thompson*) has a fundamentally different meaning from "knowingly *falsify*" (the language at issue here). But dictionaries and basic rules of statutory interpretation confirm otherwise, and the rule of lenity would require the Court to reject the government's more expansive reading regardless. And once falsify means falsify, not make misleading, the government has no FCPA case, as it is not taking issue with the literal truth of any books and records, but assailing supposedly misleading efforts to conceal facts about Madigan-recommended subcontractors. That is insufficient, as this Court's post-*Thompson* precedent has underscored.

*Snyder* and *Thompson* thus make clear that Pramaggiore's convictions cannot stand. Worse still, the government fails to persuasively defend the district court's evidentiary and sentencing errors, which also entitle Pramaggiore to a new trial or a new sentence without imprisonment. One way or another, then, this Court should reverse and do so quickly, while making crystal clear that Anne Pramaggiore does not deserve to spend another night in prison based on convictions that are dependent on legal theories undermined by not one, but two, intervening Supreme Court cases.

## ARGUMENT

### I.    *Snyder* Requires Vacating All Of Pramaggiore's Convictions.

*Snyder* removed the cornerstone of the government's case—indeed, the government accused Pramaggiore and the other Defendants of "bribery" nearly 50

times during its opening statement and closing argument, *see* D.Ct.Dkt.264.App.A-B—and should have resulted in the vacatur of not only Pramaggiore's bribery convictions, but her conspiracy and FCPA convictions too. Op.Br.27-39. The government's contrary arguments are wrong across the board.

### A. The Conspiracy Conviction May Have Rested on the Two Legally Flawed Bribery Objects of the Conspiracy.

The government acknowledges that Pramaggiore's conspiracy conviction was rendered after the district court erroneously instructed the jury that it could convict Pramaggiore of a bribery conspiracy *without* finding an agreement to engage in a *quid pro quo*. U.S.Br.43. It is well-established that "constitutional error occurs when a jury is instructed on alternative theories of guilt" in relation to a multi-object conspiracy and proceeds to "return[] a general verdict that may rest on a legally invalid theory." *Skilling v. United States*, 561 U.S. 358, 414 (2010) (citing *Yates v. United States*, 354 U.S. 298, 312 (1957)). That describes this case to a T. The government charged Pramaggiore with a four-object conspiracy count, and the two main objects related to a "bribery" scheme premised on a legal theory that the Supreme Court later squarely rejected in *Snyder*, which held that the bribery statute here (18 U.S.C. §666) requires evidence of a *quid pro quo* rather than the mere gratuities that sufficed under the jury instruction. *See* 603 U.S. at 10.

The government dismisses that error as harmless, claiming that the evidence that Pramaggiore was guilty of the remaining conspiracy objects was overwhelming.

4

But the government cannot come remotely close to satisfying the relevant standard, which requires it to demonstrate "beyond a reasonable doubt" that the *Snyder* error is so obviously "harmless" that it "did not contribute to the verdict." *Chapman v. California*, 386 U.S. 18, 24 (1967).

For all the government's current bluster about the strength of its FCPA and internal-controls case, this case was litigated from indictment through conviction as a *Snyder*-defying "bribery" case, with the remaining allegations the tail on that dog. (And old habits die hard, as the government *still* discusses the supposed scheme to "influence" Madigan as though *Snyder* never happened.  U.S.Br.3-4 & n.2, 6, 15, 25, 32, 52, 56.)  As the Supreme Court has emphasized, an error qualifies as "harmless" only if it is "unimportant" to the basis on which "the jury actually rested its verdict." *Yates v. Evatt*, 500 U.S. 391, 403-04 (1991).  Given the manner in which the government litigated this case every step of the way, it blinks reality to conclude with any confidence, much less beyond a reasonable doubt, that the "guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993).

While the government now touts the supposedly overwhelming evidence of circumventing accounting controls and falsifying books and records, as Judge Shah acknowledged, "[t]he notion that this case is now only about accounting controls and books and records, and not bribery or corrupt intent, is no doubt a matter of some

dissonance for the trial participants." D.Ct.Dkt.521.at.4. That is an understatement. It is not only "strange" but revisionist history to "fram[e] this case … as an all-or-nothing" FCPA-related "battle about the internal accounting records of ComEd." D.Ct.Dkt.419.at.4. As Judge Shah bluntly put it, "circumventing the accounting controls was not a big part of the trial." D.Ct.Dkt.419.at.11.

Perhaps that is why, although the government pays lip service to *Yates*, it reverts to arguments that mistake the standard of review by insisting that the evidence was sufficient, claiming that a "reasonable jury" "could" "infer" or "conclude" that Pramaggiore "directly" violated the FCPA or "aid[ed] and abet[ted]" such violations—and then found Pramaggiore guilty on the conspiracy count as a result. U.S.Br.47, 49. But "[t]ime and again," the Supreme Court has emphasized that a harmless-error inquiry is not the same as a review for "whether there was sufficient evidence at trial to support a verdict." *Jensen v. Clements*, 800 F.3d 892, 902-03 (7th Cir. 2015). "[A] statement," like the government's, "of what a 'rational jury *could* conclude' is *not* a statement of a harmless-error inquiry." *Id.* at 903 (emphasis added); *see Yates*, 500 U.S. at 403-04. The proper question to ask is much different and much more difficult for the government: "Is it clear beyond a reasonable doubt that a rational jury *would* have found the defendant guilty absent the error?" *Neder v. United States*, 527 U.S. 1, 18 (1999) (emphasis added). And contrary to the government's suggestion, it cannot satisfy the beyond-a-reasonable-

6

doubt standard by construing the evidence in "the light most favorable to the government."  U.S.Br.51.

The problems with the government's could-conclude argument run deeper. The government insists on appeal that "there is no basis to conclude" that the jury convicted Pramaggiore on the substantive FCPA counts based on *Pinkerton*. U.S.Br.48-49.  The government had a decidedly different view immediately after the trial when it correctly conceded that "a reasonable jury could have found Pramaggiore guilty under a theory of *Pinkerton* liability as to the substantive counts of the indictment, including the books and records charges."  D.Ct.Dkt.325.at.74. The government is forced to take the contrary (and incorrect) position now, because the district court's *Pinkerton* instruction decimates the government's argument that "the jury clearly found that [Pramaggiore] conspired to violate the FCPA by convicting [her] of multiple substantive FCPA counts."  U.S.Br.47.  Because of the *Pinkerton* instruction, and the possibility that the jury relied on a *Pinkerton* theory to convict Pramaggiore of the substantive FCPA charges, this case is unlike the out-of-Circuit cases cited by the government, where a conviction on substantive counts demonstrated that the jury necessarily found certain facts related to the conspiracy. U.S.Br.46-47.

In reality, in light of the government's trial strategy, it is highly likely that the jury first convicted Pramaggiore on the conspiracy count (*i.e.*, Count 1) based on the

legally invalid bribery objects and then convicted her on the substantive FCPA counts based on a *Pinkerton* theory—namely, that one of Pramaggiore's alleged coconspirators falsified books and records to further and conceal the bribery scheme. That is especially likely because two FCPA counts concerned allegedly falsified contracts signed *after* Pramaggiore left ComEd, and there was no evidence that Pramaggiore—the CEO of a multi-billion-dollar company with thousands of employees—ever read the contracts relevant to the two other FCPA counts. Op.Br.37.

Judge Leinenweber, who (unlike Judge Shah) actually oversaw the trial proceedings, agreed that "a reasonable jury could have found Pramaggiore guilty under a *Pinkerton* theory of[ ]liability as to the books-and-records charges." D.Ct.Dkt.357.at.43. That is consistent with the jury's eleventh-hour note to the judge, which indicated that its only lingering question concerned whether it could convict Pramaggiore on the substantive FCPA counts based on *Pinkerton*: "If on [the FCPA counts] you don't believe the government proved 'beyond reasonable doubt,' can [the *Pinkerton* instruction] still be applied?" Tr.5517. While the government asks this Court to ignore that letter, U.S.Br.48, it offers no legitimate reason to do so.[1] And regardless, the note just corroborates what the government

---

[1] The government invokes cases where juries made "a gratuitous observation … immaterial to the verdict's validity" after reaching a verdict. *Flournoy v. City of Chicago*, 829 F.3d 869, 877 (7th Cir. 2016); *see Freeman v. Franzen*, 695 F.2d 485,

conceded below—that the jury may have addressed the conspiracy count first before proceeding to convict Pramaggiore on the substantive FCPA counts under *Pinkerton*. *See* pp.7-8, *supra*.

It is all the more probable (and at least possible, which would suffice) that the convictions on the substantive FCPA counts flowed from an application of *Pinkerton* because evidence that Pramaggiore knowingly and willfully violated the FCPA is glaringly absent, especially once the government's central argument that she was knowingly trying to conceal a criminal bribery scheme falls away. The government's theory that omissions from the accounting records were misleading was not only legally flawed, *see* pp.14-16, *infra*, but also factually weak: The government had no evidence that Pramaggiore made affirmatively untrue statements in the accounting records.

The government's submission proves the point. One of the government's central contentions is that company forms omitted information about payments to subcontractors, *e.g.*, U.S.Br.15-16, but the forms at issue "did *not* require mention of subcontractors." D.Ct.Dkt.357.at.42 (emphasis added); *see* pp.10, 23, *infra.* Indeed, after "7 weeks" of trial proceedings, U.S.Br.21, the government's so-called

---

490 (7th Cir. 1982). That is not the situation here, and courts routinely invoke jury notes like this one. *See, e.g.*, *United States v. Garner*, 507 F.3d 399, 407-08 (6th Cir. 2007); *United States v. Russell*, 221 F.3d 615, 623 (4th Cir. 2000).

9

"overwhelming" evidence of Pramaggiore's guilt on the remaining conspiracy objects—*but see* D.Ct.Dkt.357.at.4 ("[T]he Government's case … did not contain the proverbial smoking gun[.]")—reduces to a grand total of seven bullet points, U.S.Br.45, all of which wildly mischaracterize the evidence:

- The government first invokes a transcript of a February 2019 phone call between Michael McClain and a lobbyist named John Bradley to describe Pramaggiore as "all in" on the alleged conspiracy. U.S.Br.45 (citing GX122). The government omits that the "all in" quote is recounting what Fidel Marquez (ComEd's head of government affairs) said and that Marquez served as a *cooperating government witness* at the time. The government cannot launder its own misguided theories through its own cooperating witness and pass it off it as "overwhelming evidence" of Pramaggiore's guilt.

- The government cites two pages of the trial transcript to argue that a contract for Jay D. Doherty & Associates (JDDA) came under Pramaggiore's budget as CEO and that she authorized JDDA's contract and monthly invoices while purportedly "knowing that his contract description and invoices were false"— ostensibly because they did not mention subcontractors. U.S.Br.45 (citing Tr.3295, 3305). The government does not dispute, however, that there is no actual evidence that Pramaggiore ever read the contracts or invoices, Op.Br.37; it also ignores what Judge Leinenweber described as "a laundry list of evidence presented which clearly establishes that the records did *not* need to list the subcontractors," D.Ct.Dkt.357.at.35 (emphasis added); and it ultimately concedes that JDDA in fact did "legitimate work," U.S.Br.35.

- The government cites a June 2013 email exchange in which McClain asked Pramaggiore whether one subcontractor (Ed Moody) could move from McClain's contract to someone else's. U.S.Br.45 (citing GX229). The email conspicuously says nothing at all about the scope of work that Moody did or did not perform and also never mentions Madigan.

- The government cites a July 2014 text message regarding subcontractor payments—"We are on it"—that Pramaggiore purportedly sent "knowing that the subcontractors were being paid not to do work, but instead as a corrupt bargain with Madigan." U.S.Br.45 (citing GX260). All of the quoted language except "We are on it" is simply government editorializing. The first

10

evidence suggesting that Pramaggiore knew that the subcontractors did little work is from February 2019, after she moved to Exelon.  *See* GX131.

- The government cites two single-source-justification forms from 2017 and 2018 related to JDDA.  U.S.Br.45 (citing GX484; GX868).  The government provides no evidence—just its *ipse dixit*—that Pramaggiore "kn[ew] that the justifications explaining the services to be provided were false."

- The government cites a transcript of a May 2018 phone call in which Pramaggiore authorizes the hiring of Michael Zalewski (the fourth and final subcontractor) and references a lobbyist "roster."  U.S.Br.45 (citing GX22). That transcript never mentions Madigan, and other witnesses explained that the term "roster" referred to the group of all ComEd lobbyists, not just lobbyists recommended by Madigan.  *See, e.g.*, Tr.1530-31.3428; *see also* Tr.1309.2347.4124.

- The government invokes a transcript of a February 2019 phone call and states that, "[a]fter becoming CEO of Exelon Utilities, Pramaggiore advised Marquez to keep the subcontractor arrangement in place to avoid upsetting Madigan."  U.S.Br.45 (citing GX131).  In fact, the transcript reveals that Pramaggiore advised Marquez to alert the new ComEd CEO about the subcontractors that very day and to change the subcontractor arrangement as soon as the legislative session ended.  *See* GX131.at.1-3.

As all of that demonstrates, "the evidence of guilt" on the remaining conspiracy objects "was hardly so overwhelming as to ensure that the jury could not have found in favor of [Pramaggiore] in the absence of the [*Synder*] error[]." *United States v. Yates*, 16 F.4th 256, 269 (9th Cir. 2021).  The upshot is that this Court cannot say with any confidence that "the guilty verdict" on the conspiracy count "actually rendered in *this* trial was surely unattributable to the [*Snyder*] error." *Sullivan*, 508 U.S. at 279.  Pramaggiore's conspiracy conviction cannot stand.

**B.     The FCPA Convictions Likely Resulted From an Improper Application of *Pinkerton*, and Those Convictions Fail on Their Own Terms in Any Event.**

Once the Court vacates the conspiracy conviction, Pramaggiore's substantive FCPA convictions fall too.  Op.Br.35-39.  To reiterate, the government has already conceded—and the district court agreed—that the jury may have convicted Pramaggiore on the substantive FCPA counts based on *Pinkerton*.  *See* pp.7-8, *supra*. Given the dearth of evidence that Pramaggiore directly or knowingly participated in a scheme to falsify books and records, it is particularly likely that Pramaggiore was convicted on a *Pinkerton* theory, which permits "conviction of a substantive crime where there was no proof of participation in or knowledge of it."  *Krulewitch v. United States*, 336 U.S. 440, 451 (1949) (Jackson, J., concurring); *see* Matthew A. Pauley, *The Pinkerton Doctrine and Murder*, 4 Pierce L. Rev. 1, 4 & nn.11-12 (2005) (criticizing *Pinkerton*).

Not even the *Pinkerton* doctrine stretches so far as to permit conviction for a substantive crime arising from acts undertaken by others to further a conspiracy deemed legally invalid.  *See United States v. Smith*, 223 F.3d 554, 573 (7th Cir. 2000) ("Before *Pinkerton* can be applied, it is of course necessary to show that a conspiracy existed[.]").  Here, however, Pramaggiore's FCPA convictions could have been premised on *Pinkerton* liability related to the since-invalidated bribery conspiracy. The district court's instruction to the jury that it could rely on *Pinkerton* to convict

12

Pramaggiore on the substantive FCPA counts thus is not "harmless … beyond a reasonable doubt."  *United States v. Walls*, 225 F.3d 858, 866 (7th Cir. 2000); *see Level 3 Comm'cns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1158 (10th Cir. 2008).

That should be the end of the matter, but there is more.  Wholly apart from *Pinkerton*, the substantive FCPA counts are dubious given that the government baked its invalid bribery theory into those very counts.  As the government argued, Pramaggiore and the other Defendants supposedly "falsif[ied] ComEd's records" by "conceal[ing]" "*bribes*."  Tr.273 (emphasis added); *see also, e.g.*, Tr.274 (similar); 314 (similar); 5184-85 (similar).  Accordingly, when the district court vacated the bribery convictions after *Snyder*, the FCPA convictions could not stand alone and should have met the same fate.

The government offers no meaningful response.  Like the district court, the government states that "[l]ying about what post-*Snyder* might be called 'corrupt gratuities' … is still a lie and undermines the accuracy of the books and records at issue."  U.S.Br.42.  But post-*Snyder*, the conduct should be called "lawful," not "corrupt gratuities," especially when the government lost *Snyder* because it could not articulate a coherent theory for what made the payments corrupt.  The government's refusal to accept as much only underscores that the government's discredited bribery "was 'interwoven' throughout" its "case-in-chief." *United States v. Hornsby*, 666 F.3d 296, 306 (4th Cir. 2012).  Absent the central emphasis on

falsifying records to conceal a criminal bribery scheme, the evidence of falsity, and any inference that Pramaggiore had the requisite knowledge to be guilty of an FCPA violation, evaporates. As the government concedes, Pramaggiore's "participation in a [purported] bribery scheme may be relevant to [her] motives." U.S.Br.42. A jury that constantly heard statements that the books and records are false because they concealed a "bribery" scheme that, in light of *Snyder*, was neither unlawful nor "bribery" plainly "may have convicted [Pramaggiore] for conduct that is not unlawful," *McDonnell v. United States*, 579 U.S. 550, 579 (2016). That possibility necessitates vacatur of the substantive FCPA convictions. *United States v. Edwards*, 869 F.3d 490, 500 (7th Cir. 2017).

In short, the government tried this case as a "bribery" case from start to finish. Because *Snyder* made clear there was no "bribery" here, the government—not Pramaggiore—must live with the consequences of its mistake. Retrial is warranted.

### C. The Conspiracy Object of Circumventing Internal Accounting Controls Was Also Legally Flawed.

Because "circumventing the accounting controls was not a big part of the trial," D.Ct.Dkt.419.at.11, and the evidence was far from overwhelming, there is no basis to conclude beyond a reasonable doubt that the jury would have convicted Pramaggiore of conspiracy based solely on the object of circumventing ComEd's internal accounting controls. *See* pp.3-11, *supra*. Separate and apart from the lack of evidence, this fourth object cannot salvage Pramaggiore's conspiracy conviction

14

because the government never advanced a legally valid theory that would support it. Op.Br.49-53.

The government contended below that Pramaggiore circumvented a "system of internal accounting controls" within the meaning of 15 U.S.C. §78m(b)(5) by violating Exelon's Code of Conduct, but the Code is a just that—a code—not "a system of internal accounting controls." The government hardly argues otherwise. Indeed, the government itself tellingly references the Code as an "internal control," not an internal *accounting* control. U.S.Br.13, 38, 51. It acknowledges that the Code bears no resemblance to anything on the "expansively" drafted "list[]" of "[e]xamples" of internal accounting controls that this Court enumerated in *McConville v. SEC*, 465 F.3d 780, 790 (7th Cir. 2006). U.S.Br.39. It does not seriously dispute that the Code itself contemplates that the internal accounting controls are *external* to the Code.[2] Op.Br.52. And it highlights a jury instruction stating that "[e]vidence that a defendant violated a corporate code of conduct or compliance policy is not, standing alone, sufficient to convict a defendant." U.S.Br.39. The government never explains why circumventing the Code—which

---

[2] The government insists that the Code "constituted internal controls" when "[c]onsidered in the light most favorable to the government." U.S.Br.38.n.9. But this question is legal, not factual. *See Stewart Org. v. Ricoh Corp.*, 487 U.S. 22, 26 (1988). Regardless, unrebutted testimony from Exelon's former Chief Compliance and Ethics officer confirmed that the Code is *not* an internal accounting control. *See* Tr.3250-53.3282.

15

also discusses matters like diversity-and-inclusion guidelines and workplace etiquette—would not establish a violation of §78m(b)(5) if the Code truly qualified as a system of internal accounting controls.

Instead of relying on the Code of Conduct, the government primarily points to *other* purported internal accounting controls:  "requirements that invoices be submitted to someone 'familiar with the charges' for approval" and "the need for single-source justifications … for contracts above \$250,000."  U.S.Br.37.  That tactical shift does not help the government, as it does not actually claim (and it certainly did not prove) that Pramaggiore or the other Defendants *circumvented* those controls.  To the contrary, the entire premise of the government's books-and-records charges is that Defendants *complied* with those controls and produced numerous single-source-justification forms and invoices as a result.  To the extent that the government is suggesting that Pramaggiore and the other Defendants knowingly circumvented a system of internal accounting controls by knowingly falsifying books and records, that argument goes nowhere not only because the books and records are not false, *see* pp.17-24, *infra*, but also because it would render Congress' distinction between those two concepts meaningless.  *See* 15 U.S.C. §78m(b)(5); *River Rd. Hotel Partners, LLC v. Amalgamated Bank*, 651 F.3d 642, 651 (7th Cir. 2011).

16

**II.** ***Thompson* Independently Forecloses Pramaggiore's Remaining Convictions.**

The government's arguments regarding *Thompson* fare no better and underscore that *Thompson* warrants not only retrial, but acquittal.  Op.Br.39-57.

**A.     The District Court Should Have Acquitted Pramaggiore of All Remaining Charges in Light of *Thompson*.**

*Thompson* held that a statute proscribing false statements captures only statements that are "not true," not those that are merely "misleading."  *See* 604 U.S. at 413-17.  The Court found that conclusion inescapable, because misleading statements can be true, while false statements cannot, and many statutes cover both false and misleading statements, but the statute in *Thompson* reached only false statements.  The statute underlying the substantive FCPA counts here similarly proscribes only falsifying statements in corporate books and records, not merely making those statements misleading or incomplete.  Because all of the challenged statements are true under *Thompson*, Pramaggiore is entitled to acquittal on the FCPA counts.  Op.Br.39-53.

Again echoing the district court, the government's principal submission is that *Thompson* "has no bearing" here whatsoever because the Supreme Court there interpreted a Title 18 statute containing the phrase "knowingly make … *false*," whereas the Title 15 statute at issue here contains the phrase "knowingly *falsify*."

U.S.Br.27-31.  That argument ignores plain meaning, common sense, and the Court's reasoning in *Thompson*.

As Pramaggiore has explained, Op.Br.41, around the time when Congress enacted the relevant FCPA provision, dictionaries defined "falsify" as simply the verb form of "false," *i.e.*, to make false.  *See Falsify*, Oxford English Dictionary (2d ed. 1989); *Falsify*, Black's Law Dictionary (5th ed. 1979).  The government does not argue that Pramaggiore has misread those dictionaries; instead, it cites two other dictionaries to suggest that "falsify" "*could* mean" something broader, like to make "misleading."[3]  U.S.Br.30 (emphasis added).  But the government does not explain why Congress would have used the word "falsify" to capture merely misleading statements when it otherwise uses the very word "misleading" in Title 15 to accomplish that objective.  *See, e.g.*, 15 U.S.C. §§45b(b)(2)(C)(iii) ("false or misleading"), 77g(b)(1)(A) ("misleading"), 78u-2(a)(1)(C) ("false or misleading").  Nor does the government confront the insight of *Thompson* that—since misleading

---

[3] In one—*Webster's New World Dictionary* (3d College ed. 1988)—the primary definition of "falsify" is "to make false."  And the Supreme Court has warned against relying on secondary definitions from that source.  *See MCI Telecomm. Corp v. AT&T Co.*, 512 U.S. 218, 225-28 (1994).  The other purports to be the 1986 Second Edition of the Oxford English Dictionary, U.S.Br.30, but is actually an interim supplement pre-dating the Second Edition, which debuted in 1989 with a caution that it "made" "certain important general revisions, and numerous local corrections" to the 1986 supplement—including a narrower understanding of "falsify."  *Oxford English Dictionary* xi (2d ed. 1989); *see* Scalia & Garner, *Reading Law* 415-24 (2012) (cautioning against relying on nonauthoritative dictionary editions).

18

statements can be true (*i.e.*, not false)—words like false or falsify, when standing alone in a criminal statute, mean something different and more demanding than misleading. In fact, the government concedes that "falsify" "could have meant 'to make false.'" U.S.Br.30. That concession gives up the game, as the "venerable" "rule of lenity dictates" that, when given a choice between a broad definition and a narrow one, the "more defendant-friendly … definition" must "be adopted." *United States v. Santos*, 553 U.S. 507, 514 (2008) (plurality op.).

The government nevertheless insists that "falsify" in §78m(b)(5) must "encompass[] a broader scope of conduct" than the making of false statements in light of neighboring statutory language. U.S.Br.30.n.6. According to the government, because the books and records subject to §78m(b)(5)'s no-falsification requirement are those books and records referenced in §78m(b)(2)(A)—and because the latter subsection imposes a general requirement that books and records must, "in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer"—§78m(b)(5)'s no-falsification requirement must apply to misleading statements. U.S.Br.30.n.6. That theory is self-defeating. Section 78m(b)(2)(A) is not the provision that Pramaggiore was convicted for violating, and Congress conspicuously did not use that "fairly reflect" language in §78m(b)(5), which employs materially different language. "[W]hen we're engaged in the business of interpreting statutes we presume differences in language like this convey

19

differences in meaning." *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017).

The government additionally suggests that, in a footnote in *United States v. Sabaini*, 161 F.4th 1036, 1047 n.3 (7th Cir. 2025), this Court already "rejected" any effort to extend *Thompson*'s reasoning beyond the context of the particular statute at issue in *Thompson* itself (18 U.S.C. §1014). U.S.Br.30-31. Cabining a very recent Supreme Court case to its facts would be a bold move, and unsurprisingly, *Sabaini* did no such thing. The *Sabaini* footnote simply explained that the defendant in that case could not take advantage of *Thompson* because his statute of conviction criminalized not just "false statements," but also "conceal[ing] or cover[ing] up by any trick, scheme, or device a material fact." 161 F.4th at 1047 n.3. Treating that broader language as capturing more than false statements is entirely consistent with *Thompson*. Indeed, one of the reasons the Court found the statute at issue in *Thompson* to be limited to actually false statements is because other statutes used broader language like "false or misleading." *See* 604 U.S. at 415. Here, as in *Thompson* but unlike in *Sabaini*, there is no broadening language in §78m(b)(5), which mentions only "falsifying" records, not rendering them materially incomplete or misleading. Congress presumably could have reached that broader range of conduct, but did not with the bare word "falsify."

20

Ultimately, the reason why the government asks the Court to stretch the meaning of "falsify" to include "to give a … misleading account of," U.S.Br.25— an account that could still be literally true—is no mystery.  The government has no serious argument that the books and records here are actually false, as opposed to incomplete and thus misleading due to "omissions."  U.S.Br.35.n.8.  That "does not fit the bill."  *Thompson*, 604 U.S. at 417.

For instance, the government emphasizes "Doherty's" 2017 contract with ComEd, which it describes as false because it supposedly stated that "Doherty" would "advis[e] ComEd on legislative issues affecting ComEd and its subsidiaries," but did not disclose that some payments "would go to" the subcontractors as opposed to "Doherty."  U.S.Br.32.  In fact, the contract is between *JDDA* (not Doherty individually) and ComEd, *see* GX868, and the government does not dispute that ComEd "expected" JDDA to perform the described services and that JDDA in fact "performed" them, U.S.Br.34.  The contract also expressly authorized JDDA to hire subcontractors, indicating that payments may go to subcontractors.  *See* GX868.at.6-7.  While the government may find the contract misleading because it did not disclose the identities of the four particular subcontractors at issue here, there is no sense in which the contract is "not true."  *Thompson*, 604 U.S. at 414.

The same goes for "the 2018 amendment to Doherty's contract."  U.S.Br.33.  The government characterizes the amendment as false because "Doherty did not

have an expanded role" as the contract purportedly suggested. U.S.Br.33. But, like the original contract, the amended contract is actually between ComEd and JDDA, not between ComEd and Doherty personally. *See* GX769. And the evidence reveals that, at the time of signing, ComEd (including the government's own cooperating witness there) expected JDDA to have an expanded role due to the hiring of the fourth subcontractor, Zalewski. *See* Tr.2408-09. The government bemoans that the contract did not disclose that Madigan also recommended Zalewski and asserts that Zalewski eventually "performed no work at all." U.S.Br.16, 33. But even if the former omission is misleading, it is certainly not a falsification. And the government cannot seriously mean that a document becomes false based only on subsequent events. If the Chicago Bears sign a free agent to a contract in the offseason on the expectation that he will contribute to the team but he then fails to produce, that does not make the contract false.

The government's objections to the single-source-justification forms suffer from similar flaws. The government suggests that "[e]ach form explained that Doherty provided expertise as a consultant that could not be obtained elsewhere." U.S.Br.34. To the contrary, those forms stated that JDDA (not Doherty) offered "unique insight & perspective" and "specific knowledge" relevant to ComEd's interests. GX868.at.2; GX484.at.3; GX867.at.1. The government does not dispute that JDDA provided such insight, perspective, and knowledge. It just believes that

22

the forms also should have noted that some payments to JDDA eventually flowed to the subcontractors.  U.S.Br.34.  But it is not a false statement to omit such information, as the undisputed evidence here demonstrates that the single-source-justification forms "did *not* require mention of subcontractors."  D.Ct.Dkt.357.at.42 (emphasis added); *see* Tr.2357-60.3352-54; DX3024.

Nor do any of the government's other arguments get the job done.  The government asserts that "Doherty's invoices" contained false statements because they included language like "professional services."  U.S.Br.32.  But the government concedes that JDDA performed "legitimate work," U.S.35, and the evidence demonstrates that professional services in this field include mere availability to perform lobbying services on an as-needed or emergency basis, regardless of whether any lobbying occurred, *see* Tr.2347.  And to the extent that the government believes that ComEd's internal accounting database contained false statements too, the government's submission makes clear that the falsity of those entries rises or falls on the falsity of the documents underlying the corresponding payments—and those are not false.  U.S.Br.34, 49; *see also United States v. Erickson*, 601 F.2d 296, 302 (7th Cir. 1979).

In sum, the government at most may have established that the books and records contained half-truths.  But the takeaway of *Thompson* is that "a half-truth is not a *false* statement because a half-truth is a true statement," even if it is "a

misleading one." *In re FirstEnergy Corp. Sec. Litig.*, 149 F.4th 587, 609 (6th Cir. 2025).[4]   Moreover, applying *Thompson* faithfully makes particular sense here, because it prevents FCPA books-and-records counts from being routinely tacked on to other prosecutions.  Documents will often lack some detail that could be said to render them misleading or incomplete.  Only when documents are actually falsified is there a distinct *actus reus* that justifies criminal punishment.  Pramaggiore thus is entitled to acquittal on the FCPA counts in light of *Thompson*.

For these reasons, Pramaggiore's enervated conspiracy conviction also cannot survive *Thompson*, which renders the FCPA conspiracy object invalid, alongside the other remaining object that is likewise legally invalid.  *See* pp.14-16, *supra*.

**B.     At a Minimum, the District Court Should Have Ordered a New Trial on All Remaining Counts in Light of *Thompson*.**

At a minimum, the government's *Thompson* errors require retrial.  The government repeatedly suggested to the jury that merely misleading statements are sufficient under the FCPA, thus denying Pramaggiore a fair trial as due process requires.   This Court assesses "[s]ix factors" in circumstances like these: "(1) whether the prosecutor misstated evidence; (2) whether the remarks implicate

---

[4] The government suggests that Pramaggiore never "argue[d] that the jury was improperly instructed" regarding falsity.  U.S.Br.31.  But Pramaggiore repeatedly argued that the government improperly told the jury (including during closing argument) that merely misleading statements qualify as false.  *See, e.g.*, D.Ct.Dkt.413.at.17-20.

24

specific rights of the accused; (3) whether the defense invited the comments; (4) the trial court's instructions; (5) the weight of the evidence against the defendant; and (6) the defendant's opportunity to rebut the improper remarks." *Evans v. Jones*, 996 F.3d 766, 778-79 (7th Cir. 2021). The government does not address most of those factors. Instead, the government primarily contends that it made no misstatements at all when it "highlighted" that Pramaggiore and the other Defendants "conceal[ed] … subcontractor payments." U.S.Br.40. As this Court's decision in *Sabaini* reveals, however, there *is* a material legal difference between making "false statements" and "concealing" information. 161 F.4th at 1047 n.3 (brackets omitted). The government does not explain why that teaching does not apply here.[5]

Contrary to the government's suggestion, moreover, the district court's "later technical instruction[]" that attorney arguments are not "evidence" did not cure the problem. *United States v. Bohle*, 445 F.2d 54, 70-71 (7th Cir. 1971), *overruled on other grounds*, *United States v. Lawson*, 653 F.2d 299 (7th Cir. 1981). The problem here concerns "a misstatement of law by a prosecutor"—*viz.*, that merely misleading statements qualify as false statements. *Whitehead v. Cowan*, 263 F.3d 708, 729 (7th Cir. 2001). Had the jury never heard that misleading statements suffice, it almost

---

[5] The government oddly suggests that Pramaggiore did not cite any examples where the government argued that misleading statements amount to false statements. U.S.Br.39. In fact, Pramaggiore did just that. Op.Br.56 (citing Tr.297.314.5178-79.5185.5187-89).

certainly would have acquitted on the FCPA counts, as the government at most proved the existence of misleading statements. *Cf. United States v. Norwood*, 982 F.3d 1032, 1053 (7th Cir. 2020).

## III.   The District Court Committed At Least Two Other Errors That Warrant Retrial Or Resentencing.

The Court need not proceed any further given that the government's fatally flawed arguments regarding *Snyder* and *Thompson* confirm that retrial or acquittal is required.  Regardless, the government's efforts to paper over the district court's evidentiary and sentencing errors are unsuccessful too.  Op.Br.58-62.

### A.   The District Court Improperly Excluded *Mens Rea* Evidence.

As the government recounts, U.S.Br.53-54, the district court not only excluded evidence that Pramaggiore in June 2012 called for an investigation into ComEd's lobbyists—including JDDA subcontractors—but prevented her from testifying about the substance of that evidence altogether.  The government promises that the court below "did not err," U.S.Br.54—even though it "severely limit[ed]" Pramaggiore's defense, *United States v. Oluwanisola*, 605 F.3d 124, 134 (2d Cir. 2010)—but it does not deliver.

The government's main argument is that Pramaggiore's request for an investigation is "irrelevant" to this case.  U.S.Br.55; *see* U.S.Br.1, 55 (characterizing the evidence as impermissible evidence of a prior "unrelated" good act).  In the government's view, because Pramaggiore's request followed a lobbyist-related

26

incident in June 2012 that "did not relate to the alleged criminal conduct" here, her request "has no bearing on her state of mind regarding the … subcontractors in this case." U.S.Br.56. That makes no sense. The government alleged that Pramaggiore knowingly participated in a purported subcontractor conspiracy that (according to the government) "start[ed] in 2011," U.S.Br.18, 46; D.Ct.Dkt.1.at.11, and that she joined no later than March 2012, *see* D.Ct.Dkt.451.at.4. Pramaggiore's eagerness in June 2012 to investigate *all* ComEd lobbyists—a group that would have included two of the four subcontractors relevant to the supposed conspiracy here, *see* U.S.Br.5—self-evidently has significant bearing on whether she knowingly participated in that conspiracy.

The government also tries to justify the district court's ruling by describing the issue here as a "narrow" one that did not warrant "the amount of time it would have consumed." U.S.Br.55, 57. But evidence regarding *mens rea* is hardly trivial, as it "help[s] to 'separate those who understand the wrongful nature of their act from those who do not.'" *Rehaif v. United States*, 588 U.S. 225, 231 (2019). Furthermore, the government makes no effort to square its theory with the uncontested fact that "Pramaggiore's state of mind was the key issue in dispute at trial." D.Ct.Dkt.357.at.77; *see also United States v. Leonard-Allen*, 739 F.3d 948, 955 (7th Cir. 2013) (excluding testimony that was "central" to a defense and would have made it "more believable" was not harmless). And introducing evidence of Pramaggiore's

27

request for an investigation (not the "results" or "consequences" of it, *contra* U.S.Br.55) would not have meaningfully lengthened the seven-week trial.

The government's other arguments are equally unavailing. The government protests that Pramaggiore "put[] the reins" of the investigation in the hands of Marquez—an alleged "coconspirator" (and definite cooperating government witness)—which supposedly would have "shade[d] its findings." U.S.Br.56. But the government ignores that Pramaggiore also sought to involve Exelon's "ethics" department and General Counsel, none of whom is alleged to have participated in the conspiracy—further indicating that Pramaggiore did not actually know of any illegal activity (if any existed at all). DX1135. The government also speculates that "any internal investigation" into company "records" "would not have revealed the subcontractors being paid to influence Madigan." U.S.Br.56. But that is just another attempt by the government to revive its discredited bribery theory and does not undermine the conclusion that the exclusion of highly probative *mens rea* evidence warrants a new trial.

## B.    The District Court Improperly Imposed a Prison Sentence in Violation of the FCPA's No Knowledge Clause.

Finally, the government's defense of the district court's sentencing decision misses the mark too. The FCPA's penalties provision prohibits a term of imprisonment if the defendant proves that she had "no knowledge" of the "rule" that she allegedly violated, 15 U.S.C. §78ff(a), and the preponderance of the evidence

28

demonstrates that Pramaggiore had no knowledge of the books-and-records rule codified in 15 U.S.C. §78m(b)(5).  Op.Br.61-62.

In response, the government first contends that the FCPA's No Knowledge Clause is "inapplicable" because this case involves alleged "statutory violations," not violations of any "rule" promulgated by the SEC.  U.S.Br.59-60.  But language in a statute setting forth a directive is often referred to as a "statutory rule."  *Ingram v. Watson*, 67 F.4th 866, 870 (7th Cir. 2023).  Indeed, the government itself cites cases in which the No Knowledge Clause is referred to as a "rule," even though the Clause is included within a statute.  U.S.Br.60 (citing *United States v. Behrens*, 713 F.3d 926, 931-32 (8th Cir. 2013)).  Because this case involves alleged violations of the statutory rule in 15 U.S.C. §78m(b)(5), the No Knowledge Clause applies.[6]

The government also argues that Pramaggiore cannot secure relief under the No Knowledge Clause because she at least supposedly knew "the substance" of §78m(b)(5) from Exelon's Code of Conduct, even if she did not know of §78m(b)(5) itself.  U.S.Br.60-61.  Setting aside that the Code neither mentions §78m(b)(5) nor contemplates individual liability, the No Knowledge Clause does not ask whether or not a defendant knew the "substance" of a rule; it asks whether the defendant knew

---

[6] The government suggests that, when Congress wanted to address statutory rules, it used the word "provision."  U.S.Br.59.  But Congress contemplated that a "rule" can contain "provisions," 15 U.S.C. §78m(m)(1)(E), and the government does not explain why provisions cannot contain rules.

29

of the actual "rule" itself.　Because the government does not dispute that Pramaggiore lacked knowledge of §78m(b)(5) itself, she is entitled to a different sentence without a prison term—consistent with the Probation Office's original recommendation that she should not serve time in prison.　*See* D.Ct.Dkt.443.at.1.

## CONCLUSION

The Court should reverse and order a judgment of acquittal, a new trial, or resentencing.

Respectfully submitted,

SCOTT R. LASSAR
DANIEL C. CRAIG
JENNIFER M. WHEELER
EMILY R. WOODRING
JOAN E. JACOBSON
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603

s/Paul D. Clement
PAUL D. CLEMENT
　*Counsel of Record*
DANIELLE SASSOON
ANDREW C. LAWRENCE
KEVIN WYNOSKY
JULIA GRANT*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Supervised by principals of the firm who are members of the Virginia bar

*Counsel for Defendant-Appellant Anne Pramaggiore*

January 20, 2026

**CERTIFICATE OF COMPLIANCE**
**WITH TYPE-VOLUME LIMITATION**

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(c) because, according to the "word count" function of Microsoft Word 2016, the Brief contains 6,995 words, excluding the parts of the brief exempted from the word count by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

January 20, 2026

s/Paul D. Clement
Paul D. Clement

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 20, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Paul D. Clement
Paul D. Clement